Glenn R. Kantor – CA State Bar No. 122643
  Email: gkantor@kantorlaw.net
Sally M. Mermelstein – MN State Bar No. 0329411
  Email: smermelstein@kantorlaw.net
  *(Pro Hac Vice pending)*
Rhonda Harris Buckner – CA State Bar No. 165830
  Email: rharris@kantorlaw.net
KANTOR & KANTOR, LLP
19839 Nordhoff Street
Northridge, CA 91324
Telephone: (818) 886-2525
Facsimile:  (818) 350-6272

Attorneys for Plaintiff,
DAVID RADMILOVICH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| DAVID RADMILOVICH, <br><br> Plaintiff, <br><br> vs. <br><br> UNUM LIFE INSURANCE COMPANY OF AMERICA , <br><br> Defendant. | Case No. 8:22-cv-00181-DOC-KES <br><br> **PLAINTIFF'S OPENING TRIAL BRIEF IN SUPPORT OF FRCP 52 MOTION FOR JUDGMENT** <br><br> *(Filed contemporaneously with Notice of Motion)* <br><br> Court Trial:  January 17, 2023 <br> Time:  8:30 a.m. <br> Courtroom:  10A |

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1

# TABLE OF CONTENTS

2

I.    Introduction ...................................................................................... 1

II.   Statement of Relevant Facts ........................................................... 2

    A.    Applicable Policy Terms ......................................................... 2

    B.    Radmilovich's Background ...................................................... 3

    C.    Radmilovich's Occupation ...................................................... 3

    D.    Radmilovich's Medical Condition and LTD Claim ............... 5

        1.    Radmilovich Suffers Cardiac Arrest/Cardiac Death and Unexpectedly Survives ....................................................... 5

        2.    Radmilovich's Return to Work is Unsuccessful ........................ 6

        3.    Radmilovich's Cardiologist Continues to Investigate ............... 7

        4.    Radmilovich Seeks Psychotherapeutic Care and a Neuropsychological Evaluation ...................................................... 8

        5.    Radmilovich Makes an LTD Claim ............................................. 9

        6.    UNUM finds Radmilovich Disabled through 10/8/19 and Continues to Administer the Claim ............................................. 13

        7.    UNUM Maintains its Decision to Terminate Benefits ............. 16

        8.    Radmilovich Appeals UNUM's Termination of Benefits ........ 17

        9.    UNUM Reviews the Appeal from a Psychological Standpoint ................................................................................. 22

        10.   UNUM Obtains a Vocational Review on Appeal ................... 23

        11.   Radmilovich Responds, Submitting Dr Light's Letter ............. 24

        12.   UNUM Reviews the Appeal From A Cardiac Standpoint ....... 25

        13.   Radmilovich Responds, Submitting Dr. Kaushal's Letter ....... 26

        14.   UNUM Denies Radmilovich's Appeal on 1/21/22 ................. 27

III.  Argument ...................................................................................... 27

    A.    The Standard of Review is *De Novo* .................................. 27

    B.    Radmilovich was Cognitively Disabled from Performing His Occupation .......................................................................... 28

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

i

C.    Radmilovich is Disabled by the Risks His Cardiac Condition Poses ........................................................................... 33

IV.    Conclusion .............................................................................. 35

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

PLAINTIFF'S OPENING TRIAL BRIEF

1

## <u>TABLE OF AUTHORITIES</u>

2

### <u>FEDERAL CASES</u>

3
4

*Abatie v. Alta Health & Life Ins. Co.*,
   458 F.3d 955 (9th Cir. 2006) ................................................................28

5
6

*Abram v. Cargill, Inc.*,
   395 F.3d 882 (8th Cir. 2005) ...............................................................29

7
8

*Bledsoe v. Metro. Life Ins.*,
   90 F. Supp. 3d 901 (C.D. Cal. 2015) ...................................................31

9
10

*Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia
   Assocs. Long Term Disability Plan*,
   705 F.3d 58 (1st Cir. 2013) ..................................................................33

11
12

*Demer v. IBM Corp. LTD Plan*,
   835 F.3d 893 (9th Cir. 2016) ...............................................................30

13
14

*Dine v. Metro. Life Ins. Co.*,
   449 F. App'x 646 (9th Cir. 2011) .........................................................12

15
16

*Doe v. Standard Ins. Co.*,
   852 F.3d 118 (1st Cir. 2017) ..................................................................4

17
18

*Green v. Sun Life Assur. Co. of Canada*,
   259 F. App'x 42 (9th Cir. 2007) ...........................................................29

19

*Hawkins v. First Union Corp. Long Term Disability Plan*,
   326 F.3d 914 (7th Cir. 2003) ...............................................................31

20
21

*Holmstrom v. Metropolitan Life Ins. Co.*,
   615 F.3d 758 (7th Cir. 2010) ...............................................................28

22
23

*Hoover v. Provident Life & Acc. Ins. Co.*,
   290 F.3d 801 (6th Cir. 2002) .........................................................28, 31

24
25

*Kay v. Hartford Life & Accident Ins. Co.*,
   No. 21-55463, 2022 WL 4363444 (9th Cir. Sept. 21, 2022) ..........32, 33

26
27

*Lasser v. Reliance Standard Life Ins. Co.*,
   344 F.3d 381 (3d Cir. 2003) .................................................................33

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

iii

*Metro. Life Ins. Co. v. Glenn*,
   554 U.S. 105 (2008).................................................................32

*Montour v. Hartford Life & Acc. Ins. Co.*,
   588 F.3d 623 (9th Cir. 2009) ....................................................28, 31

*Quintero v. Westbrooks*,
   No. 3:09-CV-00106, 2017 WL 1196520 (M.D. Tenn. Mar. 31, 2017)................21

*Rios v. Unum Life Ins. Co.*,
   No. SACV1904100DOCSKX, 2020 WL 7311343
   (C.D. Cal. Dec. 10, 2020) ........................................................26

*Saffon v. Wells Fargo & Co. Long Term Disability Plan*,
   522 F.3d 863 (9th Cir. 2008) .....................................................14

*Saliamonas v. CNA, Inc.*,
   127 F. Supp. 2d 997 (N.D. Ill. 2001)..............................................33

*Salomaa v. Honda Long Term Disability Plan*,
   642 F.3d 666 (9th Cir. 2011) ..............................................16, 27, 28

*Silver v. Executive Car Leasing Long-Term Disability Plan*,
   466 F.3d 727 (9th Cir. 2006) ............................................28, 33, 34

*Whealen v. Hartford Life & Acc. Ins. Co.*,
   No. CV06-4948PSG (PLAX), 2007 WL 1891175
   (C.D. Cal. June 28, 2007) ........................................................12

*Wolf v. Life Ins. Co. of N. Am.*,
   46 F.4th 979 (9th Cir. 2022) .....................................................12

*Woo v. Deluxe Corp.*,
   144 F.3d 1157 (8th Cir. 1998) ...................................................34

## **FEDERAL REGULATIONS**

29 C.F.R. § 2560.503-1(b)(7) .........................................................12

29 C.F.R. § 2560.503-1(g)(1)(3) ......................................................16

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

iv

**I.   Introduction**

This is an action to recover long term disability benefits ("LTD") and a life insurance premium waiver ("LWOP") under ERISA. David Radmilovich worked at Prudential Overall Supply ("Prudential") as Sr. Director of Production – an inherently stressful, cognitively demanding job. At 53 he suffered a cardiac arrest that was likely to kill him or render him catastrophically disabled. Instead, after life-saving measures, hospitalization, surgery and extensive rehabilitation, Radmilovich recovered, but not without permanent, life-altering changes. He never regained his previous cognitive abilities, including his ability to communicate fluently, and he experiences recurring chest pain that takes hours or days to resolve. Testing his abilities, he returned to work where he learned the hard way that his unpredictable chest pain episodes, nausea and fatigue, and cognitive loss precluded him from performing his job. His employer would not allow him to return under these circumstances.

UNUM paid Radmilovich's LTD benefits for a brief period based his cardiac condition alone, but because the etiology of his chest pain was not known, and he was able to exercise, it refused to pay further benefits. When the etiology of Radmilovich's chest pain was settled, and both his long-time cardiologist and an independent cardiologist concluded that he could not work because the stress of his job placed him at risk of harm or death, UNUM, an ERISA fiduciary, turned a blind eye to the etiology and the contribution of stress, relying on doctors who never examined him.

Meanwhile, Radmilovich supplied not one, but two neuropsychological exams. One called his Neurocognitive Disorder "Mild," while the other described it as "Major," but each showed he could no longer cognitively handle his job. Again, without conducting its own exams, UNUM rejected these conclusions. This was so despite that UNUM's own consulting neuropsychologist agreed Radmilovich had suffered Mild Neurocognitive Disorder. Attempting to distance itself from its own consultant, UNUM mischaracterized the opinion to its in-house psychiatrist, who obliged and adopted the mischaracterization. When Radmilovich's neuropsychologist responded, pointing out

1

UNUM's illogic, UNUM denied Radmilovich's appeal, deeming the response "no new clinical information for us to consider." This lawsuit followed.

## II.   Statement of Relevant Facts

### A.   Applicable Policy Terms

The UNUM LTD policy insuring Radmilovich defines disability as follows:

TOTAL DISABILITY means, for the first 30 months, that as a result of sickness or injury you are unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way.
After benefits have been paid for 24 months of disability, total disability means that as a result of sickness or injury you are not able to engage with reasonable continuity in any occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity.

USUAL OCCUPATION means the substantial and material acts you are routinely performing for your Employer when your disability begins.(136)

The first 6 months of this 30-month period is the Elimination Period, during which no benefits are paid. (124).

The policy gives UNUM the right to conduct a physical exam and a claimant's refusal to undergo an exam can form the basis for a termination of his benefits. (127, 143). UNUM never invoked its right to examine Radmilovich regarding any of his conditions.

The policy pays benefits for disabilities due to physical illness or mental illness, though it limits benefits to 24 months when a disability is "due **solely** to mental disorders." (143)(emphasis added).

Radmilovich's UNUM life insurance policy has its own definition of disability. If the claimant satisfies it, he is entitled to ongoing, free life insurance coverage till age 70. (7274). Disability means "unable to perform the duties of any gainful occupation" that could earn him 60% of his previous earnings. (7273-7274).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

### B. Radmilovich's Background

Before his career in the private sector, Radmilovich served in the U.S. Marine Corps as a Marine Officer and Naval Aviator, flying helicopters. (1074). During active duty, between 1986 and 1994, he fought in the Gulf War and took part in disaster relief missions abroad. *Id.* He then served as a reservist until 1997, becoming a Major and a coordinator of tactical air operations. *Id.* He left the military following the birth of his first child. (588). Afterward, Radmilovich held management-level jobs in Process and Systems Engineering, and Industrial Engineering, before landing his job at Prudential. *Id.* Before his cardiac arrest, Mr. Radmilovich was an avid cyclist, runner, swimmer, backpacker and hiker. (1074-1075).

### C. Radmilovich's Occupation

Prudential, a 190-million dollar uniform and textile rental company, operates 23 plants. (1075). Radmilovich was responsible for the operational aspects of all 23. *Id.* Radmilovich's occupational requirements as Sr. Director of Production, are established by several sources. Prudential supplied a "not all inclusive" job description. (99-103). Its overview explains, *"[t]his management employee coordinates Production in all Industrial laundries and cleanroom facilities. Employee also develops new ideas and equipment for more efficient production and cost containment."* (99). Radmilovich's position required travel, crawling, climbing, pushing and pulling (including jerking), working in industrial plants, reaching and operating forklifts or other machinery, and lifting 50 pounds. (99, 101-102, 380). As for the mental demands, the employer's job description lists: reasoning, math, reading, writing, speaking, directing/controlling (formulating plans, designs, practices, policies, methods, regulations and procedures for operations or projects; negotiating contracts, supervising subordinate workers), comparing data, and teaching/training others. (102-103).

According to Radmilovich, the job included: "verbally corresponding, negotiating, frequent traveling (both locally and out of state), speaking publicly, managing databases, creating system based reports, implementing systems and

3

enhancements, capital project management/implementation, managing budgets, performing operational and financial analysis, addressing complex productivity and quality issues, addressing safety concerns (both in the production plant and in the fleet operations), planning and executing small and large scale meetings, and managing/influencing people at all levels of the organization." (1075).

Another source is the expert vocational report of Charles Galarraga, which was submitted with Radmilovich's ERISA appeal to UNUM. Galarraga determined that the most analogous occupation from the Enhanced Dictionary of Occupational Titles ("eDOT") was Production Superintendent, with an extensive list of cognitive demands, a sampling of which includes: "Complex Problem Solving;" "Critical Thinking;" "Idea Evaluation;" "Idea Generation;" "Identifying Downstream Consequences;" "Implementation Planning;" "Judgement and Decision Making;" "Programming;" "Science;" "Speaking;" "Negotiation;" "Visioning;" and "Writing."[1] (807). This occupation includes responsibility for both safety of the products and the people in the plants. (23, 461, 474, 832, 836, 834, 835, 836, 839, 840, 841). Stress is an unavoidable component of this occupation. (830, 831, 832, 833, 835, 837, 838, 839, 840, 841).

Early on, a UNUM vocational consultant attempted to define Radmilovich's occupation, but another UNUM vocational consultant, Kelly Marsiano, later agreed with Galarraga's description. (459-461, 1464, 1364).

Despite the detailed information about Radmilovich's occupation, UNUM reudeced its Cognitive/Mental demands to: "Directing, controlling, or planning activities of others; Making judgments and decisions; Dealing with people; Performing a variety of duties; Memory for detailed instructions; Concentration and attention; Ability to make work related decision; Ability to adapt to change; Independent planning; Hazard awareness." (7264). An additional category – "influencing people in their opinions" - was supplied to one medical reviewer. (7267, 1532).

---

[1] The DOT is a compilation of job descriptions and requirements, formerly published by the U.S. Department of Labor. *Doe v. Standard Ins. Co.,* 852 F.3d 118, 121 (1st Cir. 2017).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

4

### D.   Radmilovich's Medical Condition and LTD Claim

#### 1.   _Radmilovich Suffers Cardiac Arrest/Cardiac Death and Unexpectedly Survives_

Radmilovich has no memory of the events surrounding his cardiac arrest.[2] (845). Accordingly, the following facts are assembled from medical records.

On 8/28/16, at age 53, Radmilovich experienced cardiac arrest and collapsed while cycling with his 13 year-old daughter. (1075, 1617-1618). His daughter heard him crash behind her and then saw that he was lying in the street. (1258). An off-duty Pasadena police officer driving by saw a crowd gathered around Radmilovich and started CPR. (846, 888, 1258, 1625). When paramedics arrived, Radmilovich had no discernable pulse, no blood pressure, and he was not breathing. (1617-1618). His "refractory" cardiac arrest was followed by a brief recovery, which was described collectively as "sudden cardiac death with ROSC."[3] (1257, 1259). Because of his brief recovery, he was transported to the hospital, but his heart stopped again on the way. (1250). Paramedics were still performing lifesaving CPR when Radmilovich arrived at the emergency department. (1617-1618, 1625). Emergency department notes say, "_[h]e has been extremely unstable since that time however and has never regained consciousness. His clinical condition has progressively declined after initial stabilization. His prognosis is very poor._" (1257).

That day, Radmilovich was attended to by interventional cardiologist, Dr. Kaushal, who remains his physician. (802). Urgent catheterization at the hospital revealed multilevel coronary artery disease. (1584). But surgery was an option only "_if patient makes meaningful neurologic recovery._" (802). Only 10.8% of adults who suffer out-of-hospital sudden cardiac arrest survive to discharge. (261). Only 9% survive with "good," much less intact, neurological function. _Id._ The medical records include multiple

---

[2] Cardiac arrest is not a heart attack, despite that they are often used interchangeably. In cardiac arrest the heart stops and does not pump blood to the body, including the brain and lungs. https://www.cdc.gov/heartdisease/cpr.htm.

[3] ("Return of spontaneous circulation")(1257).

PLAINTIFF'S OPENING TRIAL BRIEF

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

references to Radmilovich's hypoxic encephalopathy.[4] *See e.g.,* 803, 804, 1583, 6754, 6867, 7244. It is estimated that Radmilovich was without any cardiac activity for up to 20 minutes, and at 20 minutes, he was he remained unstable. (861). He was placed in the ICU for several days, suffered aspiration pneumonia, and was only extubated 6 days after his initial cardiac arrest. (1260-1261, 1284).

Happily, Radmilovich's recovery was meaningful enough to undergo quintuple coronary artery bypass surgery on 9/7/16. (1651). His active problem list on 9/8/16 included "*nontraumatic brain injury, likely anoxic with delayed processing, decreased recall, decreased comm[unication]."* (1284). He received in-patient rehabilitation therapy from 9/12/16 to 9/21/16. (1570-1614). The therapies included physical therapy, occupational therapy, speech therapy, post-surgery care and cognitive care due to his hypoxic encephalopathy. (1076, 1651). He had to re-learn to walk, move his limbs, and feed himself again. (1076). Thereafter, Radmilovich received in-home care and cardio rehabilitation through December 2016. (1075-1076). His final principal diagnosis after these therapies was "*anoxic brain damage, not elsewhere classified."* (1576). Radmilovich suffered "retrograde amnesia" and has no memory of his life during the 3 weeks before his cardiac arrest. (845, 1076).

### 2. *Radmilovich's Return to Work is Unsuccessful*

Despite his symptoms of palpitations, chest pain, lightheadedness, dizziness since his surgery (412, 408, 406, 405), on 1/16/17 Radmilovich returned to work. (1077, 848). In February 2017 Radmilovich underwent a stress echocardiogram that showed "evidence of severe anterior septal and apical ischemia and possible inferior ischemia versus non-transmural infarct of the inferior wall" and an angiogram that confirmed his severe coronary artery disease. (888). However, these studies did not necessarily supply an explanation for Radmilovich's symptoms. (395). Radmilovich continued seeking a solution and saw Dr. Kaushal on numerous occasions complaining of chest pain,

---

[4] https://www.webmd.com/brain/what-is-encephalopathy (defining encephalopathy as damage or disease affecting the brain and noting that Encephalopathy resulting from cardiac arrest is seen as irreversible.)

PLAINTIFF'S OPENING TRIAL BRIEF

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

pressure, palpitations, bradycardia, and shortness of breath. (317, 388, 392, 396). Radmilovich's symptoms escalated to severe chest pain, occurring without warning and rendering him debilitated for up to several days, as well as severe fatigue and nausea. (220, 848). He would be bedridden and miss work. (585). Radmilovich was unable to manage his frequent business trips due to stress, which in turn increased his chest pain symptoms. (220). When traveling, he waited at the wrong airport gate, and stopped on route to wait out dizziness and nausea or chest pain. (1077). Mental tasks that had taken hours to days now took days to weeks, and documents he created contained errors despite multiple revisions. *Id.* Radmilovich struggled to maintain his focus or hold a train of thought. *Id.* He suffered memory lapses, inability to track complex and sequential information and instruction, inability to multi-task and slowed processing speed. (1077-1078). At first, he was able to fall back on work product created before his cardiac arrest, but when called upon to develop novel projects, he found it impossible. (848, 1077).

On 9/7/18 Radmilovich experienced chest pain severe enough to send him to the emergency department. (220). On 9/15/2018, Radmilovich's employer informed him that he could not return to work until his doctor cleared him to return "without restrictions." (1569).

### 3. *Radmilovich's Cardiologist Continues to Investigate*

In his 9/18/18 follow-up with Dr. Kaushal, Radmilovich was tearful. (220). He described the episodes of pain that occurred every 1-5 days. Dr. Kaushal considered various possible causes of Radmilovich's chest pain, including chronic pericarditis, structural abnormalities in the chest, "part psychosomatic" or PTSD resulting from traumatic history of cardiac arrest exacerbated by depression/anxiety, and neuropathy resulting from the surgery. (220, 223). Radmilovich explained that the "constant pain" caused "mental fatigue," and he reported a decline in cognitive and memory function. (220). Dr. Kaushal noted, "his work is very stressful" and that Radmilovich had "had to cancel recent business trips to avoid stress which are associated with an increase in chest pain symptoms." (220). Dr. Kaushal recommended further cardiac workup to help

determine the cause of Radmilovich's chronic chest pain and a psychology referral to rule out and/or address any behavioral health cause. (223, 228, 229). Dr. Kaushal told Radmilovich to stop working in his high-stress occupation. (1079).

On 9/20/18 Radmilovich returned to Dr. Kaushal, and Dr. Kaushal again noted the list of potential causes. (228-229) A chest CT was within normal limits. (233-234)

On 10/10/18 Radmilovich complained of fatigue, described as "crashing," and chest pain occurring every 1-5 days. (216). "*Chronic left chest pain and middle chest pain were* described *as 'tearing' muscles aches which improves during exertion.*" *Id.* Dr. Kaushal noted, "*Patient is slowly acknowledging his change in baseline status and physical limitations.*" *Id.* Dr. Kaushal did not think the chest pain was "anginal," but drew no conclusions as to the cause. (219). A 11/21/18 visit was similar to the earlier visits except that Radmilovich's symptoms had improved in that his chest pain had taken 4-6 hours to resolve instead of 12-24 hours. (211). On 2/20/19 visit things were no different. (206).

> 4. *Radmilovich Seeks Psychotherapeutic Care and a Neuropsychological Evaluation*

Meanwhile, Radmilovich began psychotherapy with Vivian Credidio, Ph.D. on 9/21/2018. (507). Dr. Credidio referred Radmilovich to Dr. Keats for neuropsychological testing to assess his strengths and weaknesses and to "empower him and to give him hope." (509). Radmilovich hoped Dr. Keats' testing would help him make decisions about returning to work. (595).

In her 1/31/19 neuropsychological report (585-606), Dr. Keats made two diagnoses: "Mild Neurocognitive Disorder Due to Multiple Etiologies, Without Behavioral Disturbance" and "Somatic Symptom Disorder, With Predominant Pain, Persistent, Mild Neurocognitive Disorder Due to Another Medical Condition." (598). Dr. Keats compared Radmilovich's estimated pre-morbid functioning to the test results and found: "*Mr. Radmilovich demonstrates weaknesses in contextual verbal memory (borderline impairment), verbal fluency (low average, and non-dominant hand fine*

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

8

*motor speed and dexterity. In comparison to his premorbid functioning, these figures represent a decline over time. His self-report and the pattern of results suggest weakness in verbal recall and fluency were not apparent prior to his insult, suggesting cognitive changes are etiologically linked to his medical condition. His medical history suggests difficulties are likely due to some combination of his cardiac arrest in addition to chronic hyperlipidemia, the latter of which is a risk factor for cognitive decline."* (599). Explaining her diagnosis of Somatic Symptom Disorder, Dr. Keats wrote,"*[w]hile testing supports a medical basis for Mr. Radmilovich's pain, there may be psychological barriers which serve to exacerbate the pain experience and/or functionality.*" (599). In addition to a series of strategies for accommodating his attention, distractibility, time-management, memory, problem-solving deficits, pain management and fine motor abilities, Dr. Keats recommended a *"more flexible, less physically and cognitively arduous occupation in which he can implement pacing and stress reduction."* (598-599).

On 8/6/19, Dr. Kaushal's office visit notes reflect Radmilovich's complaints of frequent chest pain, persistent cognitive issues, slurred speech, memory issues and difficulty multi-tasking. (201). Dr. Kaushal described Radmilovich's pain as "chronic chest pain syndrome, unlikely anginal in etiology" and acknowledged, "*has undergone neuropsychiatric and psychologic evaluation, deemed origin of chest pain is not psychosomatic."* (205). Dr. Kaushal recommended a new stress test for further cardiac evaluation. (205). Only then did Radmilovich accept he would have to file for LTD benefits with UNUM. (1079).

### 5.   *Radmilovich Makes an LTD Claim*

Radmilovich's LTD claim was received at UNUM on 9/12/19. (54). Dr. Kaushal's accompanying 9/4/19 Attending Physician Statement noted that Radmilovich suffered from Coronary Artery Disease with unstable angina and Chronic Angina. (107). He indicated Radmilovich was restricted from lifting over 10 pounds, walking more than 50 feet and from "*cognitive tasks including analytics, administration, communication, project management*" because "*Chest pain exacerbated by physical & mental demands*

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

9

*of his job requirements*." (108). He noted that Radmilovich was under Dr. Credidio's care. (109).

In October 2019, UNUM contacted Dr. Credidio, looking for her treatment notes and asking questions.[5] (294-296). Dr. Credidio traced all of Radmilovich's psychological symptoms to his cardiac arrest. She explained that her diagnosis of "Adjustment Disorder w/ Mixed emotional features" was secondary to his cardiac diagnoses. (294). The "adjustment" to be made was to Radmilovich's cognitive impairments and the cardiac symptoms he suffered since his cardiac arrest. *Id.* Addressing his return-to-work prospects, Dr. Credidio noted that Radmilovich, as a "proud ex-Marine (pilot)" and a "long time high level professional," would prefer to return to work, but his return to work was "unsuccessful given his inability to sustain the necessary levels of cognitive and physical performance." (296).

On 11/11/19, UNUM wrote to Radmilovich's attorney insisting that it needed the neuropsychological report mentioned in the records.[6] (372). Harris-Buckner asked that UNUM submit questions to Dr. Keats, instead. (377-378). UNUM refused. (496).

On 11/20/19, a UNUM nurse conducted a review, claiming she was "unable to comment" on Radmilovich's date of disability, functional capacity, duration and disabling diagnoses. (478). Radmilovich's harrowing cardiac arrest, hospitalization, surgery, subsequent rehabilitation, and failed return to work was reduced to "*a cardiac arrest during 2016, emergent measures were provided, and the EE recovered, EE also with condition of adjustment disorder with mixed emotional features and cognitive issues that began approximately sep2018 to Oct2018*" (476). Discounting Radmilovich's 4-6 hours chest pain episodes, she focused on a lack of positive test results and Radmilovich's unwillingness to provide Dr. Credidio's records or Dr. Keats' neuropsychological report. *Id.*

---

[5] Attorney, Rhonda Harris-Buckner, entered an appearance to assist Radmilovich with UNUM's requests. (291).

[6] For privacy reasons Radmilovich was initially hesitant to turn Dr. Keats' report over to UNUM, which he later overcame. (370, 378).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

PLAINTIFF'S OPENING TRIAL BRIEF

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

In December 2019, a UNUM psychiatrist, Dr. Morris, posed additional questions to Dr. Credidio, asking her to retract her opinion that Radmilovich's non-physical symptoms were caused by his physical conditions. (504-512). She would not do so and pointed out that she relied on medical records concerning Radmilovich's history of encephalopathy. (505, 511, 512). Dr. Morris shared his opinion that Radmilovich was not psychiatrically impaired from performing the mental/cognitive demands of his job and was instead choosing not to work. (505). Dr. Credidio reiterated that the opposite was true. (507). She noted that she would not release Radmilovich to return to work if asked "*because I believe that I would be setting him up to fail.*" (510). Devoting multiple pages to her disagreement with Dr. Morris, Dr. Credidio noted Radmilovich's diagnoses included Hypoxic Encephalopathy after being "*without oxygen for 10-15 minutes,*" which "*likely led to some degree of brain injury that he experiences as memory lapses and inability to track complex and sequential information and instruction.*" (508). She noted his processing speed "is slower" and that "at times he slurs and drools." *Id*. She stated that the "level of cognitive acuity and performance required for his occupation is very high" and he could no longer "count on consistent and sustained cognitive performance" and "can no longer work at his occupation." (508).

Apparently ignorant of the applicable "usual occupation" definition of disability, Dr. Morris *asked* Dr. Credidio, "*how do these conditions impact ability to work at this time, given his reported capacity for* addressing *his needs at home?*" (506). Despite the irrelevance of the question, Dr. Credidio pointed to areas where Radmilovich's memory lapses affected him at home, such as forgetting things on the stove and burning pots. (509). Dr. Morris summarily rejected Dr. Credidio's elaborate responses with the mystifying comment: "*AP continues to maintain physically-based restrictions and limitations, without clearly identifying BH restrictions and limitations*." (527).

UNUM then engaged psychiatrist Dr. Mark Schroeder, who issued a 12/17/19 report opining, "I do not find that the limited documentation on file is consistent with

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

behavioral health-based restrictions and limitations any time during this claim." [7] (542). Dr. Schroeder recited UNUM's uninformative, condensed set of "Mental/Cognitive occupational demands" but did not apply them. (543). Like Dr. Morris, Dr. Schroeder suggested that a claimant who could clean, cook, shop, and exercise would not have a "mental disorder" that prevented him performing his work duties. (543). Dr. Schroeder discounted Radmilovich's cognitive complaints because of a lack of "detailed behavior observation or cognitive testing," without addressing any of Dr. Credidio's comments or explaining how Dr. Credidio's comments based on weekly, in-person treatment of Radmilovich would not reflect her detailed behavior observations. (543). Dr. Schroeder opined that if Radmilovich were truly impaired due to depression or anxiety, his treatment would be more frequent or intense.[8] *Id.* Notably, Dr. Schroeder opined that Radmilovich's claim was "*not a claim of psychiatric impairment, but is rather a claim of physical (cardiac) impairment reportedly worsened by psychological stress from work.*" (543). UNUM ignored Dr. Schroeder's re-direction. *Dine v. Metro. Life Ins. Co.,* 449 F. App'x 646, 647 (9th Cir. 2011)(MetLife abused its discretion when it "ignored its own reviewing physicians advice to order an independent medical examination."); *Whealen v. Hartford Life & Acc. Ins. Co.,* No. CV06-4948PSG (PLAX), 2007 WL 1891175, at \*14 (C.D. Cal. June 28, 2007), *aff'd,* 332 F. App'x 443 (9th Cir. 2009)(insurer's choice to ignore its own experts findings "weakens the credibility of [its] decision-making process.").

On 12/12/19 a UNUM internist, Dr. Nosaka, opined:

A recent cardiac stress test reached a metabolic equivalent of 12 which indicates the ability to race a bicycle at 16-19 miles per hour and exceeds the physical demands of his occupation.

Physical exams are unremarkable and note no cognitive deficits. He is able to exercise extensively at a level that likely exceeds the metabolic equivalent of his occupation.

---

[7] UNUM's use of Dr. Schroeder likely was a violation of the ERISA regulations. (1067-1073, 1021, 1022); 29 C.F.R. §2560.503-1(b)(7).

[8] UNUM has never claimed Radmilovich failed to receive "regular care" under the policy. (128). It cannot do so now. *Wolf v. Life Ins. Co. of N. Am.,* 46 F.4th 979, 985-987 (9th Cir. 2022).

PLAINTIFF'S OPENING TRIAL BRIEF

Treatment plan is office visits and medication adjustment which can be typically provided while performing the duties of his occupation.
Thus, given the unremarkable diagnostic and physical exam findings, the insured's level of activity and the conservative treatment plan, OSP opines that the insured is not precluded from performing the full-time duties of his occupation. (520).

Contradicting himself, Dr. Nosaka's "*Whole person analysis*" "*considered all the insured's medical conditions individually and collectively in formulating my opinion*," while simultaneously "*defer[ring] any mental health issue to Behavioral Health OSP.*" *Id*. On 12/12/19 Dr. Nosaka phoned Dr. Kaushal and the next day he wrote to him, attempting to memorialize their conversation and inviting Dr. Kaushal's comment. (573-576).

Continuing its fixation on the etiology of Radmilovich's chest pain - rather than its impact on his ability to perform his occupational duties - UNUM next turned to its cardiologist, Dr. DiDonna, asking whether he agreed with Dr. Nosaka. Dr. DiDonna acknowledged Radmilovich's complaints of chest pain but agreed that "*the medical evidence does not support that the insured was/is precluded due to a physical condition from 10/9/19 forward (the date when* rosuvastatin *was decreased from 40 mg to 20 mg) from performing the sustained full-time activities*" of his occupation. (535-536). Dr. DiDonna found no "direct evidence" of the possible etiologies, pointing to normal test results. (535). Like Dr. Nosaka, Dr. DiDonna equated Radmilovich's ability to exercise with his ability to perform his occupation:"*[t]he insured has demonstrated above average exercise capacity for age and is reasonably capable of performing the occupational demands detailed in the medical referral.*" (535).

6.   <u>UNUM finds Radmilovich Disabled through 10/8/19 and Continues to Administer the Claim</u>

On 12/23/19, without receiving Dr. Kaushal's response to Dr. Nosaka's letter, UNUM informed Radmilovich via a letter that he had been disabled as of 9/25/18 and would receive benefits for the closed period 3/24/19-10/8/19. (560-561). This seemingly random termination date was tied to the date on which Dr. Kaushal reduced

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

13

Radmilovich's dose of Rosuvastatin. (563).[9] This has never been explained. UNUM also asserted that Radmilovich's "*cardiac work-up for chest pain was negative*" and the "*etiology of his pain was unclear.*" (560-568). Though it quoted the policy language, UNUM ignored Radmilovich's chest pain that had interrupted his ability to work with "reasonable continuity," regardless of its cause. (565). UNUM's letter relied on the unanswered letter from Dr. Nosaka to Dr. Kaushal, as if Dr. Kaushal had stipulated to Dr. Nosaka's conclusions. *Saffon v. Wells Fargo & Co. Long Term Disability Plan,* 522 F.3d 863, 873 (9th Cir. 2008) ("[a] doctor is not a lawyer; though he may provide information that is relevant to a claimant's disability, his actions (or inaction) cannot bind the client").

A week later, Dr. Kaushal responded to Dr. Nosaka's letter. Dr. Kaushal had crossed out Dr. Nosaka's statement "*cardiac work-up for chest pain has been negative,*" replacing it with the statement, "*upon further review, the etiology of EE's chest pain may be coronary spasm or microvascular disease. Pain is debilitating and similar to his prior MI. Work stress has been found to be a trigger of pain.*" (575). On 1/14/20, Dr. Nosaka noted Dr. Kaushal's response to his letter and did not change his opinion. (614). This was without discussion or rationale and without addressing Dr. Kaushal's proposed diagnoses.

On 2/5/20, Dr. DiDonna agreed with Dr. Nosaka, explaining that Dr. Kaushal was relying on patient's "self-report," not new studies. (675). Dr. DiDonna also speculated, "[*i]f the insured were found to have either diagnosis its management can be difficult, but pharmacological and non-pharmacological treatments exist that allow satisfactory control of symptoms in most patients,*" leaping to the conclusion that there would be an easy fix for a diagnosis that had yet to be made and that Radmilovich was "most patients." (675).

---

[9] Rasuvastatin is commonly known as "Crestor." https://www.goodrx.com/rosuvastatin/what-is (visited 11/17/22).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

Subsequently, UNUM received and reviewed Dr. Keats' neuropsychological testing from January 2019 along with supplemental information from Dr. Keats. (20-21). In a 1/8/20 letter Dr. Keats added more information about her 2019 testing. (607-613). She reiterated that the etiology of Radmilovich's cognitive and functional impairments appeared to be his cardiac arrest. (611). She reinforced that "*there were no formal or informal indications of insufficient effort or feigning of symptoms*" (608), his test results were valid (608), and that "*[h]is overall profile was not consistent with holding vague, somatic complaints or perceptions of the self as disabled."* (611). She wrote, "*Mr. Radmilovich's cognitive profile suggests he has experienced a decline in cognitive functioning. He describes a concomitant functional decline at his place of work, which is consistent with the results from testing demonstrating cognitive changes*." (611). Dr. Keats acknowledged, as she had before, that pain and fatigue affected Radmilovich's ability to work and that the unpredictability of these symptoms pose "a challenge for a fixed schedule." (611). Because cognitive recovery tends to plateau after two years post-illness, Radmilovich was unlikely to improve.[10] (612). Dr. Keats was being optimistic, since statistically "functional recovery continues over the first six to 12 months after [out-of-hospital cardiac arrest]." (262).

In response, Dr. Morris recused himself from the question of cognitive impairments and issued a content-free opinion that there were no impairing behavioral health conditions. (681).

Dr. Nowell, neuropsychologist and clinical psychologist, issued an impenetrable report that, at best, claims that Dr. Keats' report was lacking in some way. (656). After obtaining the raw data from Dr. Keats' examination, UNUM returned to Dr. Nowell who opined, "only one index fell outside the normal range" and the testing "yielded no clear evidence of cognitive impairment." (664, 690). He did not explain why his interpretation of Dr. Keats' data differed from Dr. Keats' interpretation. When asked if there were any

---

[10] Therefore, by the time of Dr. Keats' testing, Radmilovich's cognitive abilities were permanent, since his cardiac arrest occurred in 2016.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

PLAINTIFF'S OPENING TRIAL BRIEF

psychological factors identified in Dr. Keats' testing, Dr. Nowell's answer was not clear, but he commented that Radmilovich showed an "*introverted style with greater endorsement of somatic concerns (particularly fatigue and neurological complaints) than is typical.*" (664). This did not prompt UNUM to obtain its own "clearer" cognitive testing.

On 2/14/2020, Dr. Schroeder noted, "*Neuropsychologists Dr. Keats and Dr. Nowell have disagreed about the meaning of the neuropsychological testing from 1/31/2019, with* respect *to potential psychological and cognitive impairment,*" which he apparently saw as a reason to vote for Dr. Nowell. (689). Dr. Keats' analysis was dismissed as mere "opinions," and Dr. Schroeder did not confront the bases for those her expert opinions. He repeated statements from his previous report regarding "impairment of daily activities" or participation in "intensive mental health treatment." (690, 543).

### 7. *UNUM Maintains its Decision to Terminate Benefits*

By means of a letter dated 2/14/20, UNUM informed Radmilovich's attorney that it had again determined Radmilovich was not disabled beyond 10/9/19. (698). It was, however, issuing a check for benefits to date under "Reservation of Rights." *Id.*

The letter rejected Dr. Kaushal's opinion regarding the possible causes of Radmilovich's chest pain symptoms. (669). Although a lack of cardiac studies was referenced, and UNUM had consulted with doctors who claimed knowledge of cardiology (699), UNUM did not suggest that Radmilovich undergo any particular tests to submit with his appeal. (699); 29 C.F.R. § 2560.503-1(g)(1)(3)(requiring "A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."); *Salomaa v. Honda Long Term Disability Plan,* 642 F.3d 666, 680 (9th Cir. 2011). Regarding Radmilovich's cognitive deficits, UNUM relied on the "no clear evidence of cognitive impairment" rationale and the existence of a mild somatic symptom disorder. (700). UNUM denied that Radmilovich suffered from any behavioral health impairment,

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

without explaining why "somatic symptom disorder." a disorder included in the DSM, did not qualify as such an impairment. (598, 152).

8.     *Radmilovich Appeals UNUM's Termination of Benefits*

In a letter dated 8/6/2021 (770-790), and in supplemental submissions (1314,1420), Radmilovich appealed the denial of his LTD claim through present counsel, providing UNUM with the following additional information.

- *Dr. Kaushal's Records Confirming the Cause of Radmilovich's Symptoms and Deeming it Disabling* (1315-1336, 1081-1306, 796-804)

Since UNUM's benefits termination, Dr. Kaushal had determined the cause of Radmilovich's chest pain – resolving the issue that had so distracted UNUM throughout the history of the claim. An October 2020 stress echocardiogram provided evidence of severe stress-induced ischemia of the anterior and anteroseptal walls, along with severe hypokinesis of the inferior wall. (1094, 888). The November 2020 coronary angiogram demonstrated severe native multivessel coronary artery disease. (1326, 890). This testing revealed microvascular ischemia, immediately leading Dr. Kaushal to deem Radmilovich unable to return to work indefinitely. (1326).

- *Cardiologist, Dr. Goyal's IME Confirming the Cause of Radmilovich's Chest Pain and Deeming it Disabling* (886-908)

Radmilovich's appeal included a 5/14/21 report by Dr. Parag Goyal, a renowned Cardiologist at New York's Weill Cornell Medicine with extensive credentials. (886, 893). His resume includes a lengthy list of cardiac studies in which he was involved as well as his numerous publications and presentations on cardiology. (894-908). Dr. Goyal's independent review included a Zoom interview of Radmilovich and a complete review of his medical records. (886-892). Dr. Goyal concluded that, considering 1) the events of 2016 and [Radmilovich's] severe coronary artery disease, 2) his prior diagnosis of an ischemic cardiomyopathy which intrinsically makes his myocardium abnormal even in the setting of an improved left ventricular ejection fraction following revascularization, 3) his ongoing disabling chest pain sensations which include elements

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

17

that would be consistent with typical angina, and 4) objective data of ischemia precipitated by stress on a stress echocardiogram, he would consider Radmilovich's medical condition as disabling from 9/7/18 to the present. (890).

Dr. Goyal was able to identify different types of chest pain that Radmilovich experienced. (889, 890-891). He acknowledged that PTSD could be contributing but could not be the sole cause because "*objective data on the stress echocardiogram support[s] an organic etiology*." (890).

Importantly, Dr. Goyal explained the mechanism by which stress would cause Radmilovich's symptoms:

> *Stress, whether physical or emotional, leads to activation of the sympathetic nervous system which leads to increase in myriad hormones including norepinephrine that increase heart rate and blood pressure. This increases the workload of the heart. When the demand of the heart outstrips supply, the heart is at risk of developing ischemia and injury. The Claimant's stress echocardiogram demonstrates that his heart becomes acutely ischemic and dysfunctional in the setting of stress. This can lead to worse chest pain symptoms, as well as lead to further injury of the myocardium.*

(891). Dr. Goyal added that in the medical literature "*it is fairly well-established that stress that [sic] incite/aggravate cardiac conditions and cardiac symptoms,*" that this link is biologically based, and that "*mental stress-induced myocardial ischemia in patients with known coronary artery disease increases the rate of subsequent cardiac events.*" (891). Dr. Goyal also accounted for the normal result on the previous traditional nuclear stress testing (performed in August 2019) by explaining that it can be inaccurated regarding microvascular disease. (889). Dr. Goyal indicated that he would advise any patient with coronary artery disease and/or microvascular disease to avoid stress, and would advise stress avoidance even more strongly to patients who - like Radmilovich - had abnormal echocardiograms. (892). *Id.*

- *Dr. Kaushal's Letter* (1421-1422)

In a 9/2/21 letter, Dr. Kaushal elaborated on Radmilovich's "*severe and disabling symptoms of chest pain, shortness of breath, and fatigue which have been exacerbated by physical and emotional stress, including that provided by his occupation.*" (1426). He

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

18

PLAINTIFF'S OPENING TRIAL BRIEF

explained, "*Mr. Radmilovich has undergone an extensive cardiac workup with a resulting diagnosis of coronary microvascular disease as the etiology of his symptoms*" with results that are the "*hallmark of coronary microvascular disease*." (1426). Dr. Kaushal disputed UNUM's reasoning that Radmilovich's exercise capability on a stress test demonstrated his ability to perform his occupation, writing, "*Mr. Radmilovich has consistently experienced post-exertion disabling chest pain and fatigue, including after the stress echocardiogram was complete. A similar degree of disabling symptoms has occurred with work-related stress*." (1426). He added that "*there is a clear relationship with stress (whether physical or emotional/mental) and ischemia that has been well-documented in the medical literature . . .*" (1426). Addressing Dr. DiDonna's easy-fix rationale, Dr. Kaushal explained that all therapeutic approaches had been tried without symptomatic improvement. (1247). He continued:

> *I have emphatically advised Mr. Radmilovich that he should not resume work as a life-preserving measure. If Ischemia is repeatedly elicited and protracted, this can result in adverse outcome including heart attack, heart failure, and cardiac death.*" (1427).

> *In summary I strongly support Mr. Radmilovich's claim for disability and believe that his occupation poses to him a very serious health risk. Id.*

Dr. Kaushal agreed with Dr. Goyal on three key points - that there was objective documentation of microvascular disease, that it caused Radmilovich's symptoms, and that the triggers of his symptoms include "*mental stress involved with his occupation.*" (1427).

- *Dr. Light's 7/23/20 Neuropsychological Evaluation Establishing Major Neurocognitive Disorder* (844-882)

Because UNUM concluded that Dr. Keats' testing provided "no clear evidence" of Radmilovich's neurocognitive deficits, and UNUM did not conduct its own testing, this office sent Radmilovich for additional neuropsychological testing with Dr. Roger Light, Ph.D. (844-845). He tested and interviewed Radmilovich, and to obtain "corroboration of any subjective complaints reported by Mr. Radmilovich," he interviewed Radmilovich's brother, a former co-worker, and Dr. Credidio (845). He also

19

analyzed the raw data and testing results from Dr. Keats' previous testing to ensure that his testing filled in the gaps in Dr. Keats' testing. (844, 845, 874). Dr. Light's report includes a review of medical records dating from Radmilovich's cardiac arrest in 2016. (861-862).

Dr. Light explained that the cognitive deficits Radmilovich demonstrated were consistent with the medical history he reviewed. (873). He estimated that Radmilovich was without cardiac activity or blood circulation for 5-20 minutes. (861). He noted that the description of transport to the ER, in which Radmilovich had again lost his pulse and was not breathing on his own, were "*consistent with insufficient oxygen flow to the brain, required for a diagnosis of hypoxic encephalopathy.*' (861). *"[Radmilovich] was documented as suffering a seizure in the ED, an indication of likely organic brain injury.*" (862). Dr. Light observed that at discharge Radmilovich's many diagnoses included "*encephalopathy acute and hypoxic encephalopathy.*" (862). Dr. Light explained that the cognitive deficits Radmilovich demonstrated were consistent with this medical history. (873).

Dr. Light found more impairment than Dr. Keats and the diagnosis of "*Major Neurocognitive Disorder Due to an Acquired Organic Brain Injury (likely due to Anoxic-Hypoxic Encephalopathy, Multisystem Failure, and Critical Illness Cognitive Impairment) Without behavioral disturbance.*" (872). Dr. Light explained, "*the cognitive impairments documented in the current assessment, including executive dysfunction, lack of verbal precision, verbal fluency inefficiency, ideational and verbal perseveration, mental calculation deficits, and divided attention deficits, and it become obvious that Mr. Radmilovich will never be able to successfully return to his usual and customary occupation.*" (874).

Dr. Light strongly disagreed with Dr. Keats' diagnosis of somatic symptom disorder, as the test she used was "insensitive at distinguishing actual cardiac dysfunction from *somatization.*" (874). Dr. Light's testing did not support the existence

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

of any other significant mental health diagnosis. (873-874). As Dr. Keats had observed, there was little chance that Radmilovich would improve. (875).

Dr. Light expressed surprise that the disability insurer would have questioned Radmilovich's disability "*given his history of hypoxic encephalopathy and likely critical illness cognitive impairment*." (874). Based on Dr. Light's interview and questionnaires completed by the collateral reporters, it appeared that, instead of exaggerating his deficits, Radmilovich suffered from anosognosia, or organic denial of his own limitations. (852, 875). While he deferred on the question of the impact of Radmilovich's physical conditions, Dr. Light noted the obvious - that the presence of his Radmilovich's physical symptoms "would likely provide sufficient distractions and interfere with his functioning," disabling him from performing his occupation. (874).

- *Dr. Light's Addendum Report* (883-885)

On 7/28/20 Dr. Light answered questions posed by Radmilovich's counsel. Dr. Light explained that UNUM's Dr. Nowell "is incorrect in his assertion that 'only one index fell outside the normal range'" in Dr. Keats' testing and that Dr. Nowell had essentially cherry-picked one test to the exclusion of others. (883-884). Dr. Light noted that Radmilovich's premorbid intelligence was in the superior range and that any measure at or below the 25th percentile would be considered abnormally low.[11] (844). Dr. Light also clarified that the difference between Dr. Keats' results and his could not be accounted for by the passage of time or deterioration, as Radmilovich's organic brain damage had plateaued by the time of Keats' testing and he was too young for a dementia process to have contributed. (884-885).

- *Galarraga's Vocational Analysis and Labor Market Survey* (807-844)

Also included with the appeal was a vocational analysis performed by vocational expert, Charles Galarraga. He determined which duties of Radmilovich's occupation

---

[11] *Quintero v. Westbrooks,* No. 3:09-CV-00106, 2017 WL 1196520, at *16 (M.D. Tenn. Mar. 31, 2017) (discussing the concept of relative cognitive impairment, where a person with a previously high IQ whose IQ is reduced to average will function more poorly than someone whose IQ has been average his whole life).

PLAINTIFF'S OPENING TRIAL BRIEF

were essential by performing a labor market survey of actual employers with job openings for an occupation that corresponded to the close eDOT job title. (842). All ten employers noted that a person would be precluded from working as a Production Superintendent if they suffered from any one of the following: limitations in fine motor speed and coordination in their left upper extremity; issues with language fluency and precision; issues with aspects of working memory including issues with even basic mental calculations/arithmetic; significant limitations in aspects of executive functioning skills, such as divided attention, inability to multitask, cognitive set switching, mental flexibility, insight and self-awareness and inductive reasoning, issues with emotional lability (exaggerated moods) and rapid frustrations. (842). Only one employer responded that "difficulty composing emails and letters due to dropping words and word finding struggles" would "not usually" preclude performance of the occupation (831), while the others all responded that it would. (831-842). All ten employers contacted said that the occupation would produce unavoidable stress. (830, 831, 832, 833, 835, 837, 838, 839, 840, 841).

Galarraga opined that, given Radmilovich's medical restrictions and limitations, his skills would be considered non-transferrable to both his occupation and any occupation. (825-827, 842).

### 9. *UNUM Reviews the Appeal from a Psychological Standpoint*

UNUM obtained a paper review of Dr. Light's neuropsychological evaluation from neuropsychologist, Julie Guay. (1414-1415). There is no evidence that Dr. Guay was provided with Dr. Keats' report, its raw data, or Dr. Keats' letter. (1497)(asking "Is *the* evaluation valid?" and "Does the data support the conclusion of *the* examiner concerning both of the evaluations?")(emphasis added). Dr. Guay agreed that Dr. Light's test was valid and that there was "*no evidence of purposeful malingering or significant concerns with effort.*" (1414). She thought that emotional factors could account for some of Radmilovich's uneven scores. (1414). She stated, "*the data does not support the*

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

*conclusion that somatization was not a possible factor in the claimant's performance.*"[12]
(1415). Overall, Dr. Guay found the data supported a diagnosis of "Mild Neurocognitive
Disorder," not Dr. Light's diagnosis of "Major Neurocognitive Disorder." (1414). While
she disagreed with some of Dr. Light's conclusions, at no point did she opine that
someone, much less Radmilovich, could have performed the duties of his occupation
with Mild Neurocognitive Disorder, nor did she provide a rationale for the inevitability
of such a conclusion.

In referring the claim to its in-house psychiatrist, Dr. Brown, UNUM's Appeals
Specialist, Katherine Durrell (who is not a doctor) conveyed Dr. Guay's statements
inaccurately: "*Testing results were not consistent with neurocognitive impairment.
Testing results showed, at most, a mild decline and, as mentioned, did not adequately
address the contribution of his current psychological functioning or long-standing
coping style with prominent somatic over focus.*" (1438). Dr. Brown accepted Durrell's
prompt, and rearranging her words slightly, stated, "*at most, a mild decline in cognitive
function with findings that are not consistent with those typically seen in cognitive
disorder. Moreover, the impact of current psychological function and long-standing
coping style have not been adequately addressed by the recent examiner.*" (1439). Dr.
Brown faulted Radmilovich for refusing to provide Dr. Credidio's treatment records
without explaining what difference this would have made. *Id*. Radmilovich's failure in
this regard formed the basis for Dr. Brown's conclusion that there were no supported
restrictions or limitations. (1439).

### 10.   *UNUM Obtains a Vocational Review on Appeal*

UNUM's vocational consultant, Kelly Marsiano, agreed with Galarraga's
conception of Radmilovich's occupation, including his choice of eDOT code and the
extent of its cognitive demands. (1530). Compared to UNUM's original vocational
assumptions, the proper occupation had "*more responsibility in establishing and*

---

[12] So, although at times UNUM uses the diagnosis of "somatization disorder" as a
synonym for misrepresenting or malingering, Dr. Guay's opinion makes clear that this
is wrong.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

*implementing* company *policies, goals and quality standards as well as budgeting. This occupation also interacts with the engineering professionals. The insured's job was located in the Engineering department, per the original job description*."  (1530). She explained that the stepped-up cognitive demands suggested certain "*temperaments or work situations required to perform the occupation in the usual and customary way*" and "*if additional mental or cognitive limitations are determined in clinical/medical review, consider referral for additional vocational input*." (1530).

Durrell then returned the claim to Dr. Brown. (1532). Minimizing Marsiano's vocational report, Durrell asked Dr. Brown to consider a single extra general cognitive demand – "influencing people in their opinions, attitudes, and judgments" – without mentioning any of Marsiano's determinations. (1532). Dr. Brown said the additional information did not "allow [him] to change the conclusions as per prior review." *Id.*

### 11.   *Radmilovich Responds, Submitting Dr Light's Letter*

Radmilovich was provided an opportunity to respond to the new evidence and rationales UNUM had generated in reviewing his appeal of his LTD and LWOP claims. (1536, 1563-1566). While strenuously defending his own Major Cognitive Disorder diagnosis (1565), Dr. Light identified Dr. Guay's distinction between Mild and Major neurocognitive disorder, as a red herring:

> *the diagnosis of Mild Neurocognitive Disorder would absolutely preclude Mr. Radmilovich from successfully returning to his usual and customary occupation. As per DSM-5 and ICD-10, there are only two possible diagnoses of neurocognitive disorder, Mild and Major Neurocognitive disorder. There is no "moderate" condition. Diagnosing mild neurocognitive disorder does not mean that the impact on one's functioning would be mild. Rather, this condition refers to the depth and breadth of neurologically based cognitive deficits. Those with mild neurocognitive disorder often will find tasks that were simple for them to accomplish prior to the development of that condition would become much more difficult or potentially impossible for them to accomplish. In a high-level occupation such as that of Mr. Radmilovich, which as noted by Dr. Keats is "multifaceted, requiring many different responsibilities, including verbally corresponding, negotiating, travelling, speaking publicly, managing data bases, and managing others… [and requires] working long days, multi-tasking, and sustaining attention, and is stressful and physically arduous," his physical symptoms of fatigue and his*

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

24

*cognitive deficits, whether considered either "mild" or "major", would be expected to preclude his successfully return to work.* (1564).

Dr. Light also responded to Dr. Guay's observation that Dr. Light's report did not rule out somatization as a factor:

> *Whether or not Mr. Radmilovich suffers from some type of somatization disorder or other emotional issues is completely irrelevant to the question of whether he suffers from neurological impairment, as Dr. Keats, Dr. Guay, and the current evaluator all agree that he has. Psychological testing is poor at differentiating somatization from actual medical symptoms. Given Mr. Radmilovich's complex medical history, the number of symptoms that could be incorrectly labeled as due to somatic symptom disorder is likely high. Similarly, given his deficits in cognition, the loss of his occupation due to these deficits, the inappropriate denial of disability benefits, and the loss of many of his premorbid coping mechanisms, the fact that he is experiencing some emotional issues is hardly surprising. To use these understandable emotional struggles in such a manner as to attribute his evident cognitive deficits as solely due to emotional factors to undermine a valid neurological disability claim is unconscionable.*

(1564).

### 12.   *UNUM Reviews the Appeal From A Cardiac Standpoint*

Concerning Radmilovich's cardiac conditions, UNUM sent his claim for another paper review.[13] UNUM's cardiologist, Dr. Tim McDermott, determined that the evidence of Radmilovich's myocardial ischemia was "conflicting" or remained "elusive" but that but that "*the medical records **clearly** establish that the insured retain the functional capacity to perform (and exceed) the occupational demands of his profession as* outlined *by VRC*." (1457)(emphasis added). He did not address how stress would affect Radmilovich's ability to work, except for making the brief, unsupported statement that there was no "*clear relation between physical or work stress and his related symptoms.*" (1457). Moreover, it is not clear what "occupational demands" Dr. McDermott assumed Radmilovich performed, because he relied on Radmilovich's ability to exercise and do "*household chores, shopping, visiting relatives, performing household repairs, going out to eat, going to movies, taking trips and going to the*

---

[13] At first, on 9/22/21, UNUM sent the file to Dr. Scott Norris who recognized that he was not qualified to opine on the cardiac issues and deferred to Dr. Brown on Radmilovich's mental/cognitive capacity. (1446).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

25

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

*park/beach.*" (1457). Although he promised to defer to others on Radmilovich's cognitive capacity, Dr. McDermott again insisted that Radmilovich could perform "*substantial cognitive activity to include driving, shopping, and taking trips.*" (1457).

UNUM returned the claim to Dr. Scott Norris, who, like Dr. Schroeder, would not render his own opinion but was happy to rubberstamp another physician's opinion so long as it favored UNUM.[14] Dr. Norris adopted Dr. McDermott's opinion on the cardiology issues and deferred to Dr. Brown on the rest, while simultaneously claiming to view the claim "from a whole person perspective." (1526).

### 13. *Radmilovich Responds, Submitting Dr. Kaushal's Letter (1567-1568)*

In a 12/28/21 letter, Dr. Kaushal addressed the rationale that Radmilovich's exercise tolerance was dispositive of his ability to perform his occupation:

> *First, I agree that Mr. Radmilovich's exercise tolerance was excellent during his most recent stress test on 10/26/2020, exceeding 12 metabolic equivalents; however, this degree of exercise was in fact associated with objective severe ischemia involving the ateroseptum and inferior walls, supporting the thought that has been previously mentioned that physical activity may be harmful to the patient*
> . . .
> *Furthermore, during the last 9 months, Mr. Radmilovich's exercise tolerance has significantly diminished, to the point where he is no longer exercising routinely due to the symptoms previously described. I strongly suspect that the pathology attributable to this change has been present well before 2/14/2020.*

(1567).

Dr. Kaushal also addressed Dr. McDermott's claim that the source of Radmilovich's chest pain remained "elusive," reconciling the various tests performed:

> *it is presumable that Mr. Radmilovich's physiology and/or anatomy changed since the nuclear stress test was performed. It is also-well described in cardiology literature that balanced ischemia can result in false-negative nuclear perfusion results.*
> . . .
> *I do strongly maintain my belief that Mr. Radmilovich has severe and activity-limiting chest pain and SOB that is related to microvascular*

---

[14] Dr. Norris could not reasonably have been expected to do otherwise. See e.g., *Rios v. Unum Life Ins. Co.*, No. SACV1904100DOCSKX, 2020 WL 7311343, at *1 (C.D. Cal. Dec. 10, 2020), *aff'd in part, rev'd in part and remanded sub nom. Rios v. Unum Life Ins. Co. of Am.*, No. 21-55020, 2021 WL 6116635 (9th Cir. Dec. 27, 2021).

*dysfunction and that all treatment options have been exhausted. His lifestyle and his prognosis are unfortunately negatively impacted as a result. I have known Mr. Radmilovich to take pride in his work, and his ability to work; given the consistency of chest pain symptoms related to the physical and emotional/mental demands of his job, I continue to advise him to refrain from his work duties, and I reaffirm my recommendation to abstain from the aforementioned date of 2/14/2020.*

(1567).

### 14.   *UNUM Denies Radmilovich's Appeal on 1/21/22*

After receiving Radmilovich's responses, UNUM did nothing more than craft a letter upholding it original decision to terminate LTD and LWOP benefits. (7261-7277). UNUM's denial letter shockingly contends that neither Dr. Light's nor Dr. Kaushal's responses contained "additional clinical information for us to consider." (7268). UNUM also claimed it viewed Radmilovich's condition from a "whole person" perspective, though, as the above facts show, UNUM's review was undertaken by a series of paper reviewers who limited their reviews to their respective claimed disciplines. (520, 681, 1446, 1457, 1526).

UNUM faulted Radmilovich for being hesitant to answer UNUM's questions in a 2019 phone call, failing to submit Dr. Credidio's office notes, and taking too long to send Dr. Keats' report, facts it never relied upon in its benefits termination letter. (7270, 7271); *Salomaa,* 642 F.3d 666, 679. UNUM suggested it had insufficient opportunity to understand Radmilovich's behavioral health conditions, without articulating why this was material. (7265). Illogially, UNUM simultaneously discounted Dr. Credidio's opinion that Radmilovich was cognitively impaired, deeming this to be "outside her area of practice." (7270). As it had done in the initial termination letter, UNUM listed its vague categories of mental/cognitive occupational requirements. (7265, 698).

## III.   **Argument**

### A.   **The Standard of Review is *De Novo***

The parties have agreed that the standard of review at trial is *de novo,* Dkt 16:3. In *de novo* review, the Court undertakes an independent and thorough inspection of the administrator's decision without affording any deference to the plan administrator's

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

findings. Silver *v. Executive Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 728 (9th Cir. 2006). A court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). Regardless of the standard of review, a trial court conducts a credibility determination about the administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." *Id. at* 969.

## B. Radmilovich was Cognitively Disabled from Performing His Occupation

Courts acknowledge that in-person exams are entitled to greater weight in disability determinations. *Holmstrom v. Metropolitan Life Ins. Co*., 615 F.3d 758, 775 (7th Cir. 2010) ("None of the doctors who concluded that Holmstrom failed to establish disability ever examined her."); *Salomaa* at 676; *Montour v. Hartford Life & Acc. Ins. Co.,* 588 F.3d 623, 634 (9th Cir. 2009)(insurer's decision not to perform its own exam "raise[s] questions about the thoroughness and accuracy of the benefits determination."); *Hoover v. Provident Life & Acc. Ins. Co.,* 290 F.3d 801, 809 (6th Cir. 2002)("The evidence presented in the administrative record did not support the denial of benefits when only Provident's physicians, who had not examined Hoover, disagreed with the treating physicians. Under these circumstances, the district court's decision to reverse Provident's denial of residual benefits to Hoover was correct and it is obvious that no other result was possible had the *de novo* standard of review been utilized.").

Here, every doctor who treated or examined Radmilovich agreed he was cognitively impaired to an extent that rendered him unable to perform his occupation. Dr. Credidio, whose treating relationship with Radmilovich began 9/21/18 (507), and who had the benefit of a long-term therapeutic in-person relationship with him, opined that he no longer had the cognitive ability work at his occupation. (508). Her opinion was also grounded in Radmilovich's history of hypoxic encephalopathy as well as a review of neuropsychological testing performed by Dr. Keats. (505, 508, 509, 511). Again, relying on her long relationship with her patient, Dr. Credidio noted that

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1    Radmilovich had no desire to be disabled and tried to appear more functional than he

2    actually was. (851, 510)

3    Both Dr. Keats and Dr. Light concluded that Radmilovich could no longer

4    perform his occupation, based on their testing. Their reports differ only in the diagnostic

5    description of Radmilovich's cognitive disorder; they do not differ in their ultimate

6    conclusions that the cognitive loss was sufficient to render him unable to perform his

7    previous job. Dr. Keats diagnosed Radmilovich with "Mild Neurocognitive Disorder

8    Due to Multiple Etiologies, Without Behavioral Disturbance," and the additional

9    diagnosis of "Somatic Symptom Disorder, With Predominant Pain, Persistent, Mild

10   Neurocognitive Disorder Due to Another Medical Condition." (598). However, this

11   second diagnosis in no way undermines Radmilovich's complaints of cognitive

12   impairment, or the test results demonstrating as much, as this diagnosis concerned

13   "psychological barriers which served to exacerbate the pain experience and/or

14   functionality." (599). Put differently, she opined Radmilovich's pain may be worse

15   because of this additional psychological condition.[15]

16   Dr. Light diagnosed "Major Neurocognitive Disorder." (872). Dr. Light's report

17   was more comprehensive, as it included a review of Dr. Keats' exam, the observations

18   of witnesses, Dr. Credidio's observations, and the medical records related to

19   Radmilovich's cardiac arrest, as well as performing more tests. (844-45, 861-62, 874).

20   No reviewer at UNUM undertook review of this type, much less an in-person

21

22   [15] A disability claims administrator is required to consider all of a claimant's conditions
     in combination. *Abram v. Cargill, Inc.*, 395 F.3d 882, 888 (8th Cir. 2005); *Green v. Sun*
23   *Life Assur. Co. of Canada,* 259 F. App'x 42, 44 (9th Cir. 2007)(a claimant is not required
     to claim disability based on a single diagnosis). So, in addition to considering whether a
24   psychological condition may make a pain condition worse, UNUM was under a duty to
     consider whether a man who was suffering from intermittent severe chest pain lasting
25   hours, plus fatigue, dizziness and nausea, and who *also* had a diminished cognitive
     capacity that required him to invest more time in the same tasks, could perform his
26   occupation with "reasonable continuity" and in the "usual and customary way."
     UNUM's siloed reviews did no such thing. *See also* 922.
27

28

29

examination of any kind. Regardless, Dr. Light explained that, while his diagnosis of "Major Neurocognitive Disorder" was justified, the difference between his diagnosis and "Mild Neurocognitive Disorder" would result in the same determination – that Radmilovich cannot perform his occupation. (1564-1565). He clarified that these diagnoses were also not as disparate as it appeared, since there are only two types of neurocognitive disorder – mild and major. (1564). He explained that "mild neurocognitive disorder" does not signify a mild level of impairment, and in Radmilovich's case, it certainly did not, given the complexity of his occupation. *Id.*

Although UNUM tried to make it appear otherwise, through means that call into question integrity of the claims process (1438, 1532), Dr. Guay was also in Radmilovich's camp. She agreed that he demonstrated Mild Neurocognitive Disorder, electing Dr. Keats' diagnosis over Dr. Light's diagnosis of major neurocognitive disorder. (1414). Though she also aligned herself with Dr. Keats that somatization could not be ruled out as a factor, she did not equate "somatization" with a lack of credibility, as she had already found that Radmilovich did not show malingering or lack of effort. (1414, 1415). As well, Dr. Guay's silence on the subject of whether Radmilovich could be expected to perform his occupation, given its cognitive demands, is deafening. She did not refute that Radmilovich was unable to perform his occupation.

Radmilovich's own account of his cognitive challenges cannot be ignored, especially when there is no evidence that he lacks credibility in his reports, and UNUM never undertook any of its own examinations. *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 905-906 (9th Cir. 2016). In fact, all the evidence suggests Radmilovich would prefer to hide his cognitive deficits and that his exam results were valid, as even Dr. Guay concedes. (1414, 851). Dr. Light opined that Radmilovich's tendency to deny his own limitations was, itself, organic. (852, 875).

Radmilovich describes why he could not perform his occupation in the usual and customary way. He needed to devote days or weeks to projects that had previously taken him hours to days. (1077). He could not perform his occupation accurately, even when

30

he spent extra time; he couldn't create an accurate document, even after multiple revisions. *Id*. He found it impossible to execute the novel projects his job demanded. (807, 102-103, 99). UNUM was careful not to afford Radmilovich's failed return to work any significance, but it did so erroneously. *Hawkins v. First Union Corp. Long Term Disability Plan,* 326 F.3d 914, 918 (7th Cir. 2003); *Bledsoe v. Metro. Life Ins.,* 90 F. Supp. 3d 901, 916 (C.D. Cal. 2015)(finding that plaintiff's return to work is evidence of disability, not the opposite).

Because Radmilovich's physicians are not vocational experts, Galarraga's vocational analysis clarified the extent to which Radmilovich's occupation could be performed by someone with his cognitive problems. Galarraga held up Radmilovich's cognitive deficits against "the substantial and material acts necessary to pursue your usual occupation in the usual and customary way," something UNUM never did. Employers hiring for Radmilovich's occupation made clear that his problems with language fluency, math, financial analysis,  memory, executive functioning, and attention would make performance of the occupation impossible and even unsafe. (831-842). UNUM's vocational consultant agreed with Galarraga about what the occupation required, and she reminded UNUM to revisit the question of Radmilovich's ability to perform his occupation if it determined he had restrictions or limitations. (1530). Though she understood that her hands were tied, she strongly suggested that if she were permitted to input any degree of impairment, the output would likewise be different. *Id.*

By contrast, UNUM declined to order its own neuropsychological exam, as it continued to complain about the adequacy of Radmilovich's evidence. *Montour,* 588 F.3d 623, 634. The policy afforded it this right. (127, 143). UNUM's failure to obtain an in-person exam is enough to tip the scales here, and for this Court to award benefits on the basis of Radmilovich's cognitive inability to perform his occupation. *Hoover* at 809.

However, UNUM's paper-based opinions also lack substance or applicability to the question at hand. Drs. Morris and Schroeder both sat out the issue of Radmilovich's cognitive impairments and assumed this was for neuropsychologists to resolve. (681,

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

31

689, 542-544). Dr. Nowell's unfavorable opinion was predicated on a single incorrect fact that was easily rebutted by Dr. Light, *i.e.,* that only one of Dr. Keats' test results was out of the normal range. (883-884). In addition, Dr. Nowell never read Dr. Light's report, so his opinion is of little value. Dr. Nowell's opinion, which did not acknowledge any cognitive impairment, is also contradicted by Dr. Guay's opinion that Radmilovich had Mild Neurocognitive Disorder. That UNUM's Durrell distorted Dr. Guay's opinion in referring the question to Dr. Brown, does not change the fact that Dr. Guay's opinion, on its face, does not support UNUM's denial. Dr. Brown's statement is merely a repetition of Durrell's misrepresentation, and given the faulty information he was provided, his opinion is owed little weight. *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 118 (2008)(conflict is demonstrated by failing to provide a reviewer with all the relevant information). One is left to guess what Brown would have said if given accurate information.

Moreover, not one of UNUM's paper reviewers considered the question of Radmilovich's disability under the correct policy standard, which requires an analysis of whether Radmilovich could "perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way." (136). Each was provided with the meaningless categories, which included the absurd "Dealing with people," "Performing a variety of duties," and "Ability to make work related decisions," which provided no insight into the actual occupational demands Radmilovich needed to perform and which would be required by a vast number of occupations that do not resemble his. *See e.g.,* 7264; *Kay v. Hartford Life & Accident Ins. Co.,* No. 21-55463, 2022 WL 4363444, at *2 (9th Cir. Sept. 21, 2022). But even if these categories had some meaning, they were not applied. Neither Dr. Nowell nor Dr. Guay mentioned a single occupational duty. Dr. Guay acknowledged there was Mild Neurocognitive Disorder, but she never took the extra step - an absolutely necessary step under the policy - of addressing whether Radmilovich's ability to perform his job's various duties would be affected by the disorder she acknowledged existed. Dr. Brown,

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

**PLAINTIFF'S OPENING TRIAL BRIEF**

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

who had the final word on Radmilovich's cognitive impairments, was deliberately shielded from Marsiano's true vocational opinion. (1532). To the extent they are relevant, Drs. Morris and Schroeder, and even McDermott, relied on Radmilovich's ability to perform household tasks, shopping, or trips to the beach or movies for the proposition that he could perform the cognitive demands of his management-level job. UNUM's medical reviewers' opinions were unmoored from Radmilovich's occupational requirements and from the policy standard that governed the claim. The benefits termination was wrong and it was unlawful. *Kay* at *2.

### C. Radmilovich is Disabled by the Risks His Cardiac Condition Poses

The insurance law principle that an insured is disabled if working would put his health or life at risk has been embraced by ERISA common law. *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 391 (3d Cir. 2003)(arbitrary and capricious to deny benefits to an orthopedic surgeon whose heart condition prevents him from performing surgery or on-call duties safely due to stress); *Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58, 66 (1st Cir. 2013)("risk of relapse is prohibitively impairing and thus becomes, for all practical purposes, a current disability"); *Silver,* 466 F.3d 727, 734 (9th Cir. 2006). Put simply, an insured need not risk death in order to collect benefits. *Saliamonas v. CNA, Inc*., 127 F. Supp. 2d 997 (N.D. Ill. 2001).

Once it was determined that the cause of Radmilovich's symptoms was microvascular ischemia, Dr. Kaushal and Dr. Goyal agreed that Radmilovich's occupation could be harmful or deadly. They agreed that there was objective documentation of microvascular disease, that it caused Radmilovich's symptoms, and that the triggers of his symptoms include *"mental stress involved with his occupation."* (1427). Dr. Kaushal determined cessation of work was a life-saving measure for Radmilovich. (1427). Dr. Goyal, whose credentials certainly give his opinion great weight, explained exactly *how* Radmilovich's risk arises and noted that the medical literature supports, *"mental stress-induced myocardial ischemia in patients with known*

*coronary artery disease increases the rate of subsequent cardiac events."* (891). Galarraga's determination that Radmilovich's occupation is stressful is unrebutted. Connecting the dots, Dr. Goyal made clear that stress would expose Radmilovich not only to further symptoms but to further damage to his heart and further cardiac events. (891). Even UNUM's Dr. Schroeder identified this as "*a claim of physical (cardiac) impairment reportedly worsened by psychological stress from work.*" (543). Radmilovich's need to refrain from his job duties to avoid future harm constitutes disability.

Only one doctor at UNUM actually reviewed Radmilovich's cardiac conditions on appeal, Dr. McDermott. (Dr. Norris' agreement contains nothing to discuss). Dr. McDermott's opinion does not provide anything that challenges Dr. Kaushal's or Goyal's opinions on the risk to Radmilovich, not to mention that it is fraught with inaccuracies and internal contradictions that deprive it of credibility. Dr. McDermott's statement that the etiology of Radmilovich's chest pain was conflicting or elusive, was entirely rebutted; Drs. Kaushal and Goyal explained that earlier tests could have false negative results, or his physiology and/or anatomy could have changed, (889, 1567). Furthermore, logically speaking, the fact that a diagnosis evolves over time, or is not known when a disability begins, does not make the diagnosis less certain when it is finally established. *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir. 1998)(ruling that a claimant is entitled to benefits based on a retrospective diagnosis and opinion that her disease had caused her to become disabled over a year earlier); *Silver* at 735 (angioplasty procedure that took place after the close of the elimination period was probative of ongoing disability during that period). And it is no surprise that Radmilovich's doctor took some time to arrive at a diagnosis, given that so few patients survive his type of cardiac arrest to experience the consequences. (261).

Despite his assertion of conflicting evidence, Dr. McDermott was all too willing to say that it was *clear* Radmilovich *could* perform his occupation. But additionally, his assertion was not grounded in the actual requirements of the occupation but the fallacy

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

that performing activities such as shopping, visiting relatives and going to the beach suggest an ability to perform an occupation. (1457). Dr. McDermott's focus on Radmilovich's ability to exercise is also implausible, since there is no evidence that an ability to perform some exercise protects a patient from the impact of job stress. As for Dr. McDermott's assertion of no "*clear relation between physical or work stress and his related symptoms,*" (1457) there could be nothing clearer than Radmilovich's own description of his return to work accompanied by the scientific explanations provided by Drs. Kaushal and Goyal establishing the "relation." On this record, there is no evidence challenging Dr. Kaushal and Goyal's opinions that Radmilovich was and is disabled by the risk that performing his occupation would pose.

## IV.   Conclusion

For the foregoing reasons, Radmilovich requests reinstatement into the LTD and life insurance plans, with payment of retroactive benefits, plus pre-judgment interest, attorneys' fees, and costs. Plaintiff also requests a remand to UNUM for any occupation determinations concerning both his ongoing benefits and his LWOP.

DATED:  November 22, 2022          KANTOR & KANTOR, LLP

By:   */s/ Glenn R. Kantor*
       Glenn R. Kantor
       Attorneys for Plaintiff
       DAVID RADMILOVICH

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

PLAINTIFF'S OPENING TRIAL BRIEF