1  ROBERT E. HESS (SBN CA 178042)
   rhess@maynardcooper.com
2  MAYNARD COOPER & GALE LLP
   10100 Santa Monica Blvd., Suite 550
3  Los Angeles, CA 90067
   Telephone:  310-596-4500
4

5  Attorneys for Defendant
   Unum Life Insurance Company of America
6

7

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10               SANTA ANA DIVISION

11 | DAVID RADMILOVICH,                 | Case No. 8:22-cv-00181-DOC-KES

12 |            Plaintiff,              | (Honorable David O. Carter,
   |                                    |  Ctrm: 10A – Santa Ana)
13 |    vs.                             |

14 | UNUM LIFE INSURANCE COMPANY         | **DEFENDANT UNUM LIFE
   | OF AMERICA; AND DOES 1-10,          | INSURANCE COMPANY OF
15 | inclusive,                          | AMERICA'S OPENING TRIAL
   |                                     | BRIEF**
16 |            Defendants.             |

17 |                                    | Trial Date:  January 17, 2023
   |                                    | Time:  8:30 a.m.
18 |                                    | Ctrm:  10-A Santa Ana

19 |                                    |
   |                                    | Complaint Filed:  February 3, 2022
20

21

22

23        Unum Life Insurance Company of America ("Unum") hereby submits its

24 opening trial brief in the above-referenced case.

25

26

27

28

1

## **TABLE OF CONTENTS**

2

I.     INTRODUCTION ................................................................................ 1

3

II.    FACTUAL SUMMARY .................................................................... 3

4
        A.    The Policy's key provisions .................................................... 3

5
        B.    Unum's initial claim evaluation .............................................. 4

6
        C.    The records from Plaintiff's cardiologist did not support
7
               impairment ............................................................................. 6

8
        D.    Plaintiff's refusal to cooperate with Unum ........................... 10

9
        E.    Unum's further claim evaluation and determination that Plaintiff
               was not entitled to benefits beyond early October 2019 ...... 11

10
        F.    The information submitted in support of Plaintiff's claim
11
               (including his above-average results on neuropsychological
               testing) did not establish disability ...................................... 14

12
        G.    Plaintiff's appeal of Unum's claim determination ................ 19

13
        H.    Unum affirmed its claim determination on appeal ............... 21

14

III.   UNUM'S CLAIM DETERMINATION WAS CORRECT ........................... 26

15
        A.    Plaintiff cannot meet his burden of proving entitlement to benefits
16
               .............................................................................................. 26

17
        B.    That Plaintiff has a medical condition does not mean he was
               disabled when Unum closed his claim in February 2020 ..... 26

18
        C.    Plaintiff's subjective complaints are subject to medical
19
               verification ............................................................................ 28

20

IV.   CONCLUSION ............................................................................... 31

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963-964 (9th Cir. 2006).........26

*Black & Decker v. Nord,* 538 U.S. 822, 828-829 (2003) ...........................................29

*Bratton v. Metropolitan Life Ins. Co.*, 439 F.Supp.2d 1039, 1052 (C.D. Cal. 2006) 29

*Broyles v. A.U.L. Corp. Long Term Disability Ins. Plan*, 2009 U.S. Dist. LEXIS 110744, *18 (N.D. Cal. Nov. 12, 2009) ...................................................................30

*Fair v. Bowen,* 885 F.2d 597, 602 (9th Cir.1989) ......................................................29

*Foladpour v. Hartford Life & Acc. Ins. Co.*, 2015 WL 3658774, at *12 (C.D. Cal. June 12, 2015)..........................................................................................................29

*Ibrahim v. Bayer Corp. Disability Plan*, 584 Fed. Appx. 743, 745 (9th Cir. 2014) . 30

*Inciong v. Fort Dearborn Life Ins. Co.*, 2014 U.S. App. LEXIS 7562, *4 (9th Cir. 2014) ....................................................................................................................26

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004).....................................................................................................26, 27

*Langlois v. Metropolitan Life Ins. Co.*, 2012 WL 1910020, *14 (N.D. Cal. 2012)..29

*Lawrence v. Life Ins. Co. of N. Am.*, 2015 WL 7013089, at *4-5 (C.D. Cal. Nov. 12, 2015) ......................................................................................................................26

*Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004)...............................29

*Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ............................................27

*Muniz v. Amec Constr. Mgmt.*, 623 F.3d 1290, 1294 (9th Cir. 2010).......................26

*Rorabaugh v. Continental Cas. Co.*, 321 Fed.Appx. 708, 709 (9th Cir. 2009) ........29

*Seleine v. Flour Corp LTD Plan,* 598 F.Supp. 2d 1090 (C.D. Cal. 2009) ..........28, 29

*Shaw v. Life Ins. Co. of N. Am.*, 2015 WL 6755187, at *18 (C.D. Cal. Nov. 4, 2015) ..............................................................................................................................26, 30

# I.    <u>INTRODUCTION</u>

Plaintiff David Radmilovich ("Plaintiff") had a heart attack in 2016. Fortunately, he survived and underwent successful coronary artery bypass surgery. Subsequently, Plaintiff's cardiac condition improved and stabilized, and he was able to return to work in his usual occupation in 2017.  He has not had any further heart attacks nor required hospitalization for any cardiac-related complaints. To the contrary, Plaintiff progressed to the point that by September 2018 he was routinely engaged in a strenuous exercise program, and he told his cardiologist (Dr. Rishi Kaushal) that "exercise and 'wearing himself out' make him feel better." [AR 223][1] In August 2019, Plaintiff passed with flying colors an exercise stress test that demonstrated that "[p]erfusion imaging is negative for ischmia" and Plaintiff's "[l]eft ventricle perfusion is normal." [AR 230]  Most importantly, the test confirmed that Plaintiff's heart was functioning normally and that his risk for a further cardiac event was exceedingly low:  "Overall, the patient's exercise capacity was excellent . . . normal heart rate response to stress . . . Patient has low (<1%) cardiovascular risk." [AR 231]

Notwithstanding the decidedly positive medical information noted above, Plaintiff claimed that cardiac and cognitive symptoms forced him to stop working in September 2018. One year later, in September 2019, Plaintiff submitted a claim for long-term disability ("LTD") benefits under a group insurance policy (the "Policy"). Plaintiff's LTD claim and the underlying Policy are subject to ERISA.  The Policy was issued by Unum to Plaintiff's employer, Prudential Overall Supply.

Unum evaluated Plaintiff's claim and determined the medical information did not support disability beyond October 8, 2019. Although Plaintiff reported episodes of chest pain and fatigue, extensive cardiology evaluation did not identify a cardiac etiology to explain his purportedly debilitating symptoms. Serial evaluations and

---

[1] All evidentiary cites are to the documents contained in the Administrative Record lodged with the Court (*e.g*., "AR 630" is p. 630 of the Administrative Record).

testing revealed no direct evidence of ongoing myocardial ischemia as a cause of his reported symptoms. Plaintiff was consistently engaged in a rigorous exercise program from at least 2018 into 2020, with excellent cardiac functioning, consistently unremarkable cardiac examination findings, good cardiac stress test results, and no evidence of heart failure, cardiac arrhythmias or myocardial ischemia after the surgery.

Unum arranged for nine medical experts (including two cardiologists) to review Plaintiff's file who confirmed that Plaintiff was not disabled from a cardiac perspective as of the date his benefits were discontinued.  Dr. Kaushal's findings and opinions – at least before she was prodded by Plaintiff and his counsel – were entirely in line with the opinions of Unum's medical consultants.  For example, in September 2018 Dr. Kaushal wrote, "I have not discovered any organic etiology of this chest pain . . . in fact, chest pain improves with exercise, thus very low likelihood of angina etiology of chest pain." [AR 223]  Dr. Kaushal also confirmed that Plaintiff's reported pain and fatigue were not attributable to a cardiac condition when she wrote, "I continue to feel that the majority of symptoms may be psychosomatic." [AR 228]

As explained below, *after* Unum told Plaintiff it did not find support for his LTD claim, Dr. Kaushal reported *for the first time* that Plaintiff's symptoms "may" be due to coronary spasm or microvascular disease. The timing of this brand new opinion from Dr. Kaushal (*i.e*., after treating Plaintiff for more than three years following his heart attack, and after Unum conveyed its adverse determination) and its inconsistency with the information in her own treatment records renders Dr. Kaushal's disability opinion in this case unreliable.

Unum also evaluated the non-physical aspects of Plaintiff's claim, including his report of cognitive problems, and in fact arranged for three psychiatrists and two neuropsychologists to review the relevant information. But the most critical information came from a 2019 evaluation and testing by *an independent neuropsychologist that Plaintiff himself selected,* Dr. Lauren Keats. The results from

2

that evaluation confirmed that Plaintiff was not cognitively impaired to a degree that would preclude him from returning to work. Dr. Keats found that "Mr. Radmilovich was able to sustain attention, pace, and effort over the examination, without interference from pain" [AR 595], and her summary of the tests results refuted Plaintiff's claim of disabling cognitive deficits: "Results from testing demonstrated focal areas of potential mild cognitive decline, but overall, he performed in the average to high average range. His report of difficulty counting, abstracting, losing train of thought, divided attention, focusing and remembering details, was not necessarily found on this examination." [AR 596]

The information obtained by Unum also refuted the notion that Plaintiff's underlying cardiac condition rendered him unable to withstand non-exertional stress, including stress associated with working in his occupation. In this regard, Dr. Keats reported that Plaintiff was capable of "managing his stress and symptoms well" in late 2018 [AR 610] - a time when Plaintiff was facing substantial emotional stressors, including: a pending divorce, "stressors involv[ing] his health and being at a cross roads with his career," and significant family discord ("his oldest son is not speaking with him and blames him for the divorce"). [AR 587, 588]  Plaintiff's ability to "manag[e] his stress and symptoms well" in the face of such prominent life stressors corroborates Unum's determination that he could also manage the occupational stress resulting from a return to work.

In sum, the totality of the medical information in the record and the findings and opinions of the nine medical consultants and two vocational consultants who reviewed the file at Unum's request confirm that Unum's claim determination was correct.  Accordingly, Unum is entitled to judgment in this case.

## II.   FACTUAL SUMMARY

### A.    The Policy's key provisions

Unum issued the Policy to Prudential Overall Supply ("Prudential") in 2017.

The Elimination Period under the Policy (a period after the disability onset date that must be satisfied before benefits are payable) is 180 days. [AR 12982] "Total Disability" for the first 30 months (*i.e.*, throughout the Elimination Period and the next 24 months), requires a showing that the claimant, "as a result of sickness or injury," must be "unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way." [AR 12996] After benefits have been paid for 24 months, the claimant must prove he is "not able to engage with reasonable continuity in any occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity." [AR 12996][2]

The Policy provides that benefits will stop "the date you are no longer disabled" [AR 13003], and LTD coverage will end "the last day you are in active employment." [AR 12994]  (Plaintiff's last day of active employment was September 6, 2018.) [AR 54][3]

### B.    Unum's initial claim evaluation

In September 2019, Plaintiff submitted a claim for LTD benefits. [AR 54-57] He identified his medical condition as "chronic chest pain / cognitive issues / other diagnosis" and told Unum that this medical condition rendered him unable to work as

---

[2] Unum paid LTD benefits to Plaintiff for less than 24 months, and never evaluated Plaintiff's potential entitlement to benefits under the "any occupation" definition of disability.  Thus, the issue to be decided in this case is whether Plaintiff is entitled to benefits for the remainder of the "usual occupation" period of disability, and Plaintiff's potential recovery of benefits in this action is limited to the remaining benefits payable for the 24-month "usual occupation" period that would have ended on March 23, 2021.

[3] Because Plaintiff's coverage was no longer in force after his benefits ended in February 2019, evidence regarding his alleged disability in or after June 2020 (when he was evaluated by neuropsychologist Dr. Light) are not relevant to the Court's analysis.

of September 7, 2018. [AR 54] He reported that "Heart Palpitations/Heart Flutters/Quivers in neck/Chest Pressure/Chest Pains/Spikes in Blood Pressure, PVC's, Other Heart issues, Cognitive degradation and limits" rendered him "unable to perform one or more" of the duties of his occupation as a director of production at Prudential. [AR 55]   In support of his claim, Plaintiff submitted an Attending Physician Statement ("APS") from his cardiologist, Dr. Kaushal, reflecting a diagnosis of coronary artery disease ("CAD") with "unstable angina," and chronic angina.[4] [AR 114-116] Dr. Kaushal identified restrictions and limitations ("R&Ls") consisting of lifting more than 10 pounds, walking more than 50 feet, and cognitive tasks including analytics, administration, communication and project management. [AR 115]   Dr. Kaushal told Unum these R&Ls were warranted because Plaintiff's "chest pain [was] exacerbated by physical & mental demands of his job requirements."[5] [*Id.*]

Unum also obtained information about Plaintiff's occupation from his employer, Prudential, an industrial cleaning company that supplies uniforms, laundry and work rentals. According to the job description for Director of Production, "[t]he normal work schedule is 8.00 hours per day 5 days per week" with the following physical requirements: standing occasionally (up to 1/3 of the time); walking occasionally (up to 1/3 of the time); sitting frequently (1/3 to 2/3 of the time); and "periodic (does not occur on every shift)" lifting, pushing and pulling demands. [AR 99-103]   Later, in November 2019, Prudential told Unum that Plaintiff could avoid

---

[4] Angina is a type of chest pain caused by reduced blood flow to the heart. *See* www.mayoclinic.org>angina.

[5] Unum later learned that Dr. Kaushal's R&Ls, which were based on Plaintiff's subjective reports of physical and mental activity tolerance, were completely at odds with Plaintiff's actual functional capacity.  For example, Dr. Kaushal reported that Plaintiff was unable to walk more than 50 feet. [AR 115] Yet Plaintiff told Dr. Keats that he "enjoys being physically active," and that he "currently uses the bike machine for 40 minutes per day and brings his heart rate up to 160 BPM."  [AR 587]

1  lifting heavy items if he chose to do so, and explained that lifting was required "[o]nly
2  during training for this position or filling in at a plant could this [lifting requirement]
3  apply but usually this could be passed down to a Corporate Production Manager if
4  one is in position at the time." [AR 380] Unum determined that Plaintiff's occupation
5  fell within the "light work" category. [AR 459-461]

6     During an initial call with Unum in September 2019, Plaintiff was unwilling to
7  provide essential information, and told the claim representative he wanted to speak
8  with his attorney before providing detailed information. [AR 170-173] He refused to
9  disclose any information about his daily activities or his educational and work history
10 ("would not provide"). [*Id*.] After providing some limited information, including that
11 he was treating with psychologist Dr. Vivian Credido, Plaintiff said that he was
12 skeptical of the claims process and then abruptly hung up on the representative. [AR
13 175] Shortly thereafter, attorney Rhonda Harris Buckner began representing Plaintiff
14 in connection with his claim. [AR 257-264]

15 **C.    The records from Plaintiff's cardiologist did not support**
16 **impairment**

17     Unum obtained Dr. Kaushal's records, and while those records confirmed
18 Plaintiff's diagnosis of and treatment for cardiac disease, the records reflected
19 consistently normal cardiac and physical examination findings and a complete
20 absence of any significant cardiac events (such as heart failure, cardiac arrhythmias
21 or myocardial ischemia) after the 2016 heart surgery. Dr. Kaushal's records also
22 revealed that Plaintiff routinely engaged in strenuous exercise and told Dr. Kaushal
23 that he felt his best when exercising – and in fact Plaintiff reported that his cardiac
24 related symptoms improved when he exercised.[6] Relevant entries from those records
25 include the following:

26

27 ───────────────
28 [6] Plaintiff's admissions to Dr. Kaushal about his robust exercise activities and his
   positive physical reaction to strenuous exercise are significant, as they directly
   contradict Plaintiff's subsequent reports – not asserted until *after* Unum denied his

6

9/18/18 treatment note: "[Patient] notes exercise and 'wearing himself out' make him feel better. He reports episodes of chest palpitations have been infrequent and have decreased." [AR 220] "Patient has chronic chest pain syndrome which I feel is in part psychosomatic from patient's traumatic history of cardiac arrest and possibly exacerbated by depression/anxiety.  I have not discovered any organic etiology of this chest pain other than possible neuropathic origin following open heart surgery. . . . Recent ischemic evaluations including coronary angiogram have been negative; in fact, chest pain improves with exercise, thus very low likelihood of angina etiology of chest pain." [AR 223]

9/20/18 treatment note: "I continue to feel that the majority of symptoms may be psychosomatic from patient's traumatic history of cardiac arrest and possibly exacerbated by depression/anxiety.  I have not discovered any organic etiology of this chest pain other than possible neuropathic origin . . .." [AR 228]

10/10/18 treatment note: Subjectively Plaintiff reported ongoing chest pain and fatigue, but told Dr. Kaushal he "remains active, exercises 4-5 times/week." [AR 216] Dr. Kaushal's physical examination was normal, including the exam of Plaintiff's heart ("regular rate and rhythm, S1 normal, S2 normal, no murmur, no click, no rub or gallop")[7] [AR 219] Under "Assessment and Plan," Dr. Kaushal wrote: "Left ventricular ejection fraction has essentially normalized . . .No evidence of ischemic

---

claim – that he was unable to exercise and that physical activities worsened his purported symptoms.

[7] S1 and S2 refer to heart sounds, which "are created from blood flowing through the heart chambers as the cardiac valves open and close during the cardiac cycle." See reference to "Physiology, Heart Sounds" at https://www.ncbi.nlm.nih.gov/books/NBK541010/.

lesion corresponding to stress echocardiogram . . . Chronic chest pain syndrome is likely nonanginal in etiology. Overall there has been some improvement in symptoms." [AR 219]

11/21/18 treatment note: Plaintiff reported episodes of chest pain but "[n]otes pain intensity improvement with exertion." [AR 211]  Plaintiff again reported "[h]e is active; exercise 3-4 days a week." [*Id.*] The heart exam was again normal, and Dr. Kaushal documented ongoing improvement. [AR 214]

2/20/19 treatment note: Plaintiff remained "active biking, walking, gym exercises 4-6 days a week." [AR 206] The heart exam was again normal, and Dr. Kaushal documented ongoing improvement.   [AR 209]

8/6/19 treatment note: Plaintiff was still reporting chest pain and cardiac symptoms, but reported "improvement in duration of palpitations." [AR 201] Plaintiff continued to exercise regularly, and continued to feel better when exercising: "He is active; elliptical exercises for 40 minutes 4-5 times a week. Notes degree of chest tightness during exertion but notes he feels better during exertion.  After exercising, chest tightness resolves around after 45 minutes." [AR 201] Dr. Kaushal's heart exam was again normal [AR 204], but since it had been more than 2 years since the last ischemic assessment, she ordered a nuclear stress test for further evaluation. [AR 205][8]

---

[8] Myocardial ischemia occurs when blood flow to your heart is reduced, preventing the heart muscle from receiving enough oxygen. *See* https://www.mayoclinic.org/diseases-conditions/myocardial-ischemia/symptoms-causes/syc-20375417.

8/29/19 Nuclear Stress Test (Exercise) report: "Perfusion imaging is negative for ischemia. LV [left ventricle] function and WM are normal." [AR 230]

Overall Impression: **Patient has low (<1%) cardiovascular risk**. The ECG portion of this test is normal. This is a negative test." [AR 231]

Perfusion Impression: Left ventricle perfusion is normal. [AR 231]

Function Impression: The LV function is normal. Left ventricular ejection fracture was 57%."[9] [AR 231, emphasis added]

Stress ECG Findings: An exercise test was performed . . . The patient reported no symptoms during the stress test . . . Overall, **the patient's exercise capacity was excellent**. The estimated VO2 max is 37.74 ml/min/kg . . . **normal heart rate response to stress**." [AR 231-232, emphasis added]

Thus, Dr. Kaushal's records showed that Plaintiff's cardiac condition in and after September 2018 was well controlled, with no significant clinical or diagnostic findings, with numerous references to Plaintiff's strenuous physical exercise regimen. Although at times Plaintiff reported cognitive complaints, Dr. Kaushal did not document any observed cognitive deficits upon examination of Plaintiff, and the neurological examinations performed by Dr. Kaushal were consistently normal ("negative"). [*See, e.g.*, AR 204, 218] Dr. Kaushal's records also revealed that Plaintiff had undergone "neuropsychiatric and psychology evaluation" [AR 205], but the report from that evaluation was not included with Dr. Kaushal's records.

In September 2019, Unum noted the absence of any clear support for a cardiac-based disability and documented that Dr. Kaushal's records "do not support a severity of conditions that would prevent EE [employee] from performing his job/occ

---

[9] A normal ejection fraction is about 50% to 75%, according to the American Heart Association. *See* https://www.mayoclinic.org/tests-procedures/ekg/expert-answers/ejection-fraction/faq.

demands." [AR 252] However, Unum recognized "[t]here also may be some BH [behavioral health] component," and noted that "records are missing from the therapist and from the neurocognitive psychological evaluation done earlier during 2019." [*Id.*] Unum therefore sought to obtain the records from Plaintiff's psychologist (Dr. Credido) and Dr. Keats' report. [AR 252]

### D. Plaintiff's refusal to cooperate with Unum

In response to Unum's request for Dr. Credido's records, Plaintiff's attorney told Unum "we are not comfortable with this request and do not believe Unum is entitled to this private sensitive information which is not in its entirely pertinent to Mr. Radmilovich's disability." [AR 280-281] Unum therefore wrote Dr. Credido and asked for information regarding Plaintiff's diagnosis and functional capacity. [AR 283-286] In a written response, Dr. Credido reported a diagnosis of "adjustment disorder w/ mixed emotional features" with the following explanation: "Primary stress comes from being at work & realizing that symptoms secondary to cardiac arrest impede him from functioning at the necessary level for his professional role." [AR 294] She told Unum that Plaintiff had "ongoing cognitive impairments" but reported, *inter alia*, that Plaintiff was "appropriately" managing his anxiety and depression, was exercising daily, was living "independently and complet[ing] duties of daily living such as cleaning, cooking and shopping," and was not taking any psychotropic medications. [AR 295] Dr. Credido did not describe any mental status exam results or any direct observations of cognitive dysfunction, and instead only conveyed Plaintiff's subjective reports of cognitive impairment. [AR 294-296]

In response to Unum's request for Dr. Keats' report, Plaintiff again refused to cooperate. His attorney told Unum, "this evaluation was performed and paid personally for the use of Mr. Radmilovich and was not intended either in whole or in part to be used for a disability claim or legal proceeding." [AR 378] This noncooperation was entirely unwarranted given the reports of cognitive impairment by Plaintiff and Dr. Credido. Unum told Plaintiff's attorney that if she was unwilling

1
2

to provide the report to Unum, the claim evaluation would be completed without it. [AR 469]

3
4
5
6
7
8
9
10
11
12

In December 2019, Dr. Credido attributed Plaintiff's purported cognitive impairment to "some degree of brain damage" caused by oxygen deprivation during cardiac arrest. [AR 508] However, she did not provide any imaging, test results or medical records to support her brain damage theory, which is not surprising because the medical records from 2016 confirm that Plaintiff did *not* sustain brain damage due to lack of oxygen. To wit, a 2016 brain MRI performed shortly after the heart attack confirmed there was "no evidence of anoxic brain injury."[10] [AR 1630] Dr. Credido also disclosed that Plaintiff "preferred to refrain" from trying any medications or undergoing psychiatric evaluation despite his reportedly disabling complaints. [AR 510]

13
14

**E.    Unum's further claim evaluation and determination that Plaintiff was not entitled to benefits beyond early October 2019**

15
16
17
18
19
20

In December 2019, Unum arranged for several medical consultants to review the file from both physical and behavioral health perspectives. Onsite physician ("OSP") Robert Nosaka, M.D. (internal medicine) reviewed the file and found no medical support for R&LS beyond October 9, 2019, the day Dr. Kaushal decreased the dosage of Plaintiff's Rosuvastatin (a cholesterol lowering drug). [AR 581-521] Dr. Nosaka summarized his rationale, in part, as follows:

21
22
23
24
25

"Recent cardiac stress test reached a metabolic equivalent of 12 which indicates the ability to race a bicycle at 16-19 MPH and exceeds the physical demands of his occupation.  Physical exams are unremarkable and note no cognitive deficits.  He is able to exercise extensively at a level that likely exceeds the metabolic equivalent of his occupation.

26
27

[10] Anoxic brain injury happens when your brain loses oxygen supply. *See* https://www.webmd.com/brain/anoxic-hypoxic-brain-injuries.

28

1
2
3
4
5
6

> Treatment plan is office visits and medication adjustment which can be typically provided while performing the duties of his occupation. Thus, given the unremarkable diagnostic and physical exam findings, the insured's level of activity and the conservative treatment plan, OSP opines that the insured is not precluded from performing the full-time duties of his occupation." [AR 520]

7
8
9

Dr. Nosaka also spoke with Dr. Kaushal who confirmed that the cardiac workup for chest pain had been negative and that Plaintiff was able to exercise regularly, and she acknowledged there was no clear etiology for Plaintiff's reported pain. [AR 530-531]

10
11
12
13

Designated Medical Officer ("DMO") George DiDonna, M.D. (cardiovascular disease physician) next reviewed the file and he too found that occupational R&Ls were not medically supported. [AR 533-536] Dr. DiDonna summarized his conclusions, in part, as follows:

14
15
16
17
18
19
20
21

> "While the insured has continued to complain of various types of chest pain there has not been direct evidence of ongoing myocardial ischemia as an etiology. There is no evidence of heart failure (LVEF 57%) or impairing cardiac arrhythmias. The insured has demonstrated above average exercise capacity for age and is reasonably capable of performing the occupational demands detailed in the medical referral. The insured's self-described activities align with his ETT [exercise tolerance test] results." [AR 535-536]

22
23
24
25
26
27

To address Plaintiff's complaints of cognitive impairment and Dr. Credido's disability opinion, Unum asked psychiatrist Jonathan Morris, M.D. to review the file. [AR 537-539] Dr. Morris found no clinical evidence of impairing symptoms due to a behavioral health condition or medication side effects. *Id.* Unum then asked a second psychiatrist (independent medical consultant Mark Schroeder, M.D.) to review the file. [AR 542-544] Dr. Schroeder concurred with Dr. Morris and stated as follows:

28

1
2
3
4
5
6
7
8
9
10
11
12
13

"The records did not document significant mental status abnormalities. The records of Dr. Kaushal and Dr. Credido do not include any mental status exams.  Dr. Credido opined that the claimant could not perform his full occupational duties because of cognitive impairment including problems with memory, attention, concentration, and multitasking. However, the record did not present evidence of such impairment by means of detailed behavioral observations or cognitive testing. . . . It would be expected that a mental impairment severe enough to prevent the performance of work duties would also cause significant disruption of other life activities.  However, the claimant reported performing a full range of daily activities independently including cleaning, cooking, shopping, and exercising.  That the claimant could perform these activities raises questions about the severity of impairment. . . .

14
15
16
17
18

Dr. Credido stated that the claimant declined to see a psychiatrist or to take psychotropic medication.  In the case of an impairing psychiatric disorder, one would expect to see more frequent and intensive mental health treatment.

19
20
21
22
23
24
25
26
27

In summary, I concluded that the available evidence did not support the AP's [attending physician's] opinion about behavioral health restrictions/limitations during the timeframe in question by means of significant mental status abnormalities, cognitive deficits, psychiatric impairment of daily activities, or by participation in intensive mental health treatment.  Instead, I concurred with the OSP opinion that file documentation of symptoms severity, functional impairment, and treatment intensity is not consistent with the opined restrictions and limitations during the timeframe in question." [AR 543]

28

13

Based on the opinions of Dr. Nosaka, Dr. DiDonna, Dr. Morris and Dr. Schroeder, Unum determined that the medical information did not establish that Plaintiff was unable to perform the demands of his occupation beyond October 8, 2019. [AR 554] Unum therefore approved benefits through that date and conveyed that determination to Plaintiff's attorney in a letter dated December 23, 2019. [AR 560-568] In that letter, Unum explained its position, in part, as follows:

> "the review of the medical records do not support a behavioral health or cognitive impairment at any time during the claim.  The review of the cardiology records support a functional impairment precluding the occupational demands through October 8, 2019. At this time we are able to issue benefits through October 8, 2019, but need additional information in order to continue our review for further benefits."  [AR 565]

The additional information requested was Dr. Keats' report and Plaintiff's behavioral health medical records in and after October 2019. [*Id*.]

**F.     The information submitted in support of Plaintiff's claim (including his above-average results on neuropsychological testing) did not establish disability**

One week after Unum issued its claim determination letter, Dr. Kaushal came up with a never-before mentioned opinion in an effort to support Plaintiff's disability claim.  After treating Plaintiff for *more than three years* following his August 2016 cardiac event, Dr. Kaushal wrote as follows: "Upon further review of patient's medical records & care, etiology of chest pain may be coronary spasm or microvascular disease. . . . Work stress has been found to be a trigger of pain." [AR 575] Dr. Kaushal offered no explanation for this reversal of her prior findings and opinions regarding Plaintiff's reported chest pain (including in September and November 2018, when Dr. Kaushal wrote "I continue to feel that the majority of symptoms may be psychosomatic," "I have not discovered any organic etiology of

14

this chest pain other than possible neuropathic origin," and "[c]hronic chest pain syndrome is likely nonanginal in etiology." [AR 228, 219]).

Both Dr. Nosaka and Dr. DiDonna reviewed Dr. Kaushal's revised opinion but found that that it did not alter their prior determinations, for the reasons Dr. DiDonna summarized as follows:

> "There are no additional cardiac studies submitted and no cardiac clinical information except for Dr. Kaushal's revised opinion. . . . It should be noted there are no prior manifestations of coronary artery spasm in the records . . . there is no documentation of myocardial ischemia by objective techniques. There are no Fractional Flow Reserve tests. There are no Coronary Flow Reserve tests and no evidence of either spontaneous or inducible coronary spasm have been observed by coronary angiography.

> Dr. Kaushal did not submit direct evidence supportive of [her] diagnosis except patient self-report.  In addition, there is no direct support for the diagnosis of microvascular angina despite the availability of both invasive and non-invasive tests for the diagnosis of this condition." [AR 674-675]

Dr. DiDonna also concluded that even if a diagnosis of coronary spasm or microvascular disease was supported, either condition could be managed with pharmacological and non-pharmacological treatments and would not be disabling. [AR 675]

Plaintiff thereafter submitted additional materials, including (finally) Dr. Keats' neuropsychological report. [AR 585-606] As reflected in that report, Plaintiff told Dr. Keats that he was riding an exercise bike for 40 minutes a day and is "prone to pushing through exhaustion." [AR 587] Plaintiff also told Dr. Keats there were non-medical factors impacting his decision not to return to work, including that he felt he was at a "cross roads" with his career. [AR 587]

Most significantly, the results of the tests administered by Dr. Keats demonstrated *an absence of disabling cognitive impairment*. Significant findings reflected in Dr. Keats' report include the following:

> "He was oriented in all spheres and there was no evidence of formal thought or perceptual disturbance. Speech was linear and goal-directed. . . . Overall, **sustained attention and effort appeared to be good. . . . Judgment and insight appeared intact."**

> **"Mr. Radmilovich demonstrated high average abilities to learn and retain details of a complex figure, suggesting visual memory is a strength** . . . Consistent with reported academic and occupational history, **remote memory was intact (high average range).** This is suggestive of intact abilities to retrieve well-learned information from memory.""

> **"Executive abilities ranged from average to high average**. As noted, auditory attention and working memory performance ranged between the average to high average range."

> "[Plaintiff] perceives himself to be experiencing poor health and feeling weak and tired . . . he may be prone to developing physical symptoms in response to stress or be preoccupied with physical health concerns. . . . **With the exception of neurologic symptoms, his responses indicated a lower degree of dysfunction that the reference group**."

> **"Mr. Radmilovich was able to sustain attention, pace, and effort over the examination, without interference from pain."**

1
2
3
4
5

> **"Results from testing demonstrated focal areas of potential mild cognitive decline, but overall, he performed in the average to high average range. His report of difficulty counting, abstracting, losing train of thought, divided his attention, focusing and remembering details, was not necessarily found on this examination**."

6    [AR 589-598, emphasis added]

7        Thus, the results of Dr. Keats' independent neuropsychological evaluation
8    refuted the assertions of Plaintiff, Dr. Kaushal and Dr. Credido that he was
9    experiencing cognitive impairment to a degree that precluded his return to work.  Dr.
10   Keats' diagnostic impression was somatic symptom disorder and mild neurocognitive
11   disorder. [AR 598]

12       Plaintiff's attorney also solicited a letter from Dr. Keats to support Plaintiff's
13   claim. [AR 607-613] Notably, even though Dr. Keats wrote the letter to Plaintiff's
14   attorney and was aware the letter was "needed to determine functional capacity" and
15   to "embellish" her IME report [AR 607], Dr. Keats' corresponding "support" for
16   Plaintiff's claimed R&Ls was not at all compelling.  Dr. Keats merely speculated that
17   Plaintiff's test results suggested that there was "_some_ decline in cognitive ability since
18   his injury." [AR 609, emphasis added]  Even if true, "some decline" in cognitive
19   ability does not equate to total disability, and there is no merit to the notion that
20   Plaintiff must be "100%" in order to rejoin the workforce. Further, when asked
21   whether a return to his occupation would cause harm to Plaintiff or a deterioration of
22   his functional capacity, Dr. Keats was unable to offer anything more than the
23   following inherently speculative opinion: "it is _possible_ a work environment _may_
24   exacerbate cognitive or functional difficulties." [AR 612, emphasis added] Dr. Keats
25   _did not_ opine that Plaintiff was cognitively disabled or precluded from working in his
26   occupation.

27       Significantly, Dr. Keats reported that based on her clinical interviews of
28   Plaintiff, "Mr. Radmilovich was managing his stress and symptoms well." [AR 610]

This observation (made during interviews in late 2018) is notable because at that time, Plaintiff was facing several notable life stressors: "current stressors involve his health and being at a cross roads with his career . . . he is also experiencing a divorce," and "his oldest son is not speaking with him and blames him for the divorce." [AR 587, 588]  The fact that Plaintiff was "managing his stress and symptoms well" while dealing with such enormous stressors strongly indicates that he could likewise manage the occupational stress resulting from a return to work. Certainly this evidence refutes the assertions by Plaintiff and the doctors who support his claim that he would not be able to handle occupational stress if he returns to work.[11]

Unum sent the new materials to independent neuropsychologist David Nowell, Ph.D., for review. [AR 656]  Dr. Nowell confirmed that Dr. Keats' testing showed only "mild impairment, [with] overall performance in the average to high average range." [*Id*.] Dr. Nowell's impression was somatic symptom disorder and neurocognitive disorder.  [*Id*.] He later reviewed the raw test data from Dr. Keats' evaluation and confirmed it did not support disability, explaining that the data "yields performances within normal limits with some variability as would be expected in a battery of tests yielding multiple scores and indices of performance. . . . the 1/31/19 exam yielded no clear evidence of cognitive impairment." [AR 664]

Dr. Morris and Dr. Schroeder also reviewed the additional materials and affirmed there was no support for R&Ls due to a behavioral health condition, including those R&Ls reported by Dr. Credido. [AR 679-681, 689-690]

Because the additional information did not provide a basis to overturn the prior claim determination, in February 2020 Unum reiterated its determination that Plaintiff was not entitled to benefits beyond October 8, 2019, based on its determination that

---

[11] Plaintiff's speculative concern about his ability to handle occupational stress is also undermined by the fact that he resumed working in his own occupation for nearly two years after the August 2016 heart attack before submitting his LTD claim.

Plaintiff was able to perform the duties of his occupation.  [AR 697-705] Unum conveyed that determination to Plaintiff's counsel in a letter dated February 14, 2020, and also explained that although it had paid LTD benefits for the period of October 9, 2019 through February 14, 2020 under a reservation of rights while it continued to evaluate his claim, Unum would not seek the return of those benefits.  [AR 698]

### G.    Plaintiff's appeal of Unum's claim determination

In August 2021, Plaintiff (through his attorneys) appealed Unum's claim determination and submitted various additional materials. [AR 784-768] These materials included a July 2020 neuropsychological evaluation report by Roger Light, Ph.D. which reflected a diagnosis of major neurocognitive disorder, a notable difference as compared to Dr. Keats' diagnosis of mild neurocognitive disorder. [AR 844-885] Plaintiff also submitted a report from cardiologist Dr. Parag Goyal, who did a record review and telephone interview but did not examine Plaintiff. Dr. Goyal, confirmed that "[s]erial echocardiograms have demonstrated that his left ventricular ejection fraction have improved/recovered." [AR 887] But in an attempt to establish that Plaintiff's complaints were physical (rather than psychosomatic) in nature, Dr. Goyal speculated that it is "reasonable to draw the inference that the etiology of his condition is coronary microvascular disease." [AR 889] In fact, such an inference is not supported since there are "both invasive and non-invasive tests for the diagnosis of this condition" [AR 675], yet Dr. Goyal never administered such tests to Plaintiff, and "there is no direct support for the diagnosis of microvascular angina." [*Id*.]

Notably, the updated records from Dr. Kaushal submitted on appeal showed normal physical exams contemporaneous to the termination of benefits in February 2020, including the following:

12/3/20 treatment note: "Patient reports stable symptoms which include occasional chest pain at rest and with exertion.  Remains as active as possible." "Heart: Regular rate and rhythm, S1 normal, S2 normal, no murmur, no click, no rub or gallop." [AR 1081, 1084]

19

1

2      1/4/21 treatment note: "The several times that he has exercised, feels

3      less strain on his heart when working out which he was pleased with."

4      "Heart: Regular rate and rhythm, S1 normal, S2 normal, no murmur, no

5      click, no rub or gallop." [AR 1100, 1104]

6

7          Plaintiff's attorney later submitted a September 2, 2021 letter from Dr. Kaushal

8  in support of the appeal in which Dr. Kaushal again offered a brand new opinion in

9  response to a solicitation for support for Plaintiff's claim. This time Dr. Kaushal wrote

10 that Plaintiff's ability to maintain an exercise regimen was "profoundly limited due

11 to the onset of exercise-induced and post-exertional chest pain and fatigue," and that

12 post exertional symptoms left Plaintiff "bedridden" for days. [AR 1567-1568] These

13 representations by Dr. Kaushal were wholly inconsistent with reports by Dr. Kaushal,

14 Dr. Credido and Dr. Keats that Plaintiff was not only capable of engaging in strenuous

15 exercise, but that he consistently reported that such exercise made him feel better, not

16 worse. (As noted above, Plaintiff routinely reported that he was exercising 4-5 days

17 per week [*see, e.g*., AR 206, 216].) Dr. Kaushal's report that Plaintiff was "bedridden'

18 for days at a time is demonstrably false, at least with respect to the period before

19 Plaintiff's coverage ended. Further, the timing of this second reversal by Dr. Kaushal

20 (again, after Unum's adverse claim determination, and after she was contacted by

21 Plaintiff's attorneys) is telling. Regardless of her motivations, however, Dr. Kaushal's

22 revisionist history of Plaintiff's exercise capacity is completely contradicted by the

23 entries in her own medical records. (*See* references to exercise program of 4-5 days

24 per week [AR 206, 216]; *see also.* AR 220 ("[Patient] notes exercise and 'wearing

25 himself out' make him feel better"), AR 211 ("[n]otes pain intensity improvement

26 with exertion"), AR 201 ("Notes degree of chest tightness during exertion but notes

27 he feels better during exertion. After exercising, chest tightness resolves around after

28 45 minutes")].

## H.   Unum affirmed its claim determination on appeal

In response to Plaintiff's appeal, Unum arranged for several additional medical consultants to review the file.

Independent neuropsychologist Julie Guay, Psy.D. reviewed Dr. Light's report and the raw data from his testing. [AR 1414-1415] Dr. Guay found that the data supported a diagnosis of *mild* – not major – neurocognitive disorder, and noted several reasons why Dr. Light's opinion was not reliable, including the following:

"The data supports the previous diagnosis of Mild Neurological Disorder, most likely due to multiple etiologies, and does not support a diagnosis of Major Neurocognitive Disorder. Dr. Light used a narrow range for premorbid ability (>90%) . . . and argued that every score below that range was considered a decline.  This fails to account for normal variability that occurs even in individuals who are very high functioning. The claimant's test indices and vocational history support a hypothesis that premorbid functioning was above average and a range of >75th percentile is more reasonable to account for normal variability."

"The data does not support [Dr. Light's] statement that the 'breadth and severity of the decrement from expected level of functioning was dramatic.' With respect to 'breadth,' [Dr. Light] did not assess learning and memory, even though this domain is one of the area's most often affected by hypoxia."

"The data does not support the conclusion that somatization was not a possible factor in the claimant's performance. Dr. Light did not assess for this in the current evaluation, nor did he utilize any comprehensive neuropsychological measures to assess response tendencies or symptom validity.  In addition, in contrast to Dr. Light's statement that there was

21

nothing in the claimant's history to suggest that he was prone to somatization, . . . results from Dr. Keats' evaluation from 12/2019 did reflect greater endorsement of somatic concerns that was typical, including fatigue and neurological complaints." [AR 1414-1415][12]

The additional medical consultants who reviewed the file on appeal were psychiatrist Peter Brown, M.D., Scott Norris, M.D. (family and occupational medicine physician) and Timothy McDermott, M.D. (internal medicine, cardiovascular disease, interventional cardiology and nuclear cardiology physician).

Dr. Brown found no restrictions or limitations from a psychiatric perspective and opined that Plaintiff's cognitive disorder diagnosis had not been established according to accepted standards, and explained as follows: "Repeat neuropsychological testing [] has found evidence of, at most, a mild decline in cognitive function with findings that are not consistent with those typically seen in cognitive disorder." [AR 1439] Dr. Brown also added that Plaintiff's "refusal to provide relevant treatment records seriously compromised any evaluation of [Dr. Credido's] assertions.] [*Id.*]

Dr. Norris noted the obvious discrepancies between Dr. Kaushal's attorney-solicited letters, on the one hand, and the documented evidence of Plaintiff's ability to tolerate regular (and strenuous) exercise and cardiac functional testing that showed no evidence of ischemia, with excellent exercise tolerance. [AR 1444-1446] Dr. Norris pointed out there was no explanation for "how [Plaintiff] would be able to tolerate the physical stress of a rigorous exercise program yet be unable to tolerate the occupational stress associated with his work." [AR 1446] Dr. Norris recommended sending the file to a cardiologist to further evaluate the new information. [*Id.*]

---

[12] Notably, whereas Dr. Keats' evaluation was completed in January 2019, Dr. Light did not evaluate Plaintiff until June 2020, four months after Plaintiff's LTD claim closed and his coverage under the Policy ended.

Cardiologist Dr. McDermott wrote a detailed report regarding the medical information which he summarized, in part, as follows:

> "Postoperative exercise stress testing 8/29/19 documents excellent function . . . Normal left ventricular systolic function EF 57% and normal perfusion scan no evidence ischemia. Stress echo 10/26/2020 documents excellent functional capacity 12.8 METS. Cardiac catheterization 11/24/2020 documents all surgical bypasses to be widely patent. . . . Cardiac examinations and vital signs have been unremarkable during multiple encounters . . . The insured has not required hospitalization since CABG for unstable angina or required any type of coronary intervention. Additional cardiac testing sometimes performed for evaluation in these types of conditions such as cardiac MRI, cardiac PET imaging, or invasive assessment with determination of FFR, CFR parameters has not been performed." [AR 1456-1457]

Dr. McDermott also noted a disconnect between Dr. Kaushal's statement that "[Plaintiff's] ability to maintain an exercise program is profoundly limited" with the multiple entries in the medical records showing that Plaintiff consistently engaged in regular exercise and reported that his symptoms improved with exercise. [AR 1457] He also took issue with Dr. Kaushal's report that Plaintiff experienced disabling chest pain and fatigue after the stress echocardiograms: "this is not mentioned in the report. Symptoms of this nature would typically occur within minutes (or seconds) after completion of exercise in most individuals. Reported/observed activities were c/w [consistent with] excellent physical activity tolerance and the capacity to perform substantial cognitive activity." [*Id.*] Dr. McDermott concluded his analysis as follows:

> "the available evidence including multiple stress tests in conjunction with available coronary angiograms documents persistent patency of bypass grafts and excellent functional capacity. The insured's self-

statements along with those of his AP cardiologist affirm a lifestyle that remains active and robust with vigorous physical activities performed on a regular and repetitive basis.

There is conflicting evidence as to whether this individual has myocardial ischemia. His nuclear perfusion study suggests the absence of ischemia. Prior stress test reflects the absence of cardiac symptoms during stress as well as lack of electrocardiographic changes. Stress echocardiography imaging suggests ischemia may be present but certainly there may be challenges in interpretation in the presence of preexisting wall motion abnormalities. **Regardless of whether this individual has any myocardial ischemia present, the available medical records clearly establish that the insured retains the functional capacity to perform (and exceed) the occupational demands of his profession** . . . The etiology of his reported chest pains remains elusive and has not been definitively established (based on current diagnostic means) to be based on microvascular angina; moreover, the available medical records do not establish a clear relation between physical or work stress and his related symptoms. Based on a reasonable degree of medical certainty the medical records provided do not support R&Ls as previously outlined by AP cardiology, and that the insured should have been able to participate in full time occupational work activities from 2/14/2020 and thereafter." [AR 1457, emphasis added]

Also, after Unum's vocational consultant confirmed that Plaintiff's occupation fell within the "light work" category and identified the physical and cognitive demands of the occupation [AR 1462-1464], psychiatrist Dr. Brown confirmed that the medical information did not establish R&Ls that would preclude Plaintiff from performing the cognitive demands of his job. [AR 1465-1466]

In January 2022, Plaintiff's counsel submitted additional materials, including letters from Drs. Light and Kaushal, but those materials consisted of only historical medical information that Unum had already evaluated, information about Plaintiff's status after his coverage under the Policy ended (in February 2020) that was thus irrelevant, and opinions from Drs. Light and Kaushal that were either duplicative to their prior opinions or new opinions without any new clinical evidence or support. Notably, Dr. Light conceded that his evaluation of Plaintiff did not include important test measures (as noted by Dr. Guay), but Dr. Light tried to justify his selective test battery by claiming that his was merely "a supplement to a prior neuropsychological assessment performed by Dr. Keats, and as such a full assessment was not indicated." [AR 1564] Dr. Kaushal said that Plaintiff's exercise tolerance had "significantly diminished" during the nine months from approximately March – December 2021 [AR 1567] Again, even if true, Plaintiff's purported diminished exercise tolerance during that timeframe was not pertinent to Plaintiff's attempt to show that he was disabled *in February 2020* when Unum closed his claim.

Because the information submitted with Plaintiff's appeal did not establish entitlement to further LTD benefits, Unum affirmed its prior claim determination and thoroughly explained the reasons for doing so in a letter to Plaintiff's attorneys dated January 21, 2022.  [AR 7261-7276] Unum summarized the outcome on appeal as follows:

> "The records do not support he is disabled from performing his usual occupation as of February 14, 2020, when his Long Term Disability benefits ended.  His Long Term Disability coverage also ended at that time, as he was not in active employment with the policyholder to be in an eligible group for coverage.  Any subsequent worsening of his condition or new periods of disability are not covered." [AR 7266]

1  **III.   UNUM'S CLAIM DETERMINATION WAS CORRECT**

2        **A.      Plaintiff cannot meet his burden of proving entitlement to benefits**

3        Where, as here, *de novo* review applies to an ERISA benefits decision, the

4  Court "proceeds to evaluate whether the plan administrator correctly or incorrectly

5  denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963-964 (9th

6  Cir. 2006) Under *de novo* review, the Court "determines in the first instance if the

7  claimant has adequately established that he or she is disabled under the terms of the

8  plan." *Muniz v. Amec Constr. Mgmt.*, 623 F.3d 1290, 1294 (9th Cir. 2010).

9  Moreover, the burden is on Plaintiff to prove his entitlement to benefits by a

10  preponderance of the evidence.  *See Inciong v. Fort Dearborn Life Ins. Co.*, 2014

11  U.S. App. LEXIS 7562, *4 (9th Cir. 2014) (affirming denial of long-term disability

12  benefits under de novo standard of review); *Muniz*, *supra*, 623 F.3d at 1294; *see also*

13  *Jordan*, *supra*, 63 F. Supp. 2d 1145, 1155 (C.D. Cal. 1999), aff'd, 370 F.3d 869 (9th

14  Cir. 2004) (a claimant suing for benefits under ERISA bears the burden of proving

15  his or her entitlement to plan benefits and "cannot shift the burden to the plan

16  administrator to 'disprove' an alleged disability."); *Lawrence v. Life Ins. Co. of N.*

17  *Am.*, 2015 WL 7013089, at *4-5 (C.D. Cal. Nov. 12, 2015) (noting that claim

18  administrator was not obligated to prove that claimant was not disabled and holding

19  that claimant failed to meet his burden of proving entitlement to benefits under de

20  novo standard of review); *Shaw v. Life Ins. Co. of N. Am.*, 2015 WL 6755187, at *18

21  (C.D. Cal. Nov. 4, 2015) (under *de novo* standard of review, claimant failed to meet

22  her burden of showing an inability to perform the material duties of her regular

23  occupation by a preponderance of evidence). For the reasons presented in this brief,

24  Plaintiff cannot meet this burden.

25        **B.      That Plaintiff has a medical condition does not mean he was disabled**

26        **when Unum closed his claim in February 2020**

27        Simply because Plaintiff carries diagnoses for various medical conditions does

28  not mean that he presented sufficient evidence that he is disabled as defined by the

Policy. Rather, Plaintiff must show that his medical conditions cause impairment and that such impairment is disabling under the Policy. *See Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability. A claimant bears the burden of proving that an impairment is disabling.").

As the Ninth Circuit explained: "That a person has a true medical diagnosis does not by itself establish disability.… Sometimes their medical conditions are so severe that they cannot work; sometimes people are able to work despite their condition; and sometimes people work to distract themselves from their conditions." *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004). Thus, simply because Plaintiff believes he cannot handle workplace stress, and/or because his doctors have endorsed that belief (despite substantial evidence demonstrating Plaintiff's excellent cardiac capacity and ability to manage stress) does not mean that Plaintiff is disabled and entitled to benefits under the Policy, or that he has presented sufficient evidence of disability.

Further, the substantial evidence cited above refutes the notion that Plaintiff was disabled in February 2020 (when his claim was closed) as a result of his reported diagnoses. That evidence includes extensive cardiology evaluation which did not identify a cardiac etiology to explain his purportedly debilitating symptoms, and numerous cardiology evaluations and testing that revealed no direct evidence of ongoing myocardial ischemia as a cause of his reported symptoms. Additionally, the record is replete with confirmation that Plaintiff consistently engaged in a rigorous exercise program from at least 2018 beyond February 2020, with excellent cardiac functioning, consistently unremarkable cardiac examination findings, good cardiac stress test results, and no evidence of heart failure, cardiac arrhythmias or myocardial ischemia after the surgery. And Plaintiff's own neuropsychologist confirmed that Plaintiff was able to "manag[e] his stress and symptoms well" despite dealing with

substantial emotional stressors (including a divorce and resulting family discord, health concerns and uncertainty about his career).

Additionally, the well-supported findings and opinions of the *nine* medical consultants who reviewed Plaintiff's claim (Drs. Nosaka, Morris, DiDonna, Schroeder, Nowell, Guay, Brown, Norris and McDermott) fully support Unum's determination that Plaintiff was not disabled by any condition under the terms of the Policy.

Accordingly, Plaintiff has not met his burden of proving disability, and Unum correctly determined that he was not entitled to benefits under the Policy.

**C.     Plaintiff's subjective complaints are subject to medical verification**

To the extent Plaintiff's claim is based on his self-reports of chest pain and fatigue, courts have repeatedly recognized that a claimant's subjective reports do not establish disability where other evidence in the record supports a finding that the claimant is able to work.

The district court's discussion in *Seleine v. Flour Corp LTD Plan,* 598 F.Supp. 2d 1090 (C.D. Cal. 2009), is instructive, even though that case was decided under the abuse of discretion standard of review.  In *Seleine*, the claim administrator ("LINA") determined that the claimant was not disabled under the plan's "any occupation" standard.  Similar to the evidence here, medical peer reviews noted that while the claimant had some restrictions, they did not rise to the level of disability.  *Id*. at 1097. The court entered judgment in favor of LINA, reasoning as follows:

> The records of Seleine's attending physicians primarily document her subjective complaints.  Seleine's attempts to elevate these notes of a patient's self-report to the status of "findings" is inappropriate. Doctors have an obligation to record the symptoms complained of by their patients. LINA did not ignore Seleine's subjective complaints of pain. Rather, these complaints were subject to verification by objective medical evidence. LINA was under no obligation to accept them at

face value. … The Court finds that the opinions of Seleine and her treating doctors are insufficient by themselves to establish disability under the Plan requirements and case law. *Id*. at 1101-02.

Thus, Plaintiff's assertion that his subjective complaints of pain and fatigue equate to a disability should not be taken at face value. Rather, the Court should also look to the objective medical evidence to determine whether there is evidence of actual disability. *See Foladpour v. Hartford Life & Acc. Ins. Co*., 2015 WL 3658774, at *12 (C.D. Cal. June 12, 2015) ("It is not unreasonable for a plan administrator to require some objective evidence as proof of total disability"); *Fair v. Bowen*, 885 F.2d 597, 602 (9th Cir.1989) ("the prospect of receiving disability benefits based on an ailment whose extent is objectively unverifiable provides a strong incentive to falsify or exaggerate"); *Langlois v. Metropolitan Life Ins. Co*., 2012 WL 1910020, *14 (N.D. Cal. 2012) ("subjective evidence of a disabling condition is inherently less reliable than objective evidence"); *Bratton v. Metropolitan Life Ins. Co*., 439 F.Supp.2d 1039, 1052 (C.D. Cal. 2006) ("A finding of disability based on mere subjective complaints would open the Plan up to malingering and would greatly hamper [the insurer] from exercising its fiduciary role of scrutinizing requests for benefits").

Further, the Court is not required to accept the opinion of any treating physician as determinative. *See Black & Decker v. Nord*, 538 U.S. 822, 828-829 (2003) (the "treating physician rule" does not apply to administrators in ERISA cases); *Rorabaugh v. Continental Cas. Co*., 321 Fed.Appx. 708, 709 (9th Cir. 2009) (plan administrators not obliged to accord special deference to the opinions of treating physicians even when court reviews benefit determination de novo). In fact, "[t]reating physicians are more or less required to accept their patients' representations," yet neither an ERISA claim administrator nor the reviewing court is obligated to do so. *Seleine, supra*, 598 F.Supp.2d at 1102; *see also, Leipzig v. AIG Life Ins. Co*., 362 F.3d 406, 409 (7th Cir. 2004) ("Physicians accept at face value

what patients tell them about their symptoms; but insurers ... must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk.)"

Moreover, as shown above, the disability opinions of Plaintiff's cardiologist (Dr. Kaushal) are not reliable, as the information contained in the letters she submitted to Unum at the request of Plaintiff's counsel was directly refuted by the information contained in her own treatment records.

Further, as explained above, the conclusory and belated opinions of Dr. Light and Dr. Guay are not supported by the evidence, whereas the peer reviews by Dr. Nosaka, Dr. Morris, Dr. DiDonna, Dr. Schroeder, Dr. Nowell, Dr. Guay, Dr. Brown, Dr. Norris and Dr. McDermott are well supported and should be given significant weight. *See Ibrahim v. Bayer Corp. Disability Plan*, 584 Fed. Appx. 743, 745 (9th Cir. 2014) ("The administrator was entitled to credit Dr. Hennessey's opinion rather than the conclusory and belated opinion of Dr. Yip, Ibrahim's treating physician."); *Sanchez-Levine, supra*, 2017 U.S. Dist. LEXIS 159162, *26 ("MetLife properly relied on Dr. Sugarman's and Dr. Gordan's reviews to support the conclusion that Sanchez-Levine was not disabled within the meaning of the Plan because those reports are thorough and well supported."); *Shaw, supra,* 144 F.Supp. 3d at 1130 ("a paper review by a physician retained by the plan administrator may be more reliable than the opinion of a treating physician."); *Broyles v. A.U.L. Corp. Long Term Disability Ins. Plan*, 2009 U.S. Dist. LEXIS 110744, *18 (N.D. Cal. Nov. 12, 2009) ("consulting physicians' opinions based on reviews of medical records are an acceptable basis of an administrator's determination.").

In sum, because the medical evidence simply does not support the severity of Plaintiff's subjective complaints and the conclusory opinions of his physicians, and based upon the findings and opinions of Unum's medical consultants, Unum's claim determination should be affirmed.

1

## IV.   <u>CONCLUSION</u>

For the above reasons, Unum asks that the Court enter judgment in its favor.

DATED:  November 22, 2022                    MAYNARD COOPER & GALE LLP

By:  */s/ Robert Hess*
     ROBERT E. HESS
     Attorneys for Defendant
     Unum Life Insurance Company of
     America

## CERTIFICATE OF SERVICE

### David Radmilovich *v. Unum Life Insurance Co. of America*

### Case No. 8:22-cv-00181-DOC-KES

**COUNTY OF SAN FRANCISCO, STATE OF CALIFORNIA**

I am a citizen of the United States and employed in San Francisco, California, at the office of a member of the bar of this Court at whose direction this service was made. I am over the age of 18 and not a party to the within actions. My business address is Two Embarcadero Center, Suite 1450, San Francisco, CA 94111.

On **November 22, 2022**, I served the document(s) entitled, **UNUM LIFE INSURANCE COMPANY OF AMERICA'S OPENING TRIAL BRIEF**, on the interested parties in this action as stated below:

> Glenn R. Kantor
> KANTOR & KANTOR, LLP
> 19839 Nordhoff Street
> Northridge, California 91324
> Telephone:  818-886-2525
> Facsimile:  818-350-6272
> Email: gkantor@kantorlaw.net
>
> *Attorneys for Plaintiff, David Radmilovich*

☒ **(BY CM/ECF SERVICE)**: I caused such document(s) to be delivered electronically via CM/ECF as noted herein.

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed on **November 22, 2022** at San Francisco, California.

_____
Brian Recinos

DEFENDANT UNUM LIFE INSURANCE COMPANY OF AMERICA'S OPENING TRIAL BRIEF