Glenn R. Kantor – CA State Bar No. 122643
  Email: gkantor@kantorlaw.net
Sally M. Mermelstein – MN State Bar No. 0329411
  Email: smermelstein@kantorlaw.net
  *(Pro Hac Vice pending)*
Rhonda Harris Buckner – CA State Bar No. 165830
  Email: rharris@kantorlaw.net
KANTOR & KANTOR, LLP
19839 Nordhoff Street
Northridge, CA 91324
Telephone: (818) 886-2525
Facsimile:  (818) 350-6272

Attorneys for Plaintiff,
DAVID RADMILOVICH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| DAVID RADMILOVICH,<br><br>              Plaintiff,<br><br>       vs.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA ,<br><br>              Defendant. | Case No. 8:22-cv-00181-DOC-KES<br><br>**PLAINTIFF'S RESPONSIVE TRIAL BRIEF IN SUPPORT OF FRCP 52 MOTION FOR JUDGMENT**<br><br>Court Trial:      January 17, 2023<br>Time:              8:30 a.m.<br>Courtroom:      10A |

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1

# **TABLE OF CONTENTS**

2

I.    INTRODUCTION ......................................................................................... 1

II.   RESPONSE TO UNUM'S STATEMENT OF FACTS ............................... 2

      A.   Radmilovich's cardiac arrest was not a "heart attack" ...................... 2

      B.   Dr. Kaushal did not change his diagnosis to support
           Radmilovich's LTD claim .................................................................... 4

      C.   To the extent that Radmilovich was unwilling to share certain
           private information with UNUM, his unwillingness was
           immaterial .............................................................................................. 6

      D.   There is no evidence in the record that Radmilovich stopped
           working for "non-medical" reasons ...................................................... 9

      E.   The 2016 brain MRI did not confirm that Radmilovich's brain
           was unaffected by his out-of-hospital cardiac arrest ......................... 11

III.  ARGUMENT ............................................................................................. 12

      A.   UNUM's Argument that this Court Can Refuse to Consider
           Evidence Generated After Radmilovich's Benefits Were
           Terminated Defies Logic and is Contrary to ERISA ......................... 12

      B.   The Policy Does Not Require Radmilovich To Prove the
           Etiology of His Symptoms or Prove a Specific Diagnosis ................. 17

      C.   An Objective Evidence Standard Requiring Positive Diagnostic
           Test Results Cannot be Imposed ........................................................ 20

      D.   Radmilovich's Ability to Exercise does Not Preclude a Finding
           that he is Disabled .............................................................................. 23

      E.   Treating Physicians' Opinions Can and in This Case Should be
           Given Greater Weight Than Those of Paper Reviewers ..................... 27

      F.   UNUM's Decision Lacks Credibility Because of its Absolute
           Failure to Determine Whether Radmilovich's Symptoms
           Affected his Ability to Perform the Substantial and Material
           Duties of His Usual Occupation ......................................................... 29

IV.   CONCLUSION ......................................................................................... 34

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

i

# **TABLE OF AUTHORITIES**

**Federal Cases**

*Abatie v. Alta Health & Life Ins. Co.,*
    458 F.3d 955 (9th Cir. 2006)......................................................................2, 13

*Abram v. Cargill, Inc.,*
    395 F.3d 882 (8th Cir. 2005)......................................................................8, 20

*Backman v. Unum Life Ins. Co. of Am.,*
    191 F. Supp. 3d 1053 (N.D. Cal. 2016) ........................................................18

*Black & Decker Disability Plan v. Nord,*
    538 U.S. 822, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003) ..........................28

*Brown v. Unum Life Ins. Co. of Am.,*
    356 F. Supp. 3d 949 (C.D. Cal. 2019)........................................................8, 18

*Collier v. Lincoln Life Assurance Co. of Bos.,*
    53 F.4th 1180 (9th Cir. 2022)......................................................................9, 11

*Demer v. IBM Corp. LTD Plan,*
    835 F.3d 893 (9th Cir. 2016)........................................................7, 13, 15, 19

*Dewsnup v. Unum Life Ins. Co. of Am.,*
    No. 2:17-CV-00126-TC, 2018 WL 6478886 (D. Utah Dec. 10, 2018)..........passim

*Doe v. Standard Ins. Co.,*
    852 F.3d 118 (1st Cir. 2017) ..........................................................................30

*Elliott v. Life Ins. Co. of N. Am., Inc.*
    16-CV-01348-MMC, 2019 WL 2970843 (N.D. Cal. July 9, 2019) ...................28

*Elliott v. Metro. Life Ins. Co.,*
    473 F.3d 613 (6th Cir. 2006)..........................................................................30

*Entz v. Standard Ins. Co.,*
    No. EDCV19402JGBSHKX, 2020 WL 5496072 (C.D. Cal. Sept. 11, 2020).......18

*Ferrin v. Aetna Life Ins. Co.,*
    336 F. Supp. 3d 910 (N.D. Ill. 2018) ...............................................................5

*Gaylor v. John Hancock Mut. Life Ins. Co.,*
    112 F.3d 460 (10th Cir. 1997)........................................................................21

*Godmar v. Hewlett-Packard Co.,*
    631 F. App'x 397 (6th Cir. 2015)....................................................................19

*Harlick v. Blue Shield of California,*
    686 F.3d 699 (9th Cir. 2012)......................................................................9, 11

*Hawkins v. First Union Corp. Long-Term Disability Plan,*
    326 F.3d 914 (7th Cir. 2003)..........................................................................27

*Hineman v. Long Term Disability Plan of ETrade Grp., Inc.,*
    279 F. App'x 546 (9th Cir. 2008)....................................................................13

*Holmstrom v. Metro. Life Ins. Co.,*
    615 F.3d 758 (7th Cir. 2010)............................................................11, 13, 26

*Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan,*
    349 F.3d 1098 (9th Cir. 2003)........................................................................28

*Kalish v. Liberty Mut./Liberty Life Assur. Co. of Bos.,*
    419 F.3d 501 (6th Cir. 2005)..........................................................................30

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

PLAINTIFF'S RESPONSIVE TRIAL BRIEF

*Kay v. Hartford Life & Accident Ins. Co.*,
  No. 21-55463, 2022 WL 4363444 (9th Cir. Sept. 21, 2022) ..............................29

*Kinstler v. First Reliance Standard Life Ins. Co.*,
  181 F.3d 243 (2d Cir. 1999) ........................................................................29

*Lacko v. United of Omaha Life Ins. Co.*,
  926 F.3d 432 (7th Cir. 2019).........................................................................30

*Lasser v. Reliance Standard Life Ins. Co.*,
  344 F.3d 381 (3d Cir. 2003) .....................................................................30, 32

*McDonough v. Aetna Life Ins. Co.*,
  783 F.3d 374, (1st Cir. 2015) ...................................................................29, 31

*Metro. Life Ins. Co. v. Glenn*,
  554 U.S. 105 (2008) ......................................................................................31

*Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*,
  46 F.3d 938 (9th Cir. 1995) ............................................................................18

*Montour v. Hartford Life & Acc. Ins. Co.*,
  588 F.3d 623 (9th Cir. 2009) ..........................................................................28

*Rabuck v. Hartford Life & Acc. Ins. Co.*,
  522 F. Supp. 2d 844 (W.D. Mich. 2007).............................................................5

*Radford Tr. v. First Unum Life Ins. Co. of Am.*,
  321 F. Supp. 2d 226 (D. Mass. 2004) ...............................................................14

*Rios v. Unum Life Ins. Co.*,
  No. SACV1904100DOCSKX, 2020 WL 7311343
  (C.D. Cal. Dec. 10, 2020) .......................................................................20, 28

*Rochow v. Life Ins. Co. of N. Am.*,
  482 F.3d 860 (6th Cir. 2007) ..........................................................................18

*Saffon v. Wells Fargo & Co. Long Term Disability Plan*,,
  522 F.3d 863 (9th Cir. 2008)..........................................................................14

*Salomaa v. Honda Long Term Disability Plan*,
  642 F.3d 666 (9th Cir. 2011)..........................................................................14

*Salz v. Standard Ins. Co.*,
  380 F. App'x 723 (9th Cir. 2010)......................................................................29

*Silver v. Exec. Car Leasing Long-Term Disability Plan*,
  466 F.3d 727 (9th Cir. 2006)..........................................................................14

*Slupinski v. First Unum Life Ins. Co.*,
  554 F.3d 38 (2d Cir. 2009)........................................................................5, 16

*Slupinski v. First Unum Life Ins. Co.*,
  No. 99 CIV. 0616 (TPG), 2005 WL 2385852 (S.D.N.Y. Sept. 27, 2005)............14

*Smith v. Bayer Corp. Long Term Disability Plan*,
  275 F. App'x 495 (6th Cir. 2008)......................................................................30

*Smith v. Bowen*,
  849 F.2d 1222 (9th Cir. 1988) ........................................................................13

*Smolen v. Chater*,
  80 F.3d 1273 (9th Cir. 1996) ...........................................................................3

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

iii

*Solnin v. Sun Life & Health Ins. Co.*,
  No. 08-CV-2759 DRH AYS, 2015 WL 6550549 (E.D.N.Y. Oct. 28, 2015) ........28

*Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  860 F.3d 259 (4th Cir. 2017)...................................................................13

*State of N.Y. v. Bowen*,
  655 F. Supp. 136 (S.D.N.Y. 1987)...........................................................25

*State of N.Y. v. Sullivan*,
  906 F.2d 910 (2d Cir. 1990)...............................................................24, 25

*Tekmen v. Reliance Standard Life Insurance Co.*,
  --- F.4th ---, No. 20-1510, 2022 WL 17725720 (4th Cir. Dec. 16, 2022) .......20, 21

*Toven v. Metro. Life Ins. Co.*,
  No. CV 06-7260 ABC (RZX), 2008 WL 5101727 (C.D. Cal. Dec. 2, 2008) .........8

*Vaughn v. Hartford Life & Accident Ins. Co.*,
  387 F. Supp. 3d 1119 (D. Or. 2019)..........................................................28

*Vertigan v. Halter*,
  260 F.3d 1044 (9th Cir. 2001)..................................................................26

*Woo v. Deluxe Corp.*,
  144 F.3d 1157 (8th Cir. 1998)............................................................13, 18

*Yancy v. United of Omaha Life Ins. Co.*,
  No. CV14-9803 PSG (PJWX), 2015 WL 9311729
  (C.D. Cal. Dec. 18, 2015)......................................................................30

**Federal Statutes**

29 U.S.C.A. § 1002(21)(A) .......................................................................1

29 U.S.C.A. § 1133....................................................................................1

**Federal Regulations**

29 C.F.R. § 2560.503-1 ............................................................................16

29 C.F.R. § 2560.503-1(h)...........................................................................1

29 C.F.R. § 2560.503-1(h)(iv) ...............................................................13, 17

29 C.F.R. § 2560.503-1 (h)(3)(i); (h)(4) ......................................................13

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

iv

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

## I.    INTRODUCTION

The UNUM policy insuring David Radmilovich provides that UNUM will "fairly, thoroughly, objectively, and timely investigate, evaluate and determine" benefit claims. (137). It is required to include this provision as a matter of its agreement with the State of California. (983). Of course, UNUM in its role as the claims administrator, is also an ERISA fiduciary. 29 U.S.C.A. § 1002(21)(A); (983)(agreeing to conduct its claims handling "considering the interest of the claimant at least as much as their own."). The ERISA statute, itself, entitles Radmilovich to a full and fair review. 29 U.S.C.A. § 1133; 29 C.F.R. § 2560.503-1(h). These are not mere suggestions; they are legal obligations.

The administrative record before this Court establishes that Radmilovich has met his burden to prove he was disabled from performing the "substantial and material and material acts necessary to pursue [his] usual occupation in the usual and customary way," regardless. But the paper-only reviews that UNUM relied on in terminating his benefits, and the process by which UNUM obtained those reviews, do not meet the standards of its policy, UNUM's agreement with the State of California ("the CSA"), or ERISA, making the opinions unreliable and depriving UNUM's decision of credibility.

An incomplete list of the flaws in UNUM's conduct includes:

- Hurrying to reach an adverse determination before information potentially supportive of Radmilovich could arrive;
- Failing to give due weight to Radmilovich's treating doctors' opinions;
- Failing to provide even one medical reviewer with the requirements of Radmilovich's occupation, thereby failing to apply the relevant occupational definition to the question of whether he was disabled;
- Reducing Radmilovich's occupational duties to a set of generic or unintelligible requirements that are not the duties of his "usual occupation";
- Failing to consider stress as an unavoidable component of Radmilovich's occupation;
- Equating the ability to conduct activities of daily living with the ability to perform an occupation;

1

- Failing to acknowledge that the inability to perform occupational duties with "reasonably continuity" amounts to disability under the policy;
- Requiring "direct" or objective evidence although it is not a policy requirement for proof;
- Requiring absolute certainty of the etiology of symptoms or a diagnosis although it is not a policy requirement for proof;
- Refusing to consider probative information because it was not generated contemporaneously with the period of disability;
- Failing to consider the "whole person" or co-morbid conditions in combination in making its disability determination;
- Failing to meet the obligations UNUM has to insureds in the State of California and elsewhere.

"What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 969 (9th Cir. 2006). The biased nature of the claims handling in this case would not permit UNUM's decision to survive discretionary review, much less the *de novo* review, which applies here.

## II.    RESPONSE TO UNUM'S STATEMENT OF FACTS

UNUM makes several *post-hoc*, unsupported, or otherwise misleading statements of fact that require a response.

### A.    Radmilovich's cardiac arrest was not a "heart attack"

- Statement: "Plaintiff David Radmilovich ("Plaintiff") had a heart attack in 2016." Dkt. 23:4

The very first sentence of UNUM's Opening Brief is a misstatement of fact that confuses what happened to Radmilovich – out-of-hospital cardiac arrest – with the much less serious occurrence of a "heart attack." https://www.cdc.gov/heartdisease/cpr.htm ("Cardiac arrest is not the same as a heart attack. A heart attack happens when blood flow to the heart is blocked. A person having a heart attack is still talking and breathing. This person does not need CPR – but they

PLAINTIFF'S RESPONSIVE TRIAL BRIEF

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1  do need to get to the hospital right away.") https://www.nhlbi.nih.gov/health/cardiac-

2  arrest ("Cardiac arrest occurs when the heart suddenly and unexpectedly stops pumping.

3  If this happens, blood stops flowing to the brain and other vital organs.").

4      To mistake Radmilovich's cardiac arrest for a "heart attack" is to entirely

5  misunderstand his medical history. And most critically, UNUM's mischaracterization

6  grossly underestimates the likelihood that Radmilovich would suffer the sort of

7  symptoms of which he has consistently complained. Cardiac arrest kills most of its

8  victims, and of those who survive, the majority are left with cognitive impairment.

9  (263); https://www.nhlbi.nih.gov/health/cardiac-arrest (nine out of ten cardiac arrest

10  victims die, often within minutes). So while Radmilovich is in the minority regarding

11  his survival, he is in the vast majority of those who survive to experience cognitive

12  deficits. This lends additional support, to the already voluminous support, for

13  Radmilovich's cognitive complaints. *Smolen v. Chater,* 80 F.3d 1273, 1282 (9th Cir.

14  1996)(claimant's complaints cannot be ignored where he has a condition that would

15  reasonably be expected to produce his symptoms).[1]

16      Throughout the pendency of his claim, Radmilovich struggled to overcome

17  UNUM's resistance to understanding the magnitude of his out-of-hospital cardiac

18  arrest, its likely consequences,  and its actual consequences for him. His very last appeal

19  submission included, again, the hospital records beginning during his admission for

20  cardiac arrest. However, UNUM's Ms. Durrell recorded, "*the information the attorney*

21  *submitted from 8/2016 through 2/2019 is not time-relevant to our assessment of EE's*

22  *function as of 2/14/2020 when EE's LTD benefits and coverage ended. Some of the*

23  *records rep-date the DOD, and some occurred early in his claim when we agreed he*

24  *was disabled.*" (30). UNUM continues its refusal to make the connection between

---

[1] UNUM has always ignored that Radmilovich suffers from familial chronic hyperlipidemia, requiring medication with high-dose statins, which are also a risk factor for cognitive loss. (607, 1085, 1159). For this reason, Dr. Kaushal reduced Radmilovich's dose of the statin despite his high cholesterol readings. (1085).

3

Radmilovich's cardiac arrest and his cognitive deficits and apparently has yet to appreciate the significance of that life-altering event.

**B.   Dr. Kaushal did not change his diagnosis to support Radmilovich's LTD claim**

- <u>Statement:</u> "after Unum told Plaintiff it did not find support for his LTD claim, Dr. Kaushal reported *for the first time* that Plaintiff's symptoms 'may' be due to coronary spasm or microvascular disease. The timing of this brand new opinion from Dr. Kaushal (*i.e.,* after treating Plaintiff for more than three years following his heart attack, and after Unum conveyed its adverse determination) and its inconsistency with the information in her [sic] own treatment records renders Dr. Kaushal's disability opinion in this case unreliable." Dkt.#23:5.

UNUM's statement is misleading. Even if a precise etiology were necessary – which it is not under the UNUM policy or the law – Dr. Kaushal had previously entertained various explanations for Radmilovich's symptoms, any of which were worthy of being considered as disabling. These included chronic pericarditis, structural abnormalities of the chest, PTSD due to cardiac arrest, psychosomatic, neuropathic pain from surgery, and chronic chest pain syndrome. (205, 220, 223). It is inaccurate to say or imply that Dr. Kaushal's tentative opinion of possible coronary spasm or microvascular disease (or his later arrival at the conclusion of microvascular disease) represented a wild departure. Dr. Kaushal had entertained competing etiologies; he had never thought, nor had he suggested, that Radmilovich's symptoms were out of thin air or that they were feigned. Furthermore, Dr. Kaushal's statement that microvascular disease was a potential etiology proved to be well-considered, as testing eventually supported that etiology. Dr. Kaushal's continued willingness to consider new evidence and what it revealed regarding the etiology of Radmilovich's symptoms should actually increase Dr. Kaushal's credibility and reliability.

Similarly, UNUM's suggestion that Dr. Kaushal was "prodded" by Radmilovich's counsel to change his mind is unsupported and disingenuous. Dkt.#23:5. There is no evidence of this "prodding," but it should be noted that <u>UNUM</u> prodded Dr.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

4

Kaushal to consider the etiology question, by asking him to commit to the proposition that his "cardiac work-up for chest pain has been negative." (575). And it was UNUM's haste to render a decision before hearing from Dr. Kaushal that created the timeline wherein Dr. Kaushal's response followed the benefits termination.[2]

To review, UNUM's Dr. Nosaka spoke with Dr. Kaushal on 12/12/19. (575). He then wrote to Dr. Kaushal asking him to agree with or revise the statements in the letter, including the statement, "cardiac work-up for chest pain has been negative." *Id.* Dr. Kaushal returned the letter with his revision on 12/30/19, at most 10 business days after receiving it, taking issue with Dr. Nosaka's statement, and indicating "the etiology of EE's chest pain may be coronary spasm or microvascular disease."[3] *Id.* However, UNUM had already made its decision without Dr. Kaushal's letter on day 6. (560). The timing of Dr. Kaushal's letter – after the termination of benefits determination – was due to UNUM's refusal to afford Dr. Kaushal a reasonable response time. It was through no fault of Radmilovich, his counsel, or Dr. Kaushal. *Rabuck v. Hartford Life & Acc. Ins. Co.,* 522 F. Supp. 2d 844, 879 (W.D. Mich. 2007)(finding that providing one week for a treating doctor to respond is facially unreasonable); *Ferrin v. Aetna Life Ins. Co.,* 336 F. Supp. 3d 910, 921–22 (N.D. Ill. 2018)(noting there are many reasons doctors may not return an independent medical examiner's calls, including that there is no incentive to do so and busy schedules).

---

[2] A strikingly similar pattern of behavior was described in *Slupinski v. First Unum Life Ins. Co.,* 554 F.3d 38, 43 (2d Cir. 2009). The UNUM physician wrote to the claimant's treating physician attempting to memorialize the conversation between them, but before the treating physician could object, the UNUM physician drew a conclusion that the claimant could work, actions that factored into the court's bad-faith analysis. *Id.*

[3] Obviously, this was also Christmas week.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

5

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

**C.     To the extent that Radmilovich was unwilling to share certain private information with UNUM, his unwillingness was immaterial**

- <u>Statement</u>: "Plaintiff's refusal to cooperate with UNUM"

UNUM's complaint about Radmilovich's initial reluctance to provide Dr. Keats' neuropsychological report is mystifying, since Radmilovich had a change of heart and supplied the report and the raw data. Furthermore, UNUM has used that report extensively – albeit wrongly – to show that Radmilovich suffered no significant cognitive loss, despite explanations by Dr. Keats and Dr. Light that refute UNUM's conclusion.

UNUM also complains that Radmilovich refused to turn over his psychotherapist's office notes, but it has never explained how this failure is material. UNUM had unfettered access to Dr. Credidio. She provided her findings and opinions in narrative form in response to UNUM's questions, noting her diagnosis of "Adjustment Disorder w/Mixed emotional features, secondary to his cardiac arrest." (295). She lent credence to Radmilovich's reports regarding his failed return to work and noted his strong preference for working, which in her opinion stemmed from his military and professional background. (296). Dr. Morris had the opportunity to grill Dr. Credidio by asking more questions, and after receiving lengthy explanations that far exceeded what would have been included in office notes, Dr. Morris had the temerity to reject them in a single sentence.[4] (507-513, 527). Thereafter, also without Dr. Credidio's notes, Dr. Schroeder was happy to opine that Radmilovich had no behavioral health problems and aptly pointed out that Radmilovich's claim did not involve psychiatric impairment but "*a claim of physical (cardiac) impairment reportedly worsened by psychological stress from work.*" (543)(emphasis added).

---

[4] His sentence, "AP continues to maintain physically-based restrictions and limitations, without clearly identifying BH restrictions and limitations," an implausible statement, given that Dr. Credidio mentioned anxiety, depression, grief, and stress. (527)

Eventually, UNUM also had the benefit of Dr. Light's 7/1/20 interview with Dr. Credidio, in which more details of Dr. Credidio's ongoing treatment of Radmilovich were discussed. (851-854). Nonetheless, Dr. Brown, the last UNUM psychiatrist to opine on Radmilovich, made the conclusory statement that *"[t]he refusal to provide time relevant treatment records seriously compromises any evaluation of the treating psychologist's assertions as summarized above.*" (1439).

Here, it is impossible not to return to the fact that UNUM took no advantage of its contractual right to have a mental health professional examine Radmilovich, despite supposedly thinking it needed more insight into his psychiatric conditions. *Demer v. IBM Corp. LTD Plan,* 835 F.3d 893, 905 (9th Cir. 2016). UNUM chose not to do so, but its choice undermines its already dubious complaint that its inability to obtain prized records militate against Radmilovich's disability.[5]

Regarding whether Radmilovich, in fact, suffers from a psychiatric condition, UNUM took, and continues to take, inconsistent positions, depending on its interests. On the one hand, its psychiatrists rejected that Radmilovich had a behavioral health condition, citing the unavailability of Dr. Credidio's records. Yet, despite what UNUM insists is insufficient information, UNUM continues to invoke a psychiatric condition as an explanation for Radmilovich's cardiac complaints to defeat Radmilovich's claims of cardiac impairment. Dkt.#3:5, 17, 22. Regarding Radmilovich's cognitive impairments, the same is true. It uses the existence of Dr. Keats' diagnosis of somatic symptom disorder against him. Dkt.#23:25. UNUM can't get its story straight.

However, to the extent there was a psychiatric or behavioral health explanation for Radmilovich's symptoms, UNUM was mistaken in thinking such a condition would

---

[5] It is easy to imagine what might make a claimant afraid to turn over psychotherapy notes: a claimant's sexual history; details related to a divorce or settlement of a divorce; feelings about his family members; or even feelings about the insurance company or its employees. There is little likelihood that the records contained anything useful for UNUM. It might be different if Radmilovich had claimed he was disabled by a psychiatric condition, but he did not.

PLAINTIFF'S RESPONSIVE TRIAL BRIEF

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

shield it from the obligation to pay benefits. UNUM's policy does limit benefits to two years for mental health conditions, but only for disabilities that are due "**solely**" to mental health conditions (143). Had UNUM believed that psychiatric conditions were responsible for Radmilovich's symptoms, and had UNUM taken its job as an ERISA fiduciary seriously, it should have paid benefits for two years and then gone on to investigate whether there was a physical basis for benefits to continue. But, as UNUM appreciated early on, Radmilovich could not be pigeonholed into this limitation given his physical condition. (12)("EE has physical as well."), (143), (475)(recording UNUM's acknowledgment that in California policies "physical and mental nervous cannot run concurrently").

It appears that UNUM believed instead that Radmilovich had a psychiatric condition in addition to physical conditions or resulting from them. In that case, it was required to consider whether this increased his degree of disability, though it never did so. *Abram v. Cargill, Inc.,* 395 F.3d 882, 887 (8th Cir. 2005)(requiring the claims administrator to consider whether obesity contributed to Abram's disability); *Brown v. Unum Life Ins. Co. of Am.,* 356 F. Supp. 3d 949, 969–70 (C.D. Cal. 2019)(discussing UNUM's failure to explore additional psychological conditions its reviewer suggested might exist); *Toven v. Metro. Life Ins. Co.,* No. CV 06-7260 ABC (RZX), 2008 WL 5101727, at *12 (C.D. Cal. Dec. 2, 2008)("It may be that none of Plaintiff's health problems was disabling on its own, but whether the particular combination of problems he had might together be disabling is a different question - one that was not sufficiently addressed . . . Each individual complaint magnified the others, and contributed to his overall depression and stress. His complaints, however, were not evaluated in toto, but only in an incomplete, piecemeal fashion."): *See also,* (995)(finding that UNUM's practice of "[*u*]*tilizing a policy provision limiting the 'mental and nervous conditions' benefit to 24 months to unreasonably limit the time in which benefits are paid for physiologically-based disabilities, disabling on their own, which may or may not be accompanied by a psychological component"* violates California's Insurance Code*).*

PLAINTIFF'S RESPONSIVE TRIAL BRIEF

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

There is no support for a good faith argument that UNUM needed Dr. Credidio's records or that Radmilovich's failure to provide them supports UNUM's claim determination.

### D. There is no evidence in the record that Radmilovich stopped working for "non-medical" reasons

- Statement: "Plaintiff also told Dr. Keats there were non-medical factors impacting his decision not to return to work, including that he felt he was at a 'cross roads' with his career." Dkt#23:18.

That Radmilovich had "non-medical" reasons, other than disability, for leaving his occupation, was never raised as a reason for terminating his benefits. (560-568, 667-705, 7261-7276). This Court cannot consider this rationale, as Radmilovich was never alerted to it, and it never underwent administrative review. *Harlick v. Blue Shield of California*, 686 F.3d 699, 719-720 (9th Cir. 2012)(ERISA plan administrator cannot raise a new reason for its denial that was not raised in the administrative process); *Collier v. Lincoln Life Assurance Co. of Bos.,* 53 F.4th 1180, 1188 (9th Cir. 2022).

Additionally, UNUM's interpretation of this cherry-picked phrase is unsupported by the record. After interviewing and testing Radmilovich on 1/31/19, Dr. Keats wrote that Radmilovich's "*current stressors involve his health and being at a cross roads with his career.*" (587). Radmilovich did not mention any "non-medical" factors that were preventing him from returning to work, and there is no evidence of any conflict in the workplace, only his employer's insistence that Radmilovich not return until he was medically capable of performing his job. (1569). UNUM does not even hint at what "non-medical" factors there might be; it hopes instead that a single phrase will cause this Court to extrapolate a series of facts that are not in evidence. Additionally, it should be no surprise that a man, who had previously commanded a substantial salary successfully performing a cognitively demanding job, and who found he could no longer perform his work after a nearly catastrophic medical occurrence,

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

9

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1  would be at a "cross roads" or at least would be concerned about his future role in the

2  workforce.

3       No matter. What was described as a crossroads was, in fact, a dead end. Not one

4  physician with whom Radmilovich consulted thought he could or should continue to

5  perform his occupation. Neither Dr. Credidio, Dr. Keats nor Dr. Light thought

6  Radmilovich would ever again be capable of performing his own occupation. Dr.

7  Credidio explained to UNUM that releasing him to return to work would be setting him

8  up to fail. (510). Dr. Keats' report concluded that "*he will benefit from a more flexible,*

9  *less physically and cognitively arduous occupation in which he can implement pacing*

10 *and stress reduction.*" (598). Dr. Keats later explained that Radmilovich's complaints

11 of being unable to function cognitively at work were consistent with her test results,

12 making the additional point that his physical symptoms would be "a challenge for a

13 fixed schedule." (611).  Dr. Light explained, on the basis of his testing, that "*it becomes*

14 *obvious that Mr. Radmilovich will never be able to successfully return to his usual and*

15 *customary occupation*." (874).

16      Charles Galarraga, the vocational expert, determined that all of Radmilovich's

17 acquired skills would be affected by the cognitive deficits Dr. Light described. (827).

18 Galarraga's Labor Market Survey revealed that no one would employ Radmilovich in

19 his occupation, where he had language fluency problems, issues with fine motor speed

20 of his left upper extremity, problems making mathematical calculations, executive

21 functioning problems, emotional lability, or a need to avoid stress. (830-842). To a great

22 extent, employers saw this as a matter of safety, as Radmilovich's occupation entailed

23 ensuring the safety of the industrial plants, including enforcement of OSHA and other

24 safety standards. *Id.* Radmilovich's employer observed his difficulties and requested

25 that he not return until he had no restrictions. (1569).  Galarraga also confirmed that

26 Radmilovich's job was inherently stressful, and Dr. Kaushal and Dr. Goyal insisted that

27 Radmilovich could not perform a stressful occupation without risking his health or life.

28 (1427, 1326, 891-892). Radmilovich's attempt to return to his occupation proved that

PLAINTIFF'S RESPONSIVE TRIAL BRIEF

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1  the stress was too much and that his symptoms, appearing somewhat unpredictably,

2  would make him unable to perform his occupation with continuity or in the usual and

3  customary way. (1077-1078).[6]

4      UNUM's statement that there were non-medical reasons for Radmilovich to

5  cease working cannot be considered as it is post-hoc. But it is also entirely unsupported.

6      **E.    The 2016 brain MRI did not confirm that Radmilovich's brain was**

7      **unaffected by his out-of-hospital cardiac arrest**

8  •   Statement: "[A] 2016 brain MRI performed shortly after the heart attack
       confirmed there was 'no evidence of anoxic brain injury'" Dkt.#23:14.

9

10      UNUM never pointed to the 2016 MRI as a basis for its determination, and

11  Radmilovich was never given an opportunity to contest the relevance of this test to him.

12  *Harlick at* 719-720*; Collier* at 1188. UNUM's statement is also misleading. Though a

13  2016 MRI found "no evidence of anoxic brain injury," the report did not say it

14  "confirmed" an absence of anoxic brain injury. This Court must reject UNUM's

15  invitation to speculate about the meaning of the MRI or to find that the MRI negates or

16  cuts against the existence of cognitive impairments, for several reasons.

17      First, there is nothing in the record that addresses the clinical significance of a

18  brain MRI, much less whether a negative MRI is conclusive as to whether a patient had

19  suffered brain injury. *Cf. Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 768 (7th Cir.

20  2010)(discussing evidence in the record that bone scans and EMGs do not rule out

21  CRPS, the condition claimant claimed disabled her.). Neither UNUM's counsel nor this

22  Court is qualified to render an opinion, in the first instance, on the clinical relevance of

23  the MRI.

24

25  ─────────────────

26  [6] Since Radmilovich filed his Opening Brief in this matter, yet another Circuit Court
    has rejected the argument that a return to work, even one of significant length,
27  undermines the employee's claim for disability benefits. *Tekmen* at *11. Similar to
    Radmilovich, Tekmen returned to work for most of two years after the accident that
28  originally triggered her symptoms. *Id.*

PLAINTIFF'S RESPONSIVE TRIAL BRIEF

Second, all the medical evidence available suggests the MRI was not meaningful. An additional MRI was performed in 2018 that was normal as well, yet in 2/22/19 "hypoxic encephalopathy" was still an active diagnosis and it continued to be so through 6/9/21, the date of the last of Dr. Kaushal's progress notes to be included in the record. *See e.g.,* (2204, 7244, 1190, 1323). UNUM did not ask its physicians to render an opinion about the significance of the MRIs, and none of UNUM's physicians asked to see an MRI, nor did they note that an MRI would be informative. Dr. Keats was aware of the existence of a normal MRI but did not find it pertinent or see it as a basis to qualify her opinion. (586). Dr. Light did not mention the MRI despite his review of medical records going back to Radmilovich's cardiac arrest. (861-862). Dr. Guay, the neuropsychologist who UNUM finally relied upon, concluded that Radmilovich had Mild Neurocognitive Disorder, a diagnosis she was willing to make without reviewing a brain MRI. (1414). When Radmilovich re-supplied UNUM with records of his hospitalization after his sudden cardiac arrest, which again included the MRI results, UNUM denied that there was anything new or relevant to look at.[7] (7268).

## III.   ARGUMENT

### A.   UNUM's Argument that this Court Can Refuse to Consider Evidence Generated After Radmilovich's Benefits Were Terminated Defies Logic and is Contrary to ERISA

UNUM's contention that Radmilovich's coverage ended when UNUM terminated his benefits, and that medical evidence generated after that time is therefore irrelevant, is absurd and entirely unsupported by Ninth Circuit precedent.[8] First, it begs the question by assuming that UNUM's decision to terminate Radmilovich's benefits -

---

[7] Given UNUM's demonstrated tendency to shift its rationales, it is highly likely that even if an MRI had conclusively revealed anoxic brain injury, UNUM would have fallen back on its other argument that diagnoses do not prove disability. Dkt.#23:30.

[8] It is assumed that UNUM's statement that "Plaintiff's coverage was no longer in force after his benefits ended in February 2019" is a typographical error and that it means February, 2020, when benefits actually ended.

PLAINTIFF'S RESPONSIVE TRIAL BRIEF

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1    the action that UNUM claims ended his coverage – was correct. However, it is the

2    correctness of UNUM's decision that this Court is tasked with deciding. *Abatie v. Alta*

3    *Health & Life Ins. Co.*, 458 F.3d 955, 963-964 (9th Cir. 2006). This circular argument

4    must be rejected.

5           UNUM's termination of benefits comes along with a statutory right under ERISA

6    to challenge that determination and obtain full and fair review that "*takes into account*

7    *all comments, documents, records, and other information submitted by the claimant*

8    *relating to the claim, without regard to whether such information was submitted or*

9    *considered in the initial benefit determination."* 29 C.F.R. § 2560.503-1(h)(iv). ERISA

10   claimants have 180 days to submit an appeal, meaning they frequently have no choice

11   but to assemble new evidence after the date of termination or denial. 29 C.F.R. §

12   2560.503-1 (h)(3)(i); (h)(4). If all proof generated during that 180-day period could be

13   deemed irrelevant based on the date of its creation, the right to an ERISA appeal would

14   be meaningless. UNUM's argument, if accepted, would render ERISA claims

15   incontestable, as a claimant could only prevail if he had already undergone the testing

16   the plan argued was lacking in terminating the benefits. *Holmstrom,* 615 F.3d 758, 776.

17          Accordingly, federal courts, including the Ninth Circuit, have allowed claimants'

18   evidence to relate back. As the Ninth Circuit has pointed out, retrospective medical

19   evaluations regarding disability occur often and can be probative. *Demer,* 835 F.3d 893,

20   907–08 (citing *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988)("reports containing

21   observations made after the period for disability are relevant to assess the claimant's

22   disability[;] [i]t is obvious that medical reports are inevitably rendered retrospectively

23   and should not be disregarded solely on that basis"); *Hineman v. Long Term Disability*

24   *Plan of ETrade Grp., Inc.,* 279 F. App'x 546, 548 (9th Cir. 2008)(finding it clearly

25   erroneous to equate the date of disability with the date the disability was first medically

26   diagnosed); *Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 860 F.3d 259, 266

27   (4th Cir. 2017); *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir. 1998)(granting

28   benefits where neither a diagnosis nor a medical opinion that Woo was disabled was

13

1   not made until years after she had left employment); *See also, Silver v. Exec. Car*
2   *Leasing Long-Term Disability Plan,* 466 F.3d 727, 735 (9th Cir. 2006)(acknowledging
3   that if a claimant is disabled at point A and point C, it is highly likely he was disabled
4   at point B). Indeed, the Ninth Circuit itself has remanded to give the claimant the
5   opportunity to undergo and submit a functional capacity evaluation, where the
6   claimant's benefits had been terminated years earlier. *Saffon,* 522 F.3d 863, 872.

7         UNUM should know better. *Radford Tr. v. First Unum Life Ins. Co. of Am.,* 321
8   F. Supp. 2d 226, 236–37 (D. Mass. 2004), *rev'd in part, appeal dismissed in part,* 491
9   F.3d 21 (1st Cir. 2007)(rejecting Unum's argument that disability was unsupported
10   because a diagnosis by a doctor was not made until after claimant was terminated);
11   *Slupinski v. First Unum Life Ins. Co.,* No. 99 CIV. 0616 (TPG), 2005 WL 2385852, at
12   *8 (S.D.N.Y. Sept. 27, 2005), *opinion clarified on denial of reconsideration,* No. 99
13   CV 0616(TPG), 2006 WL 2266569 (S.D.N.Y. Aug. 7, 2006), *rev'd in part,* 554 F.3d
14   38 (2d Cir. 2009), and *rev'd in part,* 554 F.3d 38 (2d Cir. 2009)(rejecting UNUM's
15   argument that medical reports issued after the date of termination could not prove
16   claimant's disability). There is little question that an ERISA claimant's right to submit
17   more evidence in support of his denied or terminated claim will involve medical
18   evidence developed after the date of termination and that an ERISA claimant has a right
19   to have that evidence considered. *See Salomaa v. Honda Long Term Disability Plan*,
20   642 F.3d 666, 679 (9th Cir. 2011)(criticizing the insurer where it first complained about
21   an absence of testing and, when the testing was produced, claimed it didn't pertain to
22   the time period in question).

23         Furthermore, UNUM acknowledges that the period of benefits at issue in this
24   case runs at least until March 23, 2021. Dkt. 23:7 FN3. Radmilovich's position is that
25   this Court should adjudicate that he was disabled and award benefits retroactively and

through "usual occupation" period, which ends 3/23/21.[9] This clearly makes later medical evidence relevant, as the Ninth Circuit has observed. *Demer* at 908 ("a current evaluation of Mr. Demer may be particularly useful because his benefit period may have extended beyond the date of the appeal . . . such that a current examination may be closer in time to the assessment period than it would otherwise appear.").

Here, UNUM appears to be most concerned about this Court's consideration of Dr. Light's neuropsychological testing, his conclusions and his addendum. Dkt.#23:7 FN3, 25 FN12, 28. UNUM would like to disappear Dr. Light's opinions, because he established both: 1) that Radmilovich had suffered considerable cognitive impairments which precluded him from performing his occupation; and 2) even if he had suffered only "Mild Neurocognitive Disorder," he would still be disabled. Not only was Dr. Light's testing probative, but it addressed the very timeliness concern UNUM argues makes his testing irrelevant. Dr. Light explained that although time had elapsed between Dr. Keats and his testing, Radmilovich would not have improved, nor would age-related have caused him to deteriorate. (884-885). In other words, Dr. Light's testing was not a snapshot or an indication that Radmilovich's cognitive abilities had declined but a reasonable measurement of the degree of cognitive impairment Radmilovich had had all along.

UNUM was never meaningfully able to dispute Dr. Lights' opinion, though it did try. UNUM's own neuropsychologist, Dr. Guay, agreed with the assessment of Mild Neurocognitive Impairment (the diagnosis made by Dr. Keats). Her opinion was conspicuously devoid of any statement that Radmilovich could be expected to perform his occupation with this disorder, and she did not address whether he could perform his occupational duties. (1414-1415). UNUM may argue that Dr. Guay's report was not entirely supportive. But that raises the question why UNUM's Durrell felt it necessary

---

[9] This Court has a basis to do so, since the administrative record includes Dr. Kaushal's progress notes through 6/9/21 documenting Radmilovich's ongoing symptoms, as well as his 9/2/21 letter. (1119, 1095, 1081, 1100. 1315, 1322, 1421-1422).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

to inaccurately re-write Dr. Guay's report to say "*testing results were not consistent with neurocognitive impairment*" before she passed it along to Dr. Brown.[10] (1438-1439).

It should be uncontested that it is not within the purview of a fiduciary delegated with the responsibility to administer ERISA claims to rewrite medical reports and then give them to another insurance company doctor to parrot the rewritten report. Dr. Brown's opinion cannot be given any weight, as, at best, it was based on a misunderstanding of what he was supposed to review. It likely additionally demonstrates Dr. Brown's willingness to advance positions without knowledge of the underlying facts.[11] Furthermore, Dr. Light explained that Dr. Guay's report was, indeed, supportive of disability:

- "[T]here are only two possible diagnoses of neurocognitive disorder, Mild and Major."
- "[M]ild neurocognitive disorder does not mean that the impact on one's functioning would be mild."
- For some, mild neurocognitive disorder will cause tasks that were previously simple to be "much more difficult or potentially impossible for them to accomplish."
- In Radmilovich's case, given his high-level occupation, "his physical symptoms of fatigue and his cognitive deficits, whether considered either 'mild' or 'major,' would be expected to preclude his successfully return [sic] to work."

(1564).

UNUM's Durrell, who had already seriously compromised Radmilovich's chance for a full and fair review, refused to consider Dr. Light's analysis for the specious coverage reason that UNUM continues to advance and because:

---

[10] *Slupinski v. First Unum Life Ins. Co.,* 554 F.3d 38, 52 (2d Cir. 2009)(noting in assessing Slupinski's eligibility for attorney fees based on UNUM's culpability, "[t]his was not the first time First Unum had omitted material language from its descriptions of reports of in-house experts on which it relied to explain the termination of disability benefit payments to Slupinski.")

[11] "[T]he plan must ensure that all claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision." 29 C.F.R. § 2560.503-1.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

PLAINTIFF'S RESPONSIVE TRIAL BRIEF

> The new information the attorney submitted in response to [Regulatory Right to Respond] does not include any new clinical information for consideration. It restates prior opinions regarding insured's symptoms, diagnoses and functional capacity. The clinical details outlined in the records and the opinions expressed by Dr. Kaushal and Dr. Light were already considered by our medical reviewers as they were already included in the medical records and prior letters from Dr. Kaushal and Dr. Light. (30).

Durrell's rationale is ridiculous for several reasons. It suggests that the more strongly a physician feels about the claimant's disability and the more willing he is to reiterate it, the less consideration his opinion will be given. As well, Durrell's refusal to consider Dr. Light's explanation, reconciling Dr. Guay's opinion with his own, must be considered as it is "clinical information," and ERISA entitles Radmilovich to have all of his submissions considered whether they are "*comments, documents, records, and other information*." § 2560.503-1(h)(iv). Durrell's conclusion that Dr. Light's analysis was "nothing new," because UNUM already knew where he stood, is not only improper but wrong. Dr. Light's explanation of why UNUM's distinction between Mild and Major Neurocognitive Disorder was flawed was, by definition, new and addressed the question whether Radmilovich's neurocognitive impairment impacted his ability to perform his occupation. UNUM could not turn its back on Dr. Light's comments and neither can this Court.

This Court must consider Dr. Light's report and his analysis as it is part of the administrative record. Moreover, it stands unrebutted. UNUM's decision that Radmilovich was not disabled from a cognitive standpoint lacks any credibility due to its mischaracterization of the essentially supportive opinion it obtained from its own expert, Dr. Guay, and its refusal to consider Dr. Light's rebuttal.

## B. The Policy Does Not Require Radmilovich To Prove the Etiology of His Symptoms or Prove a Specific Diagnosis

As it did in the administrative process, UNUM continues to point to an absence of a precise cardiac etiology for Radmilovich's symptoms of chest pain as a reason for

PLAINTIFF'S RESPONSIVE TRIAL BRIEF

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1   its benefits decision. *See e.g.,* Dkt.#23:4, 5, 10, 11, 15, 17, 18, 22, 27, 30. Dr. Kaushal's

2   conclusion as to the cause of Radmilovich's symptoms evolved over time and even

3   during the pendency of Radmilovich's claim; that much is true. However, this is not

4   problematic. Courts, including the Ninth Circuit and several other circuits, have held

5   that a disability may commence long before its etiology is known or evidence of it is

6   generated. *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan,* 46 F.3d 938,

7   944 (9th Cir. 1995)(remanding to consider new physical etiology where a psychiatric

8   explanation was originally suggested); *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th

9   Cir. 1998); See also, *Backman v. Unum Life Ins. Co. of Am.,* 191 F. Supp. 3d 1053, 1069

10  (N.D. Cal. 2016)(UNUM's failure to acknowledge the change in a doctor's opinion

11  does not support its denial of benefits). UNUM did not have to wait until Dr. Kaushal

12  arrived at an etiology to award benefits.

13       But even if UNUM does not accept Dr. Kaushal's determinations regarding the

14  cause or diagnosis responsible for Radmilovich chest pain, it was never proper for

15  UNUM to require diagnosis or etiology in the first place. Radmilovich needed only to

16  be disabled by "sickness or injury," physical, mental, or both in combination. (136,

17  142). The federal courts agree. *Rochow v. Life Ins. Co. of N. Am.,* 482 F.3d 860, 865–

18  66 (6th Cir. 2007)("Rochow does not have to prove that he was disabled in 2001 due to

19  HSV–Encephalitis; only that in 2001 he was unable to perform his duties due to injury

20  or sickness. Furthermore, the policy does not require medical evidence, only

21  'satisfactory proof.'"); *Brown v. Unum Life Ins. Co. of Am.,* 356 F. Supp. 3d 949, 964

22  (C.D. Cal. 2019)(recognizing that in disability cases the question is whether claimant is

23  disabled by her symptoms, not diagnoses, and noting, "[d]escriptions of symptomology

24  are likewise more helpful in determining Plaintiff's functional capacity than are mere

25  diagnoses."); *Entz v. Standard Ins. Co.,* No. EDCV19402JGBSHKX, 2020 WL

26  5496072, at *8 (C.D. Cal. Sept. 11, 2020)(finding the claimant disabled under the *de*

27  *novo* standard where insurer "improperly focused only narrowly on [claimant's]

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

18

asserted chronic Lyme disease, instead of assessing whether her symptoms rendered her functionally disabled.").

UNUM readily acknowledges that a disability claimant is not disabled by a diagnosis but by his symptoms. Dkt.#23:30 ("Simply because Plaintiff carries diagnoses for various medical conditions does not mean that he presented sufficient evidence that he is disabled as defined by the Policy.").

UNUM argues that not all symptoms are to be believed. However, UNUM has never developed any evidence suggesting the Radmilovich's symptoms are not credible. To do so, it would have had to perform an in-person exam, which it scrupulously avoided, choosing instead to rely on a series of flawed paper reviews. *Demer,* 835 F.3d 893, 906 (citing *Godmar v. Hewlett-Packard Co.,* 631 F. App'x 397, 406 (6th Cir. 2015)("Sedgwick had the right to examine Godmar under the Plan, and the decision not to exercise that right 'raise[s] questions about the thoroughness and accuracy of the benefits determination.").

Furthermore, there is only favorable evidence of Radmilovich's credibility, despite that lack of credibility was never a reason UNUM gave for terminating his claim. Both Dr. Credidio and Dr. Light opined that Radmilovich tends to minimize or deny his cognitive deficits with Dr. Light noting, "*Mr. Radmilovich is subject to anosognosia, organic denial of deficits, and has worked extremely hard to hide his deficits from others and continued to remain employed at his usual and customary occupation for approximately 18 months before eventually becoming aware that he was unable to successfully perform his occupation.*" (852, 874). Dr. Credidio said Radmilovich was "hard-headed" and "stubborn" in this regard, was resistant to stopping work, and was not someone who would exaggerate his symptoms. (852). She explained that Radmilovich would prefer to return to work and had difficulty accepting that he was disabled. (296). Indeed, it appeared that most of Radmilovich's psychotherapy was devoted to his difficulty accepting his limitations, not a refusal to accept that he was able or a tendency to malinger. (294-297, 507-511, 851-854). Radmilovich's brother

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

19

explained to Dr. Light that Radmilovich was unwilling to accept he was suffering from significant cognitive deficits and had to be convinced that returning to work would put him and others at risk. (856). Dr. Keats explained that her test showed no evidence that Radmilovich feigned his symptoms.  (608). It appears that there was a virtual army of people trying to convince Radmilovich that he could not return to performing his occupation, against his resistance. This is the opposite of someone whose complaints lack credibility. Even UNUM's own Dr. Guay agreed that Radmilovich had honestly completed Light's testing and demonstrated "no evidence of purposeful malingering or significant concerns with effort." (1414).

## C.   An Objective Evidence Standard Requiring Positive Diagnostic Test Results Cannot be Imposed

UNUM argues that "Plaintiff's subjective complaints are subject to medical verification," which is not untrue. But that does not mean that it can impose an objective evidence standard of proof that does not exist in the policy. (994)(UNUM's practice of *"[c]haracterizing certain disabling conditions as 'self-reported' (e.g., pain, limited range of motion, weakness), then accepting only objective test results to support disability resulting from these conditions even though no policy provision requires objective test results"* is a violation of the California Insurance Code). Particularly where pain complaints are alleged, as they are here, objective evidence cannot be required. *Saffon* at 873 ("disabling pain cannot always be measured objectively – which is as true for ERISA beneficiaries as it is for Social Security claimants."); *Salomaa* at 678; *Abram v. Cargill, Inc.,* 395 F.3d 882, 887 FN3 (8th Cir. 2005)("[w]hile fatigue is difficult to assess, disability plan administrators may not require objective medical evidence of the cause if there is consistent evidence of disability symptoms, and no finding that the claimant is not credible in her complaints."); *Tekmen v. Reliance Standard Life Insurance Co*., --- F.4th ---, No. 20-1510, 2022 WL 17725720, at *12 (4th Cir. Dec. 16, 2022); *Rios v. Unum Life Ins. Co.,* No. SACV1904100DOCSKX, 2020 WL 7311343, at *2 (C.D. Cal. Dec. 10, 2020), *aff'd in part, rev'd in part and*

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

20

*remanded sub nom. Rios v. Unum Life Ins. Co. of Am.,* No. 21-55020, 2021 WL 6116635 (9th Cir. Dec. 27, 2021).

In *Tekmen,* the claimant developed a heighted sensitivity to sound after being in a car crash. *Tekmen* at *1. She underwent many tests that did not provide an explanation for her symptoms. *Id.* at *2. The Fourth Circuit held that despite "conflicting views even among the treating physicians as to the extent, cause and severity of Tekmen's symptoms . . . most physicians who treated Tekmen believed her to have legitimate impairment in functioning, even in the face of the normal test results." *Id.* at *10. It held, "[b]ecause the plan at issue here did not require objective proof of disability, we reject Reliance contention that Tekmen's claim fails for lack of such evidence." *Id.* at *12. The observation of the Tenth Circuit is particularly apt: "*These doctors did not use a crystal ball to conclude that Ms. Gaylor was disabled; their opinions were based on clinical physical examinations. The verification requirement must be treated as evidentiary in nature. <u>Medicine is, at best, an inexact science, and we should not disregard the great weight of the evidence merely because objective laboratory diagnostic findings either are not yet within the state of the art, or are inconclusive.</u>*" *Gaylor v. John Hancock Mut. Life Ins. Co.,* 112 F.3d 460, 467 (10th Cir. 1997)(emphasis added).[12]

UNUM's relentless insistence on the absence of "direct evidence" and testing to prove why Radmilovich was having debilitating chest pain was improper under the policy. It continues to point to various negative tests and examinations, but it cannot point to a medical opinion that finds Radmilovich's complaints of his pain or other symptoms to be lacking in legitimacy. Radmilovich certainly disagrees that his claim

---

[12] The Tenth Circuit also observed, "*Hancock also denied Ms. Gaylor's claim because her physical condition could not be 'verified by the use of clinical and laboratory diagnostic techniques.' In light of the substantial evidence confirming Ms. Gaylor's disability, this reason for denying benefits reminds us of the doctor who, when asked for the diagnosis, responds, 'we won't know for sure until the autopsy.' We hold that Ms. Gaylor presented enough evidence to establish her disability.") Gaylor* at 467.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

21

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

lacks objective evidence of his cardiac conditions, and he argues that he is disabled both by his symptoms and the risk to his health and life that would be posed by his resuming his occupation with his identified microvascular disease. But even if UNUM refuses to accept Dr. Kaushal's and Dr. Goyal's opinions about the meaning of the 2020 Stress Echocardiogram, it is still the case that Radmilovich's subjective complaints of pain, dizziness, nausea, fatigue, and palpitations, occurring unpredictably, were disabling, in the absence of evidence that he was not credible in his reports. UNUM never even considered this possibility.

Interestingly, in a case against UNUM, the claimant, a trial attorney, suffered a heart attack, underwent bypass surgery, and afterward continued to suffer chest pain made worse by stress. *Dewsnup v. Unum Life Ins. Co. of Am.,* No. 2:17-CV-00126-TC, 2018 WL 6478886, at *1 (D. Utah Dec. 10, 2018). In that case, Dr. DiDonna, also a reviewer here, concluded that "from a cardiac perspective" Dewsnup had no "restrictions and limitations," though DiDonna wondered whether Dewsnup's pain might have precluded him from working. *Id*. at *5. Another reviewer discounted the pain theory because no cause had been found for the pain, Dewsnup could wear a seatbelt, and the stress of his work was speculative, since he had not actually worked since his surgery. *Id.* On appeal, Dr. Scott Norris, also appearing in this case, determined Dewsnup was not disabled, in part because he had good aerobic function, and diagnostic tests had not identified a cardiac, pulmonary or other pathology. *Id*. at *6. The District Court observed that the absence of diagnostic tests for Dewsnup's neuropathic pain did not support the termination of his LTD benefits. *Id.* at *9.

All of this should sound familiar. Radmilovich too has chest pain, the legitimacy of which no one has questioned. There is little difference between these two cases, except for the fact that Radmilovich's doctors have concluded that his microvascular disease puts him at too much risk. It would be ironic indeed if Radmilovich would be in a worse position than Dewsnup, just because, in addition to having intermittent

debilitating chest pain, he actually has a life-threatening condition.[13] In other words, the issues of lack of absolute proof of the etiology of Radmilovich's symptoms and lack of confirmation of diagnostic tests are a distraction. Even under the most unfavorable interpretation of the facts in this case, Radmilovich should be found disabled.

> **D.     Radmilovich's Ability to Exercise does Not Preclude a Finding that he is Disabled**

UNUM references Radmilovich's 8/29/19 normal Nuclear Stress Test to support its false improvement narrative. Indeed, this test was "normal," was "negative for ischemia," and led to the – temporary – "Overall Impression" of low cardiovascular risk. (230, 1219). However, UNUM takes this entirely out of context, ignoring that this test was flanked by two abnormal tests that contradict UNUM's "improvement" story. A 2/1/17 Stress Echocardiogram with exercise was abnormal. (1215, 1106-1108). Because of this abnormal test (1215), Radmilovich underwent a Cardiac Catheterization the next day, which showed his "severe native multivessel coronary artery disease" as well as other findings. (1215-1217). A day later, 10/26/20 Stress Echocardiogram with exercise was also abnormal and demonstrated, among other things, "severe stress-induced ischemia." (1109-1112, 1326). It was this latter test that finally sounded the alarm for Dr. Kaushal. He wrote, "[g]*iven the severity of stress echo findings and potential for underlying microvascular disease as explanation with potential for significant ongoing ischemia to occur at both rest and under stress, I deem the patient unable to return to work indefinitely.*" (1326). Importantly, Dr. Kaushal also found the test and the potential underlying microvascular disease to provide an explanation for Radmilovich's *symptoms*, something that had remained unsolved until the 10/26/20 test. *Id.* In other words, this provided an explanation for the symptoms Radmilovich had been suffering from all along. *Demer* at 907–08.

---

[13] The *Dewsnup* decision is also in the administrative record, as it was submitted as part of Radmilovich's appeal in hopes that UNUM would make the connection and reverse its decision. (1007-1018).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

23

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

Dr. Goyal also supported that working at his stressful occupation would be dangerous for Radmilovich. (1326, 891-892, 1427). As Dr. Goyal explained, the previously normal nuclear stress - the test UNUM relies upon to demonstrate improvement – can produce false negatives. (889). The series of exercise stress tests does not support UNUM's termination of benefits or its improvement narrative.

Furthermore, although UNUM's paper reviewers relied on the METs Radmilovich achieved in his exercise stress testing to conclude that he *could* perform his own occupation, this defies logic in a way that even a lay person can appreciate. It was the exercise tests, themselves, that produced the evidence of ischemia, and the MET level achieved did not negate the conclusion of ischemia or the diagnosis of microvascular disease. In fact, Radmilovich achieved virtually identical MET levels on each of his stress tests, regardless of whether they were normal or abnormal, showing the poor relationship between exercising and the abnormalities the tests identify. (1109, 1107, 1220). Dr. Kaushal explained as much. (1567). In other words, it is apparent that the existence of a life-threatening condition was not incompatible with good exercise tolerance on an 8-minute stress test. As the stress tests themselves make clear, the patient is under constant monitoring and the test can be stopped if there are signs of danger. Not so with the 8-hour workday. *Id.*

Additionally, exercise stress tests are not, by themselves, a reliable way to determine occupational ability. The State of New York sued the Social Security Administration, alleging that its practice of allowing the results of exercise tests in cardiac cases to be determinative of functional capacity was wrong, and it prevailed. *State of N.Y. v. Sullivan*, 906 F.2d 910, 914 (2d Cir. 1990)(finding that evidence in the case showed "[a]n individual who does not show signs of heart disease during a treadmill test may still be severely disabled from ischemia. False assessments may occur because treadmill testing does not consider the full range of stresses and exertions that arise at the workplace or in daily living. For example, the test does not account for demands placed on the heart by heat, cold, humidity, pollution, altitude, psychological

PLAINTIFF'S RESPONSIVE TRIAL BRIEF

pressures and physical efforts that are sudden or prolonged. *See* American College of Cardiology, *Insurability and Employability of the Patient with Ischemic Heart Disease,* 14 J.Amer.Coll.Card. 1003, 1033 (1989)").

This important Federal Court decision led the Social Security Administration to revise its regulations regarding the significance that can be afforded to the results of treadmill exercise tests. Revised Medical Criteria for Determination of Disability, Cardiovascular System, 59 FR 6468-01. ("We agreed with those commenters who referred to the information supplied by the American Medical Association and the American College of Cardiology in the joint amicus curiae brief these organizations filed with the U.S. Court of Appeals in New York in the case of the *State of New York v. Sullivan*, 906 F.2d 910 (2d Cir. 1990), that treadmill exercise testing does not assess all types of functioning or functioning in different environments. We, therefore, revised 4.00C2a to state more accurately that it is well recognized by medical experts that exercise testing is the best tool currently available for estimating aerobic capacity."). Importantly, since exercise stress tests cannot take psychological stress into account, Radmilovich's demonstration of his ability to exercise on these tests does not support UNUM's termination of benefits and the reviewers various attempts to conflate physical stress with psychological stress is unsupported.

As is also true in ERISA, "[t]o ignore all medical findings other than the treadmill test results deprives the claimant of the opportunity to prove his 'particular limitations' not reflected in the latter results." *State of N.Y. v. Bowen*, 655 F. Supp. 136, 143 (S.D.N.Y. 1987), *aff'd sub nom. State of N.Y. v. Sullivan,* 906 F.2d 910 (2d Cir. 1990).[14] UNUM's reviewers are out of touch, at best, in using Radmilovich's performance on exercise testing to arrive at a determination that he could perform his occupation. *See*

---

[14] *See, State of New York v. Bowen,* FN9 and FN10, excerpting the depositions of the officials who categorically applied METs results from exercise stress tests to the exclusion of all other evidence, including to claimants with ischemia, a practice that the court determined was not valid.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

*also, Holmstrom,* 615 F.3d 758, 768 (relying on Social Security standards for the relevance of tests to diagnose ERISA claimant's condition).

The same is true of UNUM's reviewers' observations that Radmilovich could exercise several days a week for 40 minutes at a time. Radmilovich's ability to participate in exercise is no more probative of his ability to perform "with reasonable continuity the substantial and material acts necessary to pursue [his] occupation in the usual and customary way" than his performance on exercise stress tests would be. Radmilovich's exercise, conducted for 40 minutes at a time, does not simulate the performance of his cognitively and physically demanding occupation for 8 hours a day, 40 hours per week, including travel and other physical demands related to the industrial settings. And Radmilovich's reports of what prevented him being able to perform his job when he returned to work do not involve lack of aerobic fitness. He reported chest pain while at rest, he had extreme episodes of chest pain and other symptoms such as palpitations, bradycardia, and shortness of breath that increased in response to the stress of work, in addition to an inability to handle the cognitive demands of work. (220, 585-586, 848-851, 1077-1078).

It is also clear that Dr. Kaushal never stopped taking Radmilovich's symptoms seriously, despite his ability to exercise. Instead, there is evidence that Dr. Kaushal tried to keep Radmilovich exercising. For instance, when the medication Amlopidine affected Radmilovich's ability to exercise, Dr. Kaushal stopped the medication and substituted another one, while simultaneously continuing to opine that Radmilovich was disabled from working. (1315, 1319).

The Ninth Circuit has faulted an ALJ for judging credibility based on claimant's physical activities that she performed for only portions of her day. *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001)("A patient may do these activities *despite* pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain or could engage in similar activity for a longer period given the pain involved . . . Ms. Vertigan's constant quest for medical treatment and pain relief refutes such a

finding."); *Hawkins v. First Union Corp. Long-Term Disability Plan,* 326 F.3d 914, 918 (7th Cir. 2003)(rejecting the plan's "bad argument" regarding Hawkins activity level, noting, "Hawkins' unfortunate choice in life is between succumbing to his pain and fatigue and becoming inert, on the one hand, and on the other hand pushing himself to engage in a certain amount of painful and fatiguing activity. If he does the latter, it does not prove that he is not disabled."); *See also Dewsnup v. Unum Life Ins. Co. of Am.,* No. 2:17-CV-00126-TC, 2018 WL 6478886, at *3 (D. Utah Dec. 10, 2018)(awarding benefits in a case where a cardiac patient who claimed chest pain was aggravated by stress exercised on a treadmill 4-5 days a week for 30 minutes at time).

Not only is it generally true that the ability to exercise does not preclude being disabled from one's occupation, but in Radmilovich's particular case, it was apparent. His return to his actual job caused exacerbation of his symptoms, regardless of his ability to exercise, as Dr. Kaushal describes.[15] (1421). And regardless of his ability to exercise both Dr. Kaushal and Dr. Goyal opined he should not return to work as a life-saving measure. (1427, 1326, 891-892).

### E. Treating Physicians' Opinions Can and in This Case Should be Given Greater Weight Than Those of Paper Reviewers

It is interesting that UNUM asserts it is not required to give special deference to opinions of treating physicians. Dkt.#23:32. It also says that its own conflicted paper-only reviewers are to be given *significant* weight. *Id.* at 33. UNUM has it backwards. While it is perhaps true that other carriers are not under an obligation to automatically

___

[15] Even more nonsensical is UNUM's assertion, made for the first time in its Opening Brief, that Radmilovich's ability to handle life stressors proves he can handle work stress. Dkt.#23:6. Radmilovich had to avoid stress, according to his cardiologist and another cardiology expert, Dr. Goyal. There is nothing that can be done about the extra stressors that Radmilovich may have been undergoing simultaneously, and in that sense, UNUM must take its insureds as it finds them. However, Radmilovich can stop working to avoid the life-threatening consequences of the work stress. So to the extent that his work stress, superimposed on his life stress, became disabling, this constitutes disability.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

give *special* weight to treating physicians, UNUM **must** give them significant weight. (980). This is because of its extensive history of "[o]verruling the opinion of the attending physician after Respondents' in-house medical personnel have conducted a 'paper review' of the medical file." (993).

It goes without saying that an ERISA claims administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S. Ct. 1965, 1972, 155 L. Ed. 2d 1034 (2003); *Tekmen* at *Id.* (*Nord* does not prohibit plan administrators or the court to give more weight to the opinions of treating physicians). Federal Courts, including this one, have frequently observed that, even though ERISA does not impose a treating physician rule, there are reasons that treating physicians' opinions should nonetheless be given greater weight.  These include: a long treating relationship with the patient;[16] physical examination of the claimant where the claims administrator elected to perform only paper reviews;[17] better explanations for their opinions;[18] and credentials.[19]

UNUM is correct that it had multiple physicians opine on Radmilovich. However, in the end, these are just paper reviews, and their opinions are outweighed by

---

[16] *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan,* 349 F.3d 1098, 1109 (9th Cir. 2003); *Tekmen* at *10; *Solnin v. Sun Life & Health Ins. Co.,* No. 08-CV-2759 DRH AYS, 2015 WL 6550549, at *11 (E.D.N.Y. Oct. 28, 2015), *aff'd sub nom. Solnin v. Sun Life,* 672 F. App'x 121 (2d Cir. 2017); *Vaughn v. Hartford Life & Accident Ins. Co.,* 387 F. Supp. 3d 1119, 1132 (D. Or. 2019)(finding that opinion of treating physician who treated the claimant for a longer period was entitled to more weight than a more recent treating physician)

[17] *Elliott v. Life Ins. Co. of N. Am., Inc.,* No. 16-CV-01348-MMC, 2019 WL 2970843, at *6 (N.D. Cal. July 9, 2019); *Dewsnup v. Unum Life Ins. Co. of Am.,* No. 2:17-CV-00126-TC, 2018 WL 6478886, at *10 (D. Utah Dec. 10, 2018); *Rios v. Unum Life Ins. Co.,* No. SACV1904100DOCSKX, 2020 WL 7311343, at *3 (C.D. Cal. Dec. 10, 2020), *aff'd in part, rev'd in part and remanded sub nom. Rios v. Unum Life Ins. Co. of Am.,* No. 21-55020, 2021 WL 6116635 (9th Cir. Dec. 27, 2021); *Montour v. Hartford Life & Acc. Ins. Co.,* 588 F.3d 623, 634 (9th Cir. 2009)("While the Plan does not require a physical exam by a non-treating physician, in this case that choice raise[s] questions about the thoroughness and accuracy of the benefits determination.")(citations omitted).

[18] *Elliott* at *Id.*

[19] *Tekmen* at *10; *Solnin* at *Id.*

---

PLAINTIFF'S RESPONSIVE TRIAL BRIEF

treating physicians who had long-term relationships with Radmilovich (Credidio, Kaushal), elaborate explanations for their opinions (Credidio, Kaushal, Keats), and conducted in-person examinations. (same).

While he is not a treating physician, Dr. Goyal's credentials certainly lend his opinion extra weight. (894-908). UNUM may argue that Goyal did not conduct an in-person exam, however, he came as close as he could by using Zoom to interview Radmilovich and taking a medical history, something that UNUM never contemplated doing. (886-892). Dr. Light's examination resulting in lengthy findings and explanations for his opinion, based on his in-person visit with Radmilovich, his interviews with other medical and non-medical witnesses, and a review of the medical records and medical literature. (844-876). He submitted additional, arguably determinative, explanations in response to Dr. Nowell's and Dr. Guay's reports. (883-885, 1564). Here, there is no comparison between UNUM's paper reviewers and Radmilovich's treating doctors and other experts, and this Court should have no difficulty assigning greater weight to the latter.

### F. UNUM's Decision Lacks Credibility Because of its Absolute Failure to Determine Whether Radmilovich's Symptoms Affected his Ability to Perform the Substantial and Material Duties of His Usual Occupation

To determine whether a claimant is disabled from her own occupation, an ERISA administrator must hold up the claimant's medical symptoms and impairments against the requirements of her occupation, as it is defined in the plan. *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 380-381, (1st Cir. 2015). In making a disability determination of whether a claimant is entitled to "own occupation" benefits, "a proper administrative review requires [the insurer] to analyze, in a reasoned and deliberative fashion, what the claimant actually does before it determines what the [essential duties] of a claimant's occupation are." *Kay v. Hartford Life & Accident Ins. Co.,* No. 21-55463, 2022 WL 4363444, at *2 (9th Cir. Sept. 21, 2022)(citing *Salz v. Standard Ins. Co.*, 380 F. App'x 723, 724 (9th Cir. 2010)); See also, *Kinstler v. First Reliance*

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

PLAINTIFF'S RESPONSIVE TRIAL BRIEF

*Standard Life Ins. Co.,* 181 F.3d 243, 253 (2d Cir. 1999)(while an occupation need not be identical to the one the claimant was performing, it must be of the same general character and take the nature of the institution at which it is performed into account); *Elliott v. Metro. Life Ins. Co.,* 473 F.3d 613, 620 (6th Cir. 2006)(a determination that Elliott could do sedentary work did not properly apply the own occupation standard which required consideration of the duties of Elliott's occupation); *Doe v. Standard Ins. Co.,* 852 F.3d 118, 124 (1st Cir. 2017)(holding an Own Occupation definition requires "a reasoned determination of the existence of disability vel non require[d], inter alia, a review of the material duties of [Doe's] particular position."); *Lasser v. Reliance Standard Life Ins. Co.,* 344 F.3d 381, 388 (3d Cir. 2003)(Reliance's interpretation of "regular occupation" was not reasonable where it removed the need to be on-call from the list of material duties of an orthopedic surgeon in a four-person practice); *Lacko v. United of Omaha Life Ins. Co.,* 926 F.3d 432, 445–46 (7th Cir. 2019)(holding it was an abuse of discretion to downgrade the essential duties of claimant's occupation by choosing a generic DOT description that eliminated specialized tasks). In sum, a claims administrator may not alter the occupation to the extent that its actual duties are no longer considered.

The inherent stress of an occupation factors into whether a claimant is disabled from that occupation. *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Bos.,* 419 F.3d 501, 510 (6th Cir. 2005); *Smith v. Bayer Corp. Long Term Disability Plan,* 275 F. App'x 495, 506 (6th Cir. 2008); *Lasser* at 389; *Doe v. Standard Ins. Co.,* 852 F.3d 118, 123 (1st Cir. 2017); *Yancy v. United of Omaha Life Ins. Co.,* No. CV14-9803 PSG (PJWX), 2015 WL 9311729, at *23 (C.D. Cal. Dec. 18, 2015)(facts suggesting stress at work do not discredit claimant's medical complaints).

The CSA, in its recital of the various "acts or practices" that California found to have violated the California Insurance Code included:

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

Mischaracterizing the claimant's occupation and/or its duties in determining whether the claimant is disabled from performing with reasonable continuity the substantial and material duties of his or her own occupation. (992-993).

Here, the parties essentially agree about the "substantial and material acts" that are required of Radmilovich's "usual occupation." At least by the time the claim was in the appeal phase, Galarraga had clarified the minimum duties of Radmilovich's occupation, using the most applicable DOT code. (825-842.) UNUM's vocational consultant agreed with Galarraga's choice of DOT code. (1462-1464). She noted that Galarraga's version of the occupation entailed more responsibility than was originally thought and included "implementing policies, goals and quality standards as well as budgeting" and she noted that the occupation was in the engineering department, implying a level of complexity and technical knowledge. (1464).

However, none of UNUM's medical reviewers were presented with a list of duties or a description of the degree of mental acuity that Radmilovich's occupation required. This makes UNUM's decision wrong, *per se. McDonough v. Aetna Life Ins. Co.,* 783 F.3d 374, 380 (1st Cir. 2015)(finding that Aetna abused its discretion where "None of the four internal reviewers upon whom Aetna relied compared the appellant's symptoms or impairments to any description of the physical and cognitive demands of his own occupation *as that term is defined in the plan documents.* Nor does the administrative record support an inference that Aetna itself made any such comparison."); *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 118 (2008)(failing to provide its expert with all the relevant evidence suggests an abuse of discretion).

Radmilovich's case is not different. If UNUM's reviewers were supplied any information about Radmilovich's occupation, it was a list of reduced, though also partly incoherent, requirements: "Directing, controlling, or planning activities of others; Making Judgments and decisions; Dealing with People; Performing a Variety of duties; Memory for detailed instructions; Concentration and Attention; Ability to make work related decisions; Ability to adapt to change; Independent planning; and Hazard

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

31

awareness." (520-521, 535-536). None appears to have been informed that stress was inevitably a component of Radmilovich's occupation. *Lasser* at 389.

UNUM's list is inadequate and fails to meet the legal standard. "Making judgments and decisions" does not tell the reviewer what type of judgments and decisions Radmilovich had to make or what the consequences of a wrong decision could be. "Ability to make work related decisions" suffers from the same problem. "Concentration and Attention" does not inform the reviewer of the degree of concentration and attention that would be necessary, an important issue in this case where Radmilovich claimed both that intermittent pain and cognitive problems interfered with Radmilovich's ability to work. Presumably, any task that is voluntary, including brushing one's teeth, requires *some* degree of concentration and attention. "Dealing with people" is so generic that it could just as easily apply to a parking lot attendant or an employee who had little ultimate responsibility. "Performing a variety of duties" is essentially gibberish.

Despite that actual occupation duties must be considered as a matter of law, some of the reviewers flouted the very notion of occupational duties. Dr. Morris's lack of knowledge or interest in occupational duties is demonstrated by his question to Dr. Credidio: "*[h]ow do these conditions impact ability to work at this time, given his reported capacity for addressing needs at home?*" a question that equates an occupation with the ability to perform basic activities of daily living. (506). Although Dr. Morris was asked to apply "occupational demands as identified by the VRC," he did not mention one of these demands, simply answering "I do not find that the limited documentation on file is consistent with BH-based restrictions and limitations at any time during this claim." (543) Dr. Schroeder was supplied with the above list, but even then, he opined that "*it would be expected that a mental disorder severe enough to prevent the performance of work duties would also cause significant disruption of other life activities. However, the claimant reported performing a full range of daily activities independently including cleaning, cooking, shopping and exercising,*" again mistaking

PLAINTIFF'S RESPONSIVE TRIAL BRIEF

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1   Radmilovich's occupation for keeping house, feeding himself, doing errands, and
2   exercising. (543).

3        Dr. Nowell was not asked to apply any occupational duties, only to interpret Dr.
4   Keats' report and its raw data. (664, 656). Dr. McDermott was supplied with the above
5   list but appears to have relied on Radmilovich's ability to exercise to support his
6   statement that Radmilovich could perform full-time work activities. (1449). He
7   acknowledged stress, but since he found the medical records not to "establish a clear
8   relation between physical or work stress and [Radmilovich's] related symptoms," and
9   he did not find a reason to consider Radmilovich's account of the impact of stress when
10  he returned to his actual work, McDermott's opinion in this regard is not credible.[20]
11  UNUM never supplied the new medical reviewers with Galarraga's report, even though
12  it could have provided it to Drs. Brown, Guay and McDermott. (748, 750). Having
13  failed to provide this critical information to the medical doctors, the misunderstanding
14  of Radmilovich's occupation persisted, making every one of UNUM's medical reviews
15  fatally flawed.

16       As such, UNUM's decision lacks credibility and can't be accurate, or even
17  reasonable, as it effectively never determined whether Radmilovich was disabled from
18  the "substantial and material" duties of his occupation or could perform those duties in
19  the usual and customary way.

20
21
22
23
24  _____
    [20] In *Dewsnup*, UNUM's medical reviewer opined that the stress of Dewsnup's
25  occupation was speculative, since he hadn't returned to work. *Dewsnup v. Unum Life
    Ins. Co. of Am.,* No. 2:17-CV-00126-TC, 2018 WL 6478886, at *5 (D. Utah Dec. 10,
26  2018). Here, Radmilovich had returned to work and the stress exacerbated his
27  symptoms, yet UNUM argues that his return to work proves he can perform his
28  occupation.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

PLAINTIFF'S RESPONSIVE TRIAL BRIEF

## IV.   CONCLUSION

For the foregoing reasons and those set forth in Plaintiff's Opening Brief, Radmilovich requests that this Court find him disabled under the policy, and order UNUM to reinstate him into the LTD and Life Insurance plans, with retroactive LTD benefits through the end of the "usual occupation" period, plus pre-judgment interest, attorneys' fees, and costs. Radmilovich also requests that this Court remand the matter to UNUM to make "any occupation" determinations under his LTD and Life Insurance (LWOP) policies, while maintaining jurisdiction over the matter.

DATED:  December 20, 2022                 KANTOR & KANTOR, LLP


By:   */s/ Glenn R. Kantor*
      Glenn R. Kantor
      Attorneys for Plaintiff
      DAVID RADMILOVICH

**KANTOR & KANTOR LLP**
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

PLAINTIFF'S RESPONSIVE TRIAL BRIEF