Glenn R. Kantor – CA State Bar No. 122643
 Email: gkantor@kantorlaw.net
Sally M. Mermelstein – MN State Bar No. 0329411
 Email: smermelstein@kantorlaw.net
 *(Pro Hac Vice)*
Rhonda Harris Buckner – CA State Bar No. 165830
 Email: rharris@kantorlaw.net
KANTOR & KANTOR, LLP
19839 Nordhoff Street
Northridge, CA 91324
Telephone: (818) 886-2525
Facsimile: (818) 350-6272

Attorneys for Plaintiff,
DAVID RADMILOVICH

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| DAVID RADMILOVICH,<br><br>              Plaintiff,<br><br>      vs.<br><br>UNUM LIFE INSURANCE<br>COMPANY OF AMERICA ,<br><br>              Defendant. | Case No. 8:22-cv-00181-DOC-KES<br><br>**PLAINTIFF'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Trial Date:   September 22, 2023<br>Time:         8:30 a.m.<br><br><br>**Complaint Filed: February 3, 2023** |

Plaintiff David Radmilovich hereby submits the following proposed Findings of Fact and Conclusions of Law:

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

## I.     [PROPOSED] FINDINGS OF FACT

### Nature of the Action

1.     This is an action for recovery of long term disability ("LTD") benefits and life waiver of premium ("LWOP") benefits under an ERISA-governed plan. It is undisputed that the Court's review of the correctness of defendant's claim decisions is *de novo*.

2.     Plaintiff was employed by Prudential Overall Supply  ("Prudential"), which established and maintained a long-term disability plan and a life insurance plan for its employees. Each was funded by an insurance policy issued by UNUM Life Insurance Company of America ("UNUM")(119-168).

3.     At issue are Radmilovich's LTD benefits past 2/14/2020 and his LWOP benefit past 2/19/2020.

### Pertinent Policy Provisions

4.     The UNUM LTD Policy, in pertinent part, defines Total Disability as:

TOTAL DISABILITY means, for the first 30 months, that as a result of sickness or injury you are unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way.

After benefits have been paid for 24 months of disability, total disability means that as a result of sickness or injury you are not able to engage with reasonable continuity in any occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity.

USUAL OCCUPATION means the substantial and material acts you are routinely performing for your Employer when your disability begins. (136).

5.     The scheduled monthly LTD benefit is 60% of Radmilovich's salary, which according to UNUM's calculations is $6,334.38. (122).

6. The first 6 months of the 30-month usual occupation period is the Elimination Period, during which no benefits are paid. (124).

7. The policy gives UNUM the right to conduct a physical exam and a claimant's refusal to undergo an exam can form the basis for a termination of his benefits. (127, 143). UNUM never invoked this right with respect to any of Radmilovich's conditions, choosing instead to conduct only paper reviews.

8. The policy pays benefits for disabilities due to physical illness or mental illness, though it limits benefits to 24 months when a disability is "due **solely** to mental disorders." (143)(emphasis added). Where a California claimant's disability is due to a combination of mental and physical illnesses, the 24-month limit does not apply. (12, 475, 974, 982).

9. The policies do not limit benefits because a disability is self-reported or based on symptoms that cannot be established with objective testing. This is consistent with UNUM's settlement agreement with the State of California, which prohibits UNUM from including such limitations. (982, 984, 994).

10. Under Radmilovich's LWOP policy he is entitled to free life insurance coverage till age 70 if he is "unable to perform the duties of any gainful occupation" that could earn him 60% of his previous earnings. (7273-7274).

11. Neither the LTD nor the LWOP policy require that a diagnosis be confirmed at the time of the onset of disability. Nor do they require that a diagnosis be firmly established at any time in order to qualify for benefits.

12. The UNUM policy promises UNUM will "fairly, thoroughly, objectively, and timely investigate, evaluate and determine" benefit claims. (137); *See also*, (983).

**Plaintiff's Background**

13. Before entering the private sector, Radmilovich served in the U.S. Marine Corps as a Marine Officer and Naval Aviator, flying helicopters. (1074). Between 1986 and 1994, he fought in the Gulf War and took part in disaster relief missions abroad. *Id.* He then served as a reservist until 1997, becoming a Major and a coordinator of tactical

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

air operations. *Id.* He left the military following the birth of his first child. (588). Afterward, Radmilovich held management-level jobs in Process and Systems Engineering, and Industrial Engineering, before landing his job at Prudential. *Id*. Before his cardiac arrest, Mr. Radmilovich was an avid cyclist, runner, swimmer, backpacker and hiker. (1074-1075).

**Radmilovich's Occupation**

14.    Radmilovich was responsible for the operational aspects of 23 plants at Prudential, a 190-million dollar uniform and textile rental company. (1075).

15.    Radmilovich's occupational requirements as Sr. Director of Production, are established through several sources. Prudential supplied a "not all inclusive" job description. (99-103). An overview explains, "[t]his management employee coordinates Production in all Industrial laundries and cleanroom facilities. Employee also develops new ideas and equipment for more efficient production and cost containment." (99). The duties listed include "Hiring and training of all Plant Superintendents," "Performs Operational reviews for all industrial cleanroom facilities," "Develops and maintains all wash formulas," "Ensures quality of all finished products," "Conducts training seminars," "Attends trade shows," "Fills in and run Industrial and Cleanroom plants as needed," and "Develops new processing techniques." *Id.*

16.    Prudential's job description included frequent "talking," meaning "[e]xpress or exchange ideas by means of the spoken word to impart oral information to client or to the public and convey detailed spoken instructions to other workers accurately, loudly, or quickly. Employee deals frequently with vendors and plant personnel. This management employee conducts training meetings and speaks at seminars." (101).

17.    Despite that it was a management position, Radmilovich's position was no desk job; it required travel, crawling, climbing, pushing and pulling (including jerking), working in industrial plants, reaching and operating forklifts or other machinery, and lifting 50 pounds. (99, 101-102, 380). As for the mental demands, the employer's job

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

description lists reasoning, math, reading, writing, speaking, directing/controlling (formulating plans, designs, practices, policies, methods, regulations and procedures for operations or projects; negotiating contracts, supervising subordinate workers), comparing data, and teaching/training others. (102-103).

18.    Radmilovich explained that his job is best described as "Industrial Engineer." (824). In a Declaration submitted with his ERISA appeal, Radmilovich explained his occupation further. (1074-1079). His occupation included, "verbally corresponding, negotiating, frequent travel (both locally and out of state), speaking publicly, managing databases, creating system based reports, implementing systems and enhancements, capital project management/implementation, managing budgets, performing operational and financial analysis, addressing complex productivity and quality issues, addressing safety concerns (both in the production plant and in the fleet operations), planning and executing small and large scale meetings, and managing/influencing people at all levels of the organization. The position required working long days, multi-tasking, sustaining attention and was stressful and physically arduous. I lead work related to design, implementation, and operational startup of capital projects ranging from small to large projects nearing $29M . . . I was also responsible for overseeing adherence to and implementation of OSHA/State/Company safety policies/regulations as well as overseeing the adherence to and implementation of Federal/State/Company DOT policies and regulations" (1075). As Radmilovich described, "you can certainly cause physical harm or death to employees by missing or mistaking safety related needs within the operations of the company." (1078).

19.    An expert vocational report by Charles Galarraga was submitted with Radmilovich's ERISA appeal to UNUM, providing additional information about the occupation. (807-844). Galarraga determined that the most analogous occupation from the Enhanced Dictionary of Occupational Titles ("eDOT") was Production

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

4

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Superintendent.[1] (807, 825). He noted that the eDOT code initially arrived at by UNUM's vocational assessment, performed by Desiree Marziali, did not exist. *Id.*

20.    As part of his vocational evaluation, Galarraga conducted a Labor Market Survey. He submitted questionnaires to actual employers that were hiring for Radmilovich's occupation, *i.e.,* the occupation that most closely corresponded to the eDOT job title. (829-842).

21.    Galarraga was able to determine which demands of Radmilovich's occupation were non-negotiable by asking potential employers whether they could employ a person who lacked the ability perform specific activities. *Id.* No employers would hire an otherwise qualified candidate with any *one* of the following problems: inability to tolerate stress; issues with fine motor speed an coordination in one upper extremity; issues with language fluency and precision; working memory problems; executive functioning limitations to include divided attention, inability to multitask, cognitive set switching, mental flexibility, insight and self-awareness and inductive reasoning; emotional lability; or difficulty with writing. (829-842).

22.    Notably, and as Radmilovich had explained in his declaration, an essential duty of the occupation is to maintain the safety of the products and the people in the plants. (23, 461, 474, 832, 834, 835, 836, 839, 840, 841). According to the potential employers, stress is an unavoidable component of this occupation. (830, 831, 832, 833, 835, 837, 838, 839, 840, 841).

23.    There is no dispute over the eDOT code. UNUM's own vocational consultant, Kelly Marsiano, agreed with Galarraga's choice of eDOT code. (459-461, 1464, 1364).

---

[1] The eDOT is "a private resource published by the Economic Research Institute." *Fetter v. United of Omaha Life Ins. Co*., No. 20-C-0633, 2021 WL 1842463, at *6 (E.D. Wis. May 7, 2021). Therefore, in order to challenge UNUM's initial vocational opinion and choice of eDOT code, Radmilovich was forced to hire a vocational expert with access to the proprietary resource.

5

24.     Although Marsiano admitted that Radmilovich's occupation included more responsibility and was more technical than the original job description suggested (1530), UNUM's medical reviewers were deprived of any insight into what Radmilovich did for a living and instead were provided the following list of generic cognitive demands: "Directing, controlling, or planning activities of others; Making judgments and decisions; Dealing with people; Performing a variety of duties; Memory for detailed instructions; Concentration and attention; Ability to make work related decisions; Ability to adapt to change; Independent planning; Hazard awareness." (515, 488, 493, 521, 533-536, 542-543, 1436-1438, 1487-1490, 7264, 7266-7267, 1532). An additional category – "influencing people in their opinions" – was supplied to one medical reviewer. (7267, 1532).

25.     This list of cognitive demands supplied to the medical reviewers provided no information about the level of stress that Radmilovich was under in his occupation or the gravity of the consequences of making mistakes in his occupation. Nor would they have known what field his occupation was in. The medical reviewers would have no idea that Radmilovich was in charge of 23 industrial plants and the safety of the people in those plants, that frequent travel was required, that he was in charge of projects with multi-million dollar budgets, that he developed new processing techniques for the clothing, that he had to do public speaking and plan and execute large meetings, or that he managed databases.

26.     Put differently, UNUM never obtained an opinion as to whether Radmilovich could perform his occupation in the usual and customary way pursuant to the terms of the LTD policy.

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

1

**Radmilovich's Cardiac Arrest/Cardiac Death in August 2016**

2      27.     On August 28, 2016, at age 53, Radmilovich experienced cardiac arrest[2]

3  [3]and collapsed while cycling with his 13-year-old daughter. (1075, 1617-1618).

4  Radmilovich's daughter heard him crash behind her and then saw his body in the street.

5  (1258). An off-duty Pasadena police officer driving by noticed a crowd  around

6  Radmilovich and began CPR. (846, 888, 1258, 1625).

7      28.     Nonetheless, when paramedics arrived, Radmilovich had no discernable

8  pulse, no blood pressure, and he was not breathing. (1617-1618).

9      29.     Radmilovich's "refractory" cardiac arrest was followed by a brief

10  recovery, or "sudden cardiac death with ROSC."[4] (1257, 1259).

11      30.     Radmilovich was transported to the hospital, but his recovery was not

12  sustained and his heart stopped again on the way. (1250). Paramedics were still

13  performing lifesaving CPR when Radmilovich arrived at the emergency department.

14  (1617-1618, 1625). He was in PEA.[5] (1617). Emergency department notes say, "[h]e

15  has been extremely unstable since that time however and has never regained

16  consciousness. His clinical condition has progressively declined after initial

17  stabilization. His prognosis is very poor." (1257).

18

19  _____

[2] Cardiac arrest is not a heart attack or myocardial infarction, despite that UNUM has
20  used these terms interchangeably. [7262,
Dkt.23:4].https://www.cdc.gov/heartdisease/cpr.htm. "A heart attack happens when
21  blood flow to the heart is blocked. A person having a heart attack is still talking and
breathing. This person does not need CPR." https://www.nhlbi.nih.gov/health/cardiac-
22  arrest ("Cardiac arrest occurs when the heart suddenly an unexpectedly stops pumping.
If this happens blood stop flowing to the brain and other vital organs.")
23

24  [3] https://www.nhlbi.nih.gov/health/cardiac-arrest (nine out of ten cardiac arrest victims
die, often within minutes).
25  [4] ("Return of spontaneous circulation")(1257).

26  [5] https://acls.com/articles/what-is-pulseless-electrical-activity-
pea/#:~:text=PEA%20arrests%20are%20associated%20with,%2Dof%2Dhospital%
27  20cardiac%20arrest.

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

31.     At the hospital, Radmilovich was attended to by interventional cardiologist, Dr. Kaushal, who remained Radmilovich's physician thereafter. (800-802). Urgent catheterization performed by Dr. Kaushal at the hospital revealed multilevel coronary artery disease. (801). But surgery to address the underlying coronary artery disease was an option only "if patient makes meaningful neurologic recovery." (802).

32.     The medical records include multiple references to Radmilovich's hypoxic encephalopathy.[6] *See e.g.,* 803, 804, 1583, 6754, 6867, 7244.

33.     Cardiac arrest kills most of its victims, and of those who survive, the majority are left with cognitive impairment. (262). Only 10.8% of adults who suffer out-of-hospital sudden cardiac arrest survive to discharge. (261). Only 9% survive with "good," much less intact, neurological function. *Id.* So, while Radmilovich is in the minority, as a survivor of cardiac arrest, to the extent he suffered cognitive deficits from the cardiac arrest, he was in the vast majority.

34.     Additionally, Radmilovich, himself, is pre-disposed to cognitive loss, even in the absence of his cardiac arrest. His familial hyperlipidemia requires medication with high-dose statins, which, in turn, are a risk factor for cognitive loss. (607, 1085, 1159). This was acknowledged by Dr. Kaushal, who reduced Radmilovich's cholesterol lowering medication despite his high cholesterol readings recording, "[o]ngoing short-term memory loss most likely attributable to hypoxic brain injury incurred during cardiac arrest, however, cannot rule out high-dose statin effect as well. Reduce rosuvastatin to 20 mg nightly.*" (1085). It was also acknowledged by Dr. Keats, who performed neuropsychological testing on Radmilovich. (599).

---

[6] https://www.webmd.com/brain/what-is-encephalopathy (defining encephalopathy as damage or disease affecting the brain and noting that Encephalopathy resulting from cardiac arrest is seen as irreversible.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

35.     It is estimated that Radmilovich was without any cardiac activity for up to 20 minutes. (861), (1618)(noting that 16:50 was his last known well time and at 17:11 he had no blood pressure or pulse). A critical care attending physician noted that he was "having trouble oxygenating the patient" but finally at 18:35 Radmilovich was "stable to go to cardiac cath lab for angiogram." (1671).

36.     Radmilovich's recovery was meaningful enough to undergo quintuple coronary artery bypass surgery on 9/7/16. (1651). His active problem list on 9/8/16 included "nontraumatic brain injury, likely anoxic with delayed processing, decreased recall, decreased comm[unication]." (1284).

37.     Radmilovich received in-patient rehabilitation therapy from 9/12/16 to 9/21/16. (1570-1614). The therapies included physical therapy, occupational therapy, speech therapy, post-surgery care and cognitive care due to his hypoxic encephalopathy. (1076, 1651). Radmilovich had to re-learn to walk, move his limbs, and feed himself again. (1076). Thereafter, Radmilovich received in-home care and cardio rehabilitation through December 2016. (1075-1076).

38.     His final principal diagnosis after these therapies was "anoxic brain damage, not elsewhere classified." (1576). Radmilovich suffered "retrograde amnesia" and has no memory of his life during the 3 weeks before his cardiac arrest. (845, 1076).

**Radmilovich's Return to Work is Unsuccessful**

39.     On 01/16/17 Radmilovich returned to work with the understanding that he was not yet recovered but with confidence that "there would be progress." (1077).

40.     He found that "many of the tasks that were performed with competence in the past had become a struggle. Tasks that took hours or days took days and weeks to complete. Proofing documents, emails, and calculations I created were an impossible job. Reviewing a document required multiple attempts and yet, you still found errors. Keeping focus and holding a train of thought was imperfect to state it lightly. Multi-tasking was a continuous challenge without losing concentration. New problems were

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

an impossibility if I could not significantly leverage historical work performed in the past." (1077).

41.    Radmilovich describes the mechanisms he used to cope with his cognitive limitations at work, which included covering them up: "I learned that most people do not recognize a memory deficiency regarding a complex topic or long meeting if you are able to speak to one point out of a complex topic. It did not matter that you could not remember the remaining 'X' number of critical points." (1077). *See also,* 507 ("These symptoms concerned him but he attempted to forge through them with as little overt manifestation of disabilities.") He learned to "rely heavily (almost exclusively) on work [he] did prior to the cardiac arrest." *Id.*

42.    Shortly after returning to work Radmilovich also experienced increased physiological symptoms causing him to see Dr. Kaushal. (848, 405-406).

43.    Dr. Kaushal's 01/31/17 office visit documents Radmilovich had experienced palpitations for four days, the sudden onset of more rapid heartbeat and felt a strong pounding. The symptoms lasted up to a few hours and subsided slowly. He also experienced occasional lightheadedness/dizziness. (405-406).    Dr. Kaushal explained:"Current symptomatology with respect to palpitations is concerning since it proceeded his cardiac arrest, despite absence of angina. Patient does complain of some dyspnea on exertion which is also concerning for ischemic etiology. Will evaluate patient with 24-hour Holter monitor and have patient return tomorrow for stress echocardiogram given symptomatology is similar to prior myocardial infarction. Continue current medical therapy for now. ER precautions given to patient." (408). The diagnoses of palpitations and dyspnea on exertion were added to Radmilovich's active problem list during the 01/31/17 visit. (408), *Cf.* 409.

44.    In February 2017 Radmilovich underwent various tests ordered by Dr. Kaushal. A stress echocardiogram showed "evidence of severe anterior septal and apical ischemia and possible inferior ischemia versus non-transmural infarct of the inferior wall." (888). This was an abnormal test. (400). An angiogram confirmed his

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

10

severe coronary artery disease. (888). The 24-hour Holter monitor results were notable for "242 isolated premature ventricular ectopic beats" and "there were 5 diary entries which included symptoms of palpitations correlating to PVC's." (888).

45.     However, Dr. Kaushal was not convinced that these studies necessarily supplied an explanation for Radmilovich's symptoms. (395).

46.     On 2/14/17 Radmilovich did not complain of angina or shortness of breath but was still having palpitations. (401, 402). He was directed to return in 3 months or sooner if he worsened. (403).

47.     Radmilovich returned on 4/17/17, before the 3 months were up, with chest pain, bradycardia, and palpitations.[7] (396). He had been unable to sleep because of the sensation of a very forceful heartbeat. (397). Dr. Kaushal noted that "*the heart rate monitor that he wears daily demonstrates bradycardia into the 40s overnight.*" Dr. Kaushal recommended a medication change. (399).

48.     At his 6/27/17 visit with Dr. Kaushal, Radmilovich was still having palpitations. (394).

49.     On 6/6/18 Radmilovich returned to Dr. Kaushal after a period of undergoing testing with Dr. Naqi and Dr. Lopez for hypothyroidism and LFT (liver function test) abnormalities, respectively. (389, 12864, 12893, 12908, 12968-70).

50.     At a 7/24/18 visit with Dr. Kaushal, Radmilovich reported an incident of shortness of breath. (385). It was accompanied by left side chest pressure above the rib cage which was still present. *Id.* He also complained of a trembling/fluttering sensation after exerting himself. (384-385). Dr. Kaushal thought "ischemic etiology" was unlikely and noted that he "reassured" Radmilovich. (387).

51.     Radmilovich was unable to manage his frequent business trips due to stress, which in turn increased his chest pain symptoms. (220). When traveling, he

_____

[7] Bradycardia is an abnormally low heart rate. (1078).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

waited at the wrong airport gate, and stopped on route to wait out dizziness and nausea or chest pain. (1077).

52.     His co-worker, Ira Jacobs, noticed that Radmilovich, who had been "*one of the sharpest, most clever,* and *most intelligent gentlemen he has ever worked with*," had begun to struggle. (857). After his illness, he took longer to gather his thoughts or to focus on the present conversation. He noted that the medical device Radmilovich wore on his wrist would frequently advise of a rapid heartbeat or increased blood pressure, which would distract Radmilovich. (857).

53.     Ira Jacobs indicated that he saw Radmilovich "*as almost obsessed with his recovery and improvement but he became increasingly frustrated that he could not make the progress necessary to keep moving forward*." (858). Radmilovich would travel frequently for work which is very stressful, and he believed Radmilovich was frustrated that he could not successfully manage frequent business trips due to the unpredictable nature of his cardiac episodes. *Id.*

54.     On 9/7/18 Radmilovich, after experiencing chest pain on and off for weeks but increasing over the previous 7 days, reported to the emergency department. (2107, 2113). Dr. Kaushal met him there. (220, 2112). Dr. Kaushal prescribed anti-inflammatories for possible pericarditis. (220). Various explanations for the chest pain were ruled out. (2169). The emergency department physicians did not identify a cause related to Radmilovich's heart but advised him that "sometimes the signs of a serious problem take more time to appear." (2170).

55.     Radmilovich had already cut back on his work until it was part-time. (588). After his emergency department visit, he did not return to the workplace (11, 54).

56.     Forced to cancel a business trip, on 9/14/18 Radmilovich emailed his employer, "I've already contacted the airlines and canceled . . . I will be out through Tues." (1569). In return, Prudential informed him on 9/15/18 that he was not to return to work until his doctor cleared him to return "without restrictions. We need to make sure you are 100% ready and healthy for work." (1569, 588-589).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

12

57.     In his 9/18/18 appointment with Dr. Kaushal, Radmilovich was tearful. (202). He described the episodes of pain that occurred every 1-5 days. Radmilovich explained that the "constant pain" caused "mental fatigue," and he reported a decline in cognitive and memory function. (220).

58.     Dr. Kaushal considered various possible causes of Radmilovich's chest pain, including chronic pericarditis, structural abnormalities in the chest, "part psychosomatic" or PTSD resulting from traumatic history of cardiac arrest exacerbated by depression/anxiety, and neuropathy resulting from the surgery. (220, 223).

59.     Dr. Kaushal noted, "his work is very stressful" and that Radmilovich had "had to cancel recent business trips to avoid stress which are associated with an increase in chest pain symptoms." (220). Dr. Kaushal recommended further cardiac workup to help determine the cause of Radmilovich's chronic chest pain and a psychology referral to rule out and/or address any behavioral health cause. (223, 228- 229).

60.     Dr. Kaushal told Radmilovich to stop working, which devastated Radmilovich. (1079).

61.     On 9/20/2018, Radmilovich returned to Dr. Kaushal who again noted a list of potential causes. Dr. Kaushal's 9/20/2018 office visit notes document "continues to have non-exertional chest pain that is quite bothersome. Has not exercised since last visit." (225, 229). Dr. Kaushal indicated he had not found any organic etiology of the chest pain except neuropathic origin following open heart surgery, although he noted "Dx does include chronic pericarditis." (228-229). A chest CT was within normal limits. (233-234).

62.     Following Dr. Kaushal's advice, on 09/21/2018, Radmilovich began psychotherapy with Vivian Credidio, Ph.D. (507). Dr. Credidio, in turn, sent Radmilovich to Dr. Keats for a neuropsychological evaluation. (509). Radmilovich hoped Dr. Keats' testing would help him obtain an understanding of his cognitive strengths and weaknesses so he could better compensate (1079) and to assist him in making a return-to-work decision. (595).

13

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

63.     Dr. Kaushal's 10/10/2018 office visit notes document complaints of fatigue, described as "crashing," and chest pain occurring every 1-5 days. (216). "Chronic left chest pain and middle chest pain were described as 'tearing' muscles aches which improves during exertion." *Id.* Dr. Kaushal noted, "Patient is slowly acknowledging his change in baseline status and physical limitations." *Id.* Dr. Kaushal did not think the chest pain was "anginal," but he drew no conclusions as to the cause. (219). He noted Aleve relieves the chest ache but not the sharp chest pains. He also noted, the more fatigue, the more palpitations. (216).

64.     On 11/15/18 and 12/19/18, Dr. Keats, the neuropsychologist, completed the interview portion of her exam of Radmilovich. (585). The psychometric testing portion of the exam was completed on 1/31/19. *Id.*

65.     An 11/21/18 visit with Dr. Kaushal was similar to the earlier visits except that Radmilovich's symptoms had improved in that his chest pain had taken 4-6 hours to resolve instead of 12-24 hours. (211). On 2/20/19 things were no different. (206).

66.     In her neuropsychological report (585-606), Dr. Keats rendered two diagnoses: "Mild Neurocognitive Disorder Due to Multiple Etiologies, Without Behavioral Disturbance" and "Somatic Symptom Disorder, With Predominant Pain, Persistent, Mild Neurocognitive Disorder Due to Another Medical Condition." (598).

67.     Dr. Keats noted that Radmilovich scored at or below 15% on tests of "Delayed contextual verbal learning and memory;" "Semantic and phonemic verbal fluency," "Problem solving," and "Fine motor speed and dexterity." (591).

68.     Dr. Keats compared Radmilovich's estimated pre-morbid functioning to the test results and found: "Mr. Radmilovich demonstrates weaknesses in contextual verbal memory (borderline impairment), verbal fluency (low average, and non-dominant hand fine motor speed and dexterity. In comparison to his premorbid functioning, these figures represent a decline over time. His self-report and the pattern of results suggest weakness in verbal recall and fluency were not apparent prior to his insult, suggesting cognitive changes are etiologically linked to his medical condition.

14

His medical history suggests difficulties are likely due to some combination of his cardiac arrest in addition to chronic hyperlipidemia, the latter of which is a risk factor for cognitive decline." (599).

69.     Explaining her diagnosis of Somatic Symptom Disorder, Dr. Keats wrote,"[w]hile testing supports a medical basis for Mr. Radmilovich's pain, there may be psychological barriers which serve to exacerbate the pain experience and/or functionality." (599).

70.     Dr. Keats noted Radmilovich's scores indicated that his pain "extremely" interferes with his life, significantly impacting his ability to work, enjoy social and recreational activities and function in family relationships. (594).

71.     In addition to a series of strategies for accommodating his attention, distractibility, time-management, memory, problem-solving deficits, pain management and fine motor abilities, Dr. Keats recommended a "more flexible, less physically and cognitively arduous occupation in which he can implement pacing and stress reduction." (598-599).

72.     On 8/6/19, Dr. Kaushal's office visit notes reflect Radmilovich's complaints of frequent chest pain, persistent cognitive issues, slurred speech, memory issues and difficulty multi-tasking. (201). Dr. Kaushal wrote, "[d]oubt ischemia etiology however recommend a nuclear stress test for repeat evaluation." (205).

73.     The August 2019 nuclear stress test was negative for ischemia; however, as both Dr. Kaushal and Dr. Goyal later indicated, this test was not determinative because a nuclear stress test may miss this diagnosis or produce a false negative result. (1567, 889).

74.     Dr. Kaushal described Radmilovich's pain as "chronic chest pain syndrome, unlikely anginal in etiology" but acknowledged that neuropsychological testing had "*deemed origin of chest pain is not psychosomatic.*" (205).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

15

1

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

**Radmilovich Applies For Benefits**

75.  Radmilovich eventually accepted he would have to file for LTD benefits with UNUM. (1079). Radmilovich's LTD claim was received at UNUM on 9/12/19. (54).

76.  Dr. Kaushal's accompanying 9/4/19 Attending Physician Statement noted that Radmilovich suffered from Coronary Artery Disease with unstable angina and Chronic Angina. (107). He indicated Radmilovich was restricted from lifting over 10 pounds, walking more than 50 feet and from "cognitive tasks including analytics, administration, communication, project management" because "Chest pain exacerbated by physical & mental demands of his job requirements." (108).  He noted that Radmilovich was under Dr. Credidio's care. (109).

77.  In October 2019, UNUM contacted Dr. Credidio, looking for her treatment notes and asking voluminous questions to which she responded.[8] (294-296). Dr. Credidio traced all of Radmilovich's psychological symptoms to his cardiac arrest. She explained that her diagnosis of "Adjustment Disorder w/ Mixed emotional features" was secondary to his cardiac diagnoses. (294). The "adjustment" Radmilovich was making was to his cognitive impairments and the cardiac symptoms he suffered since his cardiac arrest. *Id.*

78.  Dr. Credidio provided a lengthy explanation of how Radmilovich's psychiatric symptoms were related to his cardiac arrest: "It was apparent that Mr. Radmilovich was grieving the loss of his accustomed level of functioning as a professional. He could no longer count on his sustained concentration and physical stamina and wellbeing. This naturally led to significant stress secondary to the loss of confidence in his professional abilities." (507).

---

[8] Attorney, Rhonda Harris-Buckner, entered an appearance to assist Radmilovich with UNUM's requests. (291).

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

79.     Addressing his return-to-work prospects, Dr. Credidio noted that Radmilovich, as a "proud ex-Marine (pilot)" and a "long time high level professional," would prefer to return to work, but his return to work was "unsuccessful given his inability to sustain the necessary levels of cognitive and physical performance." (296).

80.     In December 2019, a UNUM psychiatrist, Dr. Morris, tried to tease out Radmilovich's psychiatric condition from his physical conditions and shared that his "initial file analysis is that Mr. Radmilovich is not and has not been *psychiatrically* impaired from fulfilling his mental/cognitive occupational demands as noted above on a fulltime basis if he chose to do so at any time during this claim." (505). He asked whether Dr. Credidio agreed with this statement. (505). She did not. (505).

81.     In making the above statement, Dr. Morris was unaware of the actual duties of Radmilovich's occupation. (505).

82.     Dr. Morris asked Dr. Credidio to retract her opinion that Radmilovich's non-physical symptoms were caused by his physical conditions and to instead defer this opinion to other types of providers. (504-512). Dr. Credidio would not do so and pointed out that she relied on medical records, which she attached, concerning Radmilovich's history of encephalopathy. (505-513).

83.     When asked whether she would release Radmilovich to return to work, Dr. Credidio said, "No" because "*I would be setting him up to fail.*" (510).

84.     In a lengthy letter disagreeing with Dr. Morris, Dr. Credidio noted Radmilovich's diagnoses included Hypoxic Encephalopathy after being "without oxygen for 10-15 minutes," which "likely led to some degree of brain injury that he experiences as memory lapses and inability to track complex and sequential information and instruction." (508). She noted his processing speed "is slower" and that "at times he slurs and drools." *Id*. She stated that the "level of cognitive acuity and performance required for his occupation is very high" and he could no longer "count on consistent and sustained cognitive performance" and "can no longer work at his occupation." (508).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

17

85.    Dr. Morris asked Dr. Credidio, "how do these conditions impact ability to work at this time, given his reported capacity for addressing his needs at home?" (506). Despite the irrelevance of the question, Dr. Credidio was able to point to areas where Radmilovich's memory lapses affected him at home, such as forgetting things on the stove and burning pots. (509).

86.    UNUM then engaged psychiatrist Dr. Mark Schroeder, who issued a 12/17/19 report opining, "I do not find that the limited documentation on file is consistent with behavioral health-based restrictions and limitations any time during this claim." (542).

87.    Dr. Schroeder was not aware of the actual demands of Radmilovich's occupation, as he was only provided the generic list. (542).

88.    But Schroeder failed to consider even the generic list. Like Dr. Morris, Dr. Schroeder suggested that a claimant who could perform basic activities such as clean, cook, shop, and exercise would not have a "mental disorder" that prevented him performing his work duties. (543).

89.    Notably, Dr. Schroeder opined that Radmilovich's claim was "*not a claim of psychiatric impairment, but is rather a claim of physical (cardiac) impairment reportedly worsened by psychological stress from work.*" (543).

## UNUM's Initial Assessment Finds Radmilovich Disabled From a Cardiac Standpoint from 9/25/2018 to 10/8/2019 and then Terminates Benefits

90.    On 12/23/19 UNUM approved Radmilovich's LTD benefits but only through 10/9/19. (560-568).

91.    UNUM had relied on its internist, Dr. Nosaka, who opined:

A recent cardiac stress test reached a metabolic equivalent of 12 which indicates the ability to race a bicycle at 16-19 miles per hour and exceeds the physical demands of his occupation.

Physical exams are unremarkable and note no cognitive deficits.
He is able to exercise extensively at a level that likely exceeds the metabolic equivalent of his occupation.

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

Treatment plan is office visits and medication adjustment which can be typically provided while performing the duties of his occupation.

Thus, given the unremarkable diagnostic and physical exam findings, the insured's level of activity and the conservative treatment plan, OSP opines that the insured is not precluded from performing the full-time duties of his occupation. (520).

92.    Dr. Nosaka was unaware of the nature of Radmilovich's occupation and provided no evidence of its "metabolic equivalent." (493).

93.    Treadmill tests alone do not measure whether a person can perform occupationally, so the Social Security Administration has revised its regulations to correct any such misunderstanding. 50 FR 6469-01. ("We agreed with American Medical Association and the American College of Cardiology in the joint amicus curiae brief these organizations filed with the U.S. Court of Appeals in New York in the case of the *State of New York v. Sullivan*, 906 F.2d 910 (2d Cir. 1990), that treadmill exercise testing does not assess all types of functioning or functioning in different environments. We therefore, revised 4.00C2a to state more accurately that it is well recognized by medical experts that exercise testing is the best tool currently available for estimating aerobic capacity.").

94.    Likewise, there is no evidence in the record that it is possible to measure the extent of a patient's tolerance of mental stress by means of a cardiac stress test.

95.    Contradicting himself, Dr. Nosaka claimed to have performed a "Whole person analysis" "considered all the insured's medical conditions individually and collectively in formulating my opinion," while he simultaneously declined to consider the impact of any mental or behavioral issues, which he left to another UNUM physician. (200).

96.    On 12/12/19 Dr. Nosaka phoned Dr. Kaushal, and the next day (Friday, 12/13/19) he wrote to him, attempting to memorialize their conversation and inviting Dr. Kaushal's comment. (573-576).

19

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

97.    Dr. Nosaka asked Dr. Kaushal to agree with or revise statements in his letter, including the statement, "cardiac work-up for chest pain has been negative." (575).

98.    UNUM then turned to its cardiologist, Dr. DiDonna, asking whether he agreed with Dr. Nosaka without waiting for Dr. Kaushal's response. Dr. DiDonna acknowledged Radmilovich's complaints of chest pain but agreed that "the medical evidence does not support that the insured was/is precluded due to a physical condition from 10/9/19 forward (the date when rosuvastatin was decreased from 40 mg to 20 mg) from performing the sustained full-time activities" of his occupation. (535-536). Dr. DiDonna found no "direct evidence" of the possible etiologies, pointing to normal test results. (535).

99.    Like Dr. Nosaka, Dr. DiDonna equated Radmilovich's ability to exercise with his ability to perform his occupation: "[t]he insured has demonstrated above average exercise capacity for age and is reasonably capable of performing the occupational demands detailed in the medical referral." (535). Dr. DiDonna was not aware of Radmilovich's actual occupational duties, only the generic list. (533-536).

100.    UNUM's approval and termination of benefits was issued without receiving Dr. Kaushal's response to Dr. Nosaka's letter. (575). Yet UNUM's letter relied on the *unanswered* letter from Dr. Nosaka to Dr. Kaushal, as if Dr. Kaushal had stipulated to Dr. Nosaka's conclusions. (563).

101.    UNUM's rationales for terminating the benefits were that Radmilovich's cardiac work-up was negative for cardiac causes, that he could exercise, and that whatever was wrong could be treated by seeing his doctor and taking medicines. (560).

102.    UNUM's random termination date was tied to the date on which Dr. Kaushal reduced Radmilovich's dose of the statin, Rosuvastatin. (563). This has never been explained. UNUM also asserted that Radmilovich's "cardiac work-up for chest pain was negative" and the "etiology of his pain was unclear." (560-568). Though it quoted the policy language, UNUM ignored Radmilovich's chest pain that had

20

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

interrupted his ability to work with "reasonable continuity," regardless of its cause. (565).

103.   On 12/30/19, approximately 10 business days later, Dr. Kaushal responded to Dr. Nosaka's letter. Dr. Kaushal had crossed out Dr. Nosaka's statement "cardiac work-up for chest pain has been negative," replacing it with the statement, "upon further review, the etiology of EE's chest pain may be coronary spasm or microvascular disease. Pain is debilitating and similar to his prior MI. Work stress has been found to be a trigger of pain." (575).

104.   On 1/14/20, Dr. Nosaka was asked, "Does the AP responses from Dr. Kaushal imaged 12/30/19 change your noted opinion below that EE is not precluded from noted occ demand beyond 10/9/19?" (614). Without discussion and without addressing Dr. Kaushal's proposed diagnoses, Dr. Nosaka answered, "No. To a reasonable degree of medical certainty, OSP opines that the medical evidence does not support that the insured was/is precluded due to a physical condition from 10/9/19 forward (the date when rosuvastatin was decreased) from performing the sustained full-time activities noted above concurrent with this treatment." (614).

105.   On 2/5/20, Dr. DiDonna agreed with Dr. Nosaka, explaining that Dr. Kaushal was relying on patient's "self-report," not new studies. (675). Dr. DiDonna also stated, "[i]f the insured were found to have either diagnosis its management can be difficult, but pharmacological and non-pharmacological treatments exist that allow satisfactory control of symptoms in most patients," speculating about a potential easy fix for a diagnosis that had yet to be made and that Radmilovich was like "most patients." (675).

**UNUM Reviews Dr. Keats' Neuropsychological Testing**

106.   Subsequently, UNUM received and reviewed Dr. Keats' neuropsychological testing from January 2019 along with supplemental information from Dr. Keats. (20-21).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

107.   In her 1/8/20 letter, Dr. Keats added more information about her 2019 testing. (607-613). She reiterated that the etiology of Radmilovich's cognitive and functional impairments appeared to be his cardiac arrest (611) or a combination of his cardiac arrest and chronic hyperlipidemia, the latter of which is a risk factor for cognitive decline. (607).

108.   Dr. Keats noted that Radmilovich's slower processing speeds require that information be given to him at a slower pace. (609). She suggested he may not be able to mentally solve novel problems as he used to and may instead rely on a trial and error approach. (609).

109.   Dr. Keats provided a short summary detailing how Radmilovich's weaknesses may influence daily function. (609).

110.   Dr. Keats reinforced that "there were no formal or informal indications of insufficient effort or feigning of symptoms" (608), his test results were valid (608), and that "[h]is overall profile was not consistent with holding vague, somatic complaints or perceptions of the self as disabled." (611).

111.   Dr. Keats wrote, "Mr. Radmilovich's cognitive profile suggests he has experienced a decline in cognitive functioning. He describes a concomitant functional decline at his place of work, which is consistent with the results from testing demonstrating cognitive changes." (611). Dr. Keats acknowledged, as she had before, that pain and fatigue affected Radmilovich's ability to work and that the unpredictability of these symptoms posed "a challenge for a fixed schedule." (611).

112.   Dr. Keats noted that because cognitive recovery tends to plateau after two years post-illness, Radmilovich was unlikely to improve. (612). Dr. Keats was being optimistic, since the record includes information explaining that,"functional recovery continues over the first six to 12 months after [out-of-hospital cardiac arrest]." (262).

113.   Therefore, by the time of Dr. Keats' testing, Radmilovich's cognitive abilities were permanent, since his cardiac arrest occurred in 2016.

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

114. In response, UNUM's Dr. Morris recused himself from the question of cognitive impairments and issued a content-free opinion that there were no impairing behavioral health conditions. (681).

115. Dr. Nowell, neuropsychologist and clinical psychologist, issued an impenetrable report that, at best, claims that Dr. Keats' report was lacking in some way. (656). After obtaining the raw data from Dr. Keats' examination, UNUM returned to Dr. Nowell who opined, "only one index fell outside the normal range. This was one of several index scores assessing performance on a problem solving task." (664).

116. Dr. Nowell indicated the testing "yielded no clear evidence of cognitive impairment." (664, 690). He did not explain why his interpretation of Dr. Keats' data differed from Dr. Keats' interpretation or what was needed for clarity. This did not prompt UNUM to obtain its own "clearer" cognitive testing. When asked if there were any psychological factors identified in Dr. Keats' testing, Dr. Nowell's answer was opaque, but he commented that Radmilovich showed an "introverted style with greater endorsement of somatic concerns (particularly fatigue and neurological complaints) than is typical." (664).

117. On 2/14/2020, Dr. Schroeder noted, "Neuropsychologists Dr. Keats and Dr. Nowell have disagreed about the meaning of the neuropsychological testing from 1/31/2019, with respect to potential psychological and cognitive impairment," which he apparently saw as a reason to adopt Dr. Nowell's view without any further analysis. (689-690). He concluded, "the additional evidence did not support the AP's opinion about behavioral health restrictions/limitations during the timeframe in question by means of significant mental status abnormalities, psychiatric impairment of daily activities, or by participation in intensive mental health treatment." (690). Again Dr. Schroeder's opinion was completely divorced from considerations of the duties of Radmilovich's occupation.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

**UNUM Maintains its Decision to Terminate Benefits**

118.   In a letter dated 2/14/20, UNUM informed Radmilovich's attorney that it had again determined Radmilovich was not disabled beyond 10/9/19. (698). It was, however, issuing a check for benefits to date under "Reservation of Rights." *Id.*

119.   UNUM's 2/14/20 appeal denial letter rejected Dr. Kaushal's opinion regarding the possible causes of Radmilovich's chest pain symptoms. (669). Although a lack of cardiac studies was referenced, and UNUM had consulted with doctors who claimed knowledge of cardiology (699), UNUM did not suggest that Radmilovich undergo any particular tests to submit with his appeal. (699); 29 C.F.R. § 2560.503-1(g)(1)(3)(requiring "A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."); *Salomaa v. Honda Long Term Disability Plan,* 642 F.3d 666, 680 (9th Cir. 2011).

120.   Regarding Radmilovich's cognitive deficits, UNUM relied on the "no clear evidence of cognitive impairment" rationale and the existence of a mild somatic symptom disorder. (700).

121.   UNUM denied that Radmilovich suffered from any behavioral health impairment, without explaining why "somatic symptom disorder," a disorder diagnosed by Dr. Keats, included in the Diagnostic and Statistical Manual, ("DSM"), did not qualify as a behavioral health impairment. (598, 152).

**Radmilovich Appeals Through His Representative**

122.   In a letter dated 8/6/2021 (770-790), and in supplemental submissions (1314, 1420), Radmilovich appealed the denial of his LTD claim through present counsel, providing UNUM with additional information.

123.   After UNUM's February 2020 benefits termination (and Covid shutdowns beginning in March 2020), Radmilovich underwent additional cardiac workup in October-November 2020 with Dr. Kaushal, which finally determined the cause of Radmilovich's chest pain. In his notes Dr. Kaushal wrote, "[r]ecent stress

24

KANTOR & KANTOR LLP 19839 Nordhoff Street Northridge, California 91324 (818) 886 2525

echocardiogram markedly abnormal, demonstrating stress-induced ischemia of the anterior, anteroseptal, and inferior walls. Likely accounting for patient exertional dyspnea and chest pain syndrome." (1326). This testing revealed microvascular ischemia, immediately leading Dr. Kaushal to deem Radmilovich unable to return to work indefinitely. (1326).[9]

124.   Radmilovich's appeal included a 5/14/21 independent report by Dr. Parag Goyal, a renowned Cardiologist at New York's Weill Cornell Medicine, with extensive credentials. (886, 893). His resume includes a lengthy list of cardiac studies in which he was involved as well as his numerous publications and presentations on cardiology. (894-908).

125.   Dr. Goyal's independent review included a medical examination of Radmilovich via teleconference and a complete review of his medical records and cardiac studies including: the  Holter monitor results; Stress echocardiogram, and Cardiac Catheterization conducted in 2017; the Nuclear stress test conducted in 2019; and the Stress Echocardiogram, at rest echocardiogram, and Cardiac catheterization of 2020. (886-892).

126.   Dr. Goyal was able to identify different types of chest pain that Radmilovich experienced. (889, 890-891). He acknowledged that PTSD could be contributing but could not be the sole cause because "objective data on the stress echocardiogram support[s] an organic etiology." (890).

127.   Radmilovich's symptoms supported a diagnosis of typical angina although there were also some atypical features such as that exercise does not reproduce the pain. (889).

---

[9] UNUM argued in its Opening Trial Brief, "Dr. Kaushal's finding and opinions – at least before she [sic] was prodded by his counsel – were entirely in line with the opinions of Unum's medical consultants." Dkt.#23:5. It should be noted that Radmilovich's counsel erroneously agreed at trial that this statement had not been made. Transcript of Trial Day 1 p.77:6-78:10.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

128. Dr. Goyal noted that the purpose of the 2020 cardiac catheterization was to identify whether Radmilovich had "ischemia related to his bypass grafts" to see if stenting would be necessary. (889). There were no irregularities related to his bypass grafts identified. *Id.*

129. Dr. Goyal explained how the normal result on the traditional 2019 nuclear stress testing can be inaccurate regarding microvascular disease and may miss the diagnosis of ischemia. (889).

130. Concerning the October 2020 Stress echocardiogram, Dr. Goyal noted that "there is objective data demonstrating ongoing myocardial ischemia, which further supports an organic cardiac etiology to [Radmilovich's] disabling symptoms." (889).

131. Considering Radmilovich's symptoms, his negative 2020 cardiac catheterization, and his abnormal 2020 stress echocardiogram, Dr. Goyal found it reasonable to conclude that etiology of Radmilovich's condition is "coronary microvascular disease" and that it was disabling dating from 9/7/18 [the date Radmilovich went to the emergency department with chest pain] to the present. (889-890).

132. Dr. Goyal explained the mechanism by which stress would cause Radmilovich's symptoms: "Stress, whether physical or emotional, leads to activation of the sympathetic nervous system which leads to increase in myriad hormones including norepinephrine that increase heart rate and blood pressure. This increases the workload of the heart. When the demand of the heart outstrips supply, the heart is at risk of developing ischemia and injury. The Claimant's stress echocardiogram demonstrates that his heart becomes acutely ischemic and dysfunctional in the setting of stress. This can lead to worse chest pain symptoms, as well as lead to further injury of the myocardium".(891).

133. Dr. Goyal added that in the medical literature "*it is fairly well-established that stress that [sic] incite/aggravate cardiac conditions and cardiac symptoms,*" that this link is biologically based, and that "*mental stress-induced myocardial ischemia in*

26

*patients with known coronary artery disease increases the rate of subsequent cardiac events."* (891).

134.   Dr. Goyal indicated that he would advise any patient with coronary artery disease and/or microvascular disease to avoid stress and would advise stress avoidance even more strongly to patients who - like Radmilovich - had abnormal echocardiograms. (892).

135.   In a 9/2/21 letter, Dr. Kaushal, now informed by Radmilovich's new testing, elaborated on Radmilovich's "severe and disabling symptoms of chest pain, shortness of breath, and fatigue which have been exacerbated by physical and emotional stress, including that provided by his occupation." (1426). Dr. Kaushal explained, "Mr. Radmilovich has undergone an extensive cardiac workup with a resulting diagnosis of coronary microvascular disease as the etiology of his symptoms" with results that are the **"hallmark of coronary microvascular disease."** (1426). [emphasis added]

136.   Dr. Kaushal disputed UNUM's reasoning that Radmilovich's exercise capability on a stress test demonstrated his ability to perform his occupation, writing, **"Mr. Radmilovich has consistently experienced post-exertion disabling chest pain and fatigue, including after the stress echocardiogram was complete. A similar degree of disabling symptoms has occurred with work-related stress."** (1426). [emphasis added]

137.   Dr. Kaushal added that "there is a clear relationship with stress (whether physical or emotional/mental) and ischemia that has been well-documented in the medical literature . . ." (1426).

138.   Addressing Dr. DiDonna's easy-fix rationale, Dr. Kaushal explained that all therapeutic approaches had been tried without symptomatic improvement. (1247). He continued, *"I have emphatically advised Mr. Radmilovich that he should not resume work as a life-preserving measure. If Ischemia is repeatedly elicited and protracted,*

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

*this can result in adverse outcome including heart attack, heart failure, and cardiac death.*" (1427).

139. Dr. Kaushal agreed with Dr. Goyal on three key points: that there was objective documentation of microvascular disease; that it caused Radmilovich's symptoms; and that the triggers of his symptoms include "mental stress involved with his occupation." (1427).

140. Because UNUM concluded that Dr. Keats' testing provided "no clear evidence" of Radmilovich's neurocognitive deficits, and UNUM did not conduct its own testing, plaintiff's counsel sent Radmilovich for further neuropsychological testing with Dr. Roger Light, Ph.D. (844-845).

141. Dr. Light tested and interviewed Radmilovich, and to obtain "corroboration of any subjective complaints reported by Mr. Radmilovich," he interviewed Radmilovich's brother, a former co-worker, and Radmilovich's psychotherapist, Dr. Credidio (845). He also analyzed the raw data and testing results from Dr. Keats' previous testing to ensure that his testing filled  in  any gaps in Dr. Keats' testing.  (844, 845, 874).  Dr. Light's report includes a review of medical records dating from Radmilovich's cardiac arrest in 2016. (861-862).

142. Dr. Credidio had explained to Dr. Light that Radmilovich's resistance to discontinue working was due to his "functional denial" which appears to relate to anosognosia, organic denial of deficits that are typical of brain injury survivors. (852). Dr. Light concurred. (852, 875).

143. Radmilovich's brother, Todor, explained to Dr. Light that the physicians who treated Radmilovich after his cardiac arrest were very concerned about the likelihood of significant brain damage. (855). Todor had observed that Radmilovich had improved over time but that his short-term memory and ability to focus had been "dramatically reduced." (855). He could no longer multi-task or "process multiple analytics and issues in his mind simultaneously . . . he can now only focus on one thing at a time." (856).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

144.   Todor gave specific examples of how Radmilovich's memory for simple things had even been affected. (855).

145.   Todor explained that Radmilovich's return to work was a result of being unable to accept that he had significant cognitive deficits. (856). Radmilovich had to be convinced that his impairments could potentially put others and himself at risk where he was responsible for safety. (856).

146.   Dr. Light's testing revealed no malingering or suboptimal effort. (865). Dr. Light found that the cognitive deficits Radmilovich demonstrated were consistent with the  medical history he reviewed. (873). He estimated that Radmilovich was without cardiac activity or blood circulation for 5-20 minutes post cardiac arrest. (861). He noted that the description of transport to the ER, in which Radmilovich had again lost his pulse and was not breathing on his own, were "consistent with insufficient oxygen flow to the brain, required for a diagnosis of hypoxic encephalopathy." (861). "[Radmilovich] was documented as suffering a seizure in the ED, an indication of likely organic brain injury." (862).

147.   Dr. Light observed that at discharge, Radmilovich's many diagnoses included "encephalopathy acute and hypoxic encephalopathy." (862).

148.   Dr. Light found a greater degree of impairment than Dr. Keats, rendering the diagnosis of "Major Neurocognitive Disorder Due to an Acquired Organic Brain Injury (likely due to Anoxic-Hypoxic Encephalopathy, Multisystem Failure, and Critical Illness Cognitive Impairment) Without behavioral disturbance." (872).

149.   Dr. Light explained, "the cognitive impairments documented in the current assessment, including executive dysfunction, lack of verbal precision, verbal fluency inefficiency, ideational and verbal perseveration, mental calculation deficits, and divided attention deficits, and it becomes obvious that Mr. Radmilovich will never be able to successfully return to his usual and customary occupation." (874).

150.   Dr. Light's testing did not support the existence of any other significant mental health diagnosis, which was a departure from Dr. Keats. (873-874).

29

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

151.   However, Dr. Light agreed with Dr. Keats that there was little chance that Radmilovich would improve cognitively. (875).

152.   Dr. Light expressed surprise that the disability insurer would have questioned Radmilovich's disability "given his history of hypoxic encephalopathy and likely critical illness cognitive impairment." (874).

153.   While he deferred on the question of the impact of Radmilovich's physical conditions, Dr. Light noted the obvious - that the presence of Radmilovich's physical symptoms "would likely provide sufficient distractions and interfere with his functioning," disabling him from performing his occupation. (874).

154.   On 7/28/20 Dr. Light answered questions posed by Radmilovich's counsel. Dr. Light explained that UNUM's Dr. Nowell "is incorrect in his assertion that 'only one index fell outside the normal range'" in Dr. Keats' testing and that Dr. Nowell had essentially cherry-picked one test to the exclusion of others. (883-884).

155.   Dr. Light noted that Radmilovich's premorbid intelligence was in the superior range and that any measure at or below the 25th percentile would be considered abnormally low.[10] (844).

156.   Dr. Light also clarified that the difference between Dr. Keats' results and his could not be accounted for by the passage of time or deterioration, as Radmilovich's organic brain damage had plateaued by the time of Keats' testing and he was too young for a dementia process to contribute. (884-885).

157.   Also included with the appeal was a vocational analysis performed by vocational expert, Charles Galarraga. After determining the requirements of Radmilovich's occupation and performing a Labor Market Survey, interviewing Radmilovich, reviewing Dr. Light's report, reviewing a 12/3/20 Progress Note from

---

[10] *Quintero v. Westbrooks,* No. 3:09-CV-00106, 2017 WL 1196520, at *16 (M.D. Tenn. Mar. 31, 2017) (discussing the concept of relative cognitive impairment, where a person with a previously high IQ whose IQ is reduced to average will function more poorly than someone whose IQ has been average his whole life).

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

Dr. Kaushal, and reviewing Dr. Goyal's IME report, Galarraga concluded that Radmilovich could not perform the substantial and material duties of his occupation in the usual and customary way, given his restrictions. (825-842).

### UNUM Reviews the Appeal from a Psychological Standpoint

158.   During the appeal review, UNUM obtained a brief paper review report from neuropsychologist, Julie Guay, who was asked to opine on Dr. Light's neuropsychological report. (1414-1415). There is no evidence that Dr. Guay was provided with Dr. Keats' report or its raw data.

159.   In her report dated 9/10/21, Dr. Guay agreed that Dr. Light's test was valid with "no evidence of purposeful malingering or significant concerns with effort." (1414). She thought that emotional factors could account for some of Radmilovich's uneven scores. (1414). Dr. Guay stated, "the data does not support the conclusion that somatization was not a possible factor in the claimant's performance." (1415).

160.   Overall, Dr. Guay found the data supported a diagnosis of "Mild Neurocognitive Disorder," not Dr. Light's diagnosis of "Major Neurocognitive Disorder." (1414).

161.   While Dr. Guay disagreed with some of Dr. Light's conclusions, at no point did she opine that Radmilovich could have performed the duties of his occupation with Mild Neurocognitive Disorder, nor did she provide a rationale for the inevitability of such a conclusion. (1414-1415). There is no evidence that she was asked to provide an opinion as to whether Radmilovich could perform the duties of his occupation and she was not supplied with even the generic list that the others received.

162.   In summarizing the claim for UNUM's in-house psychiatrist, Dr. Brown, Appeals Specialist, Katherine Durrell (who is not a doctor) conveyed Dr. Guay's statements inaccurately: "Testing results were not consistent with neurocognitive impairment. Testing results showed, at most, a mild decline and, as mentioned, did not adequately address the contribution of his current psychological functioning or long-standing coping style with prominent somatic over focus." (1438). Dr. Brown was

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

31

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

provided the generic list of occupational duties. (1437). There is no evidence that Dr. Brown reviewed any neuropsychological reports or any other documents himself.

163.   Dr. Brown accepted Durrell's prompt, and rearranging her words slightly, stated, "*at most, a mild decline in cognitive function with findings that are not consistent with those* typically *seen in cognitive disorder. Moreover, the impact of current psychological function and long-standing coping style have not been adequately addressed by the recent examiner.*" (1439).

164.   Although both Durrell and Dr. Brown mentioned that there might have been psychological components to Radmilovich's cognitive deficits, he was again blamed for not producing Dr. Credidio's office notes and this formed a basis for rejecting her opinions. (1439).

**Radmilovich Responds, Submitting Dr. Light's Letter**

165.   Radmilovich was provided an opportunity to respond to the new evidence and rationales UNUM had generated in reviewing his appeal of his LTD and LWOP claims. (1536, 1563-1566). While strenuously defending his own Major Cognitive Disorder diagnosis (1565), Dr. Light identified Dr. Guay's distinction between Mild and Major neurocognitive disorder, as a red herring:

> the diagnosis of Mild Neurocognitive Disorder would absolutely preclude Mr. Radmilovich from successfully returning to his usual and customary occupation. As per DSM-5 and ICD-10, there are only two possible diagnoses of neurocognitive disorder, Mild and Major Neurocognitive disorder. There is no "moderate" condition. Diagnosing mild neurocognitive disorder does not mean that the impact on one's functioning would be mild. Rather, this condition refers to the depth and breadth of neurologically based cognitive deficits. Those with mild neurocognitive disorder often will find tasks that were simple for them to accomplish prior to the development of that condition would become much more difficult or potentially impossible for them to accomplish. In a high-level occupation such as that of Mr. Radmilovich, which as noted by Dr. Keats is "multifaceted, requiring many different responsibilities, including verbally corresponding, negotiating, travelling, speaking publicly, managing data bases, and managing others… [and requires] working long days, multi-tasking, and

32

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

sustaining attention, and is stressful and physically arduous," his physical symptoms of fatigue and his cognitive deficits, whether considered either "mild" or "major," would be expected to preclude his successfully return to work. (1564).

166.   Dr. Light also responded to Dr. Guay's observation that Dr. Light's report did not rule out somatization as a factor:

> Whether or not Mr. Radmilovich suffers from some type of somatization disorder or other emotional issues is completely irrelevant to the question of whether he suffers from neurological impairment, as Dr. Keats, Dr. Guay, and the current evaluator all agree that he has. Psychological testing is poor at differentiating somatization from actual medical symptoms. Given Mr. Radmilovich's complex medical history, the number of symptoms that could be incorrectly labeled as due to somatic symptom disorder is likely high. Similarly, given his deficits in cognition, the loss of his occupation due to these deficits, the inappropriate denial of disability benefits, and the loss of many of his premorbid coping mechanisms, the fact that he is experiencing some emotional issues is hardly surprising. To use these understandable emotional struggles in such a manner as to attribute his evident cognitive deficits as solely due to emotional factors to undermine a valid neurological disability claim is unconscionable. (1564)

## UNUM Reviews the Appeal From A Cardiac Standpoint

167.   On 9/22/21, UNUM sent the file to Dr. Scott Norris, who realized he was not qualified to opine on whether Radmilovich's cardiac issues or mental/cognitive capacity affected his functionality (1446). His report is most notable for its boilerplate statement, completely at odds with the rest of his report, "I have considered all conditions individually and in aggregate, as well as the opinions of the insured's treating providers" (1445).

168.   UNUM sent Radmilovich's claim for a paper review with UNUM's cardiologist, Dr. Tim McDermott, who determined that the evidence of Radmilovich's myocardial ischemia was "conflicting" or remained "elusive" but now suggested that the etiology didn't matter because "the medical records **clearly** establish that the insured

33

retain the functional capacity to perform (and exceed) the occupational demands of his profession as outlined by VRC." (1457)(emphasis added).

169.   Dr. McDermott made the brief, unsupported statement that there was no "*clear relation between physical or work stress and his related symptoms.*" (1457). He did not suggest a way to establish this "relation."

170.   Like the others, Dr. McDermott was supplied with the generic list of job demands and was ignorant of Radmilovich's actual occupation. (1449). Also, like Drs. Schroeder and McDermott, he relied on Radmilovich's ability to do non-occupational activities such as exercise "household chores, shopping, visiting relatives, performing household repairs, going out to eat, going to movies, taking trips and going to the park/beach." (1457).

171.   Although he promised to defer to others on Radmilovich's cognitive capacity, Dr. McDermott again insisted that Radmilovich could perform "substantial cognitive activity to include driving, shopping, and taking trips." (1457).

172.   UNUM returned the claim to Dr. Scott Norris, who, like Dr. Schroeder, would not render his own opinion but was happy to rubberstamp another physician's opinion so long as it favored UNUM.[11] Dr. Norris adopted Dr. McDermott's opinion on the cardiology issues and deferred to Dr. Brown on the rest, while again simultaneously claiming to view the claim "from a whole person perspective." (1526).

**Radmilovich Responds, Submitting Dr. Kaushal's Letter**

173.   In a 12/28/21 letter, Dr. Kaushal explained why it was factually and medically wrong to rely on Radmilovich's exercise tolerance:

---

[11] Dr. Norris could not reasonably have been expected to do otherwise. See e.g., *Rios v. Unum Life Ins. Co.,* No. SACV1904100DOCSKX, 2020 WL 7311343, at *1 (C.D. Cal. Dec. 10, 2020), *aff'd in part, rev'd in part and remanded sub nom. Rios v. Unum Life Ins. Co. of Am.,* No. 21-55020, 2021 WL 6116635 (9th Cir. Dec. 27, 2021).

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

To Whom It May Concern,

I am writing in support of David Radmilovich's appeal to the denial of his disability claim. Mr. Radmilovich has been my patient as stated in a prior document supporting his claim. I have reviewed the provided documentation in which a medical consultant has provided his/her opinion on Mr. Radmilovich's ability to perform his work duties from 2/14/2020 and thereafter.

I will respond specifically to Mr. Radmilovich's functional capacity and question regarding consistency of presence of coronary ischemia.

First, I agree that Mr. Radmilovich's exercise tolerance was excellent during his most recent stress test on 10/26/2020, exceeding 12 metabolic equivalents; however, this degree of exercise was in fact associated with objective severe ischemia involving the anteroseptum and inferior walls, supporting the thought that has been previously mentioned that physical activity may be harmful to the patient. I would propose that lesser degrees of exertion would also result in myocardial ischemia, at is [sic] known that the extent of ischemia is a spectrum related to myocardial supply-demand dictated in part by one's heartrate which is affected by the level of emotional or physical stress. **I invite any cardiac expert with experience in interpretation of stress echocardiography to individually review the imaging to corroborate the findings of ischemic wall motion abnormalities following physical stress**. Furthermore, during the last 9 months, Mr. Radmilovich's exercise tolerance has significantly diminished, to the point where he is no longer exercising routinely due to the symptoms previously described. I strongly suspect that the pathology attributable to this change has been present well before 2/14/2020. (1567). [emphasis added]

174.   Dr. Kaushal's letter also addressed Dr. McDermott's claim that the source of Radmilovich's chest pain remained "elusive," reconciling the various test performed:

Regarding the inconsistency related to the presence of myocardial ischemia, it is true that an exercise nuclear perfusion study done in 2019 did not demonstrate any ischemia; however, it is presumable that Mr. Radmilovich's physiology and/or anatomy changed since the nuclear stress test was performed. **It is also-well described in cardiology literature that balanced ischemia can result in false-negative nuclear perfusion results.**

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

To conclude, despite the demonstration of severe stress-induced ischemia on the most recent stress echocardiogram, Mr. Radmilovich's coronary angiography following the stress echocardiogram demonstrated widely patent bypass grafts. **I have suspected microvascular dysfunction to be the etiology of this discrepancy in terms of angiographically adequate coronary supply in the presence of a severe ischemic response to stress**. More concerning is Mr. Radmilovich's progression of symptoms during the past 9 months and the reduction of his exercise as a result. I do strongly maintain my belief that Mr. Radmilovich has severe and activity-limiting chest pain and SOB that is related to microvascular dysfunction and that all treatment options have been exhausted. His lifestyle and his prognosis are unfortunately negatively impacted as a result. I have known Mr. Radmilovich to take pride in his work, and his ability to work; given the consistency of chest pain symptoms related to the physical and emotional/mental demands of his job, I continue to advise him to refrain from his work duties, and I reaffirm my recommendation to abstain from the aforementioned date of 2/14/2020. (1567). [emphasis added]

## UNUM Denies Radmilovich's Appeal on 1/21/22

175.   After receiving Radmilovich's responses, UNUM did nothing more than craft a letter upholding its original decision to terminate LTD and LWOP benefits. UNUM did not respond to Dr. Kaushal's invitation to "any cardiac expert with experience in interpretation of stress echocardiography to individually review the imaging to corroborate the findings of ischemic wall motion abnormalities following physical stress." (7261-7277). It did not ask for the imaging and none of its reviewers appear to have been curious about the imaging.

176.  Instead, UNUM's Durrell internally recorded, "*the information the attorney submitted from 8/2016 through 2/2019 is not time-relevant to our assessment of EE's function as of 2/14/2020 when EE's LTD benefits and coverage ended. Some of the records rep-date the DOD, and some occurred early in his claim when we agreed he was disabled.*" (30)(emphasis added).

177.   UNUM's denial letter contended, "*[y]ou submitted responsive letters from Dr. Kaushal and Dr. Light. Those letters do not contain additional clinical information*

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

*for us to consider.*" (7268). The records UNUM rejected as irrelevant included records from 2018 and 2019 and "a note from September 2018 indicating Mr. Radmilovich would be out sick from work,[12]" all for the same reason: "*These notes are dated prior to his work stoppage in September 2018, or early in the claim when we agreed he was disabled and we were issuing benefits. They do not provide information specific to his occupational function as of February 14, 2020, when his Long Term Disability benefits and coverage ended.*" (7268).

178.   At trial, UNUM argued that Radmilovich's medical records from the time during which his was working were the most pertinent in deciding the case. However, during the administrative process

179.   UNUM also claimed it viewed Radmilovich's condition from a "whole person" perspective, though, as the above facts show, UNUM's review was undertaken by a series of paper reviewers who limited their reviews to their respective claimed disciplines. (520, 681, 1446, 1457, 1526).

180.   UNUM continued to fault Radmilovich for being hesitant to answer UNUM's questions in a 2019 phone call, failing to submit Dr. Credidio's therapy notes, and taking too long to send Dr. Keats' report, rationales it never relied upon in its benefits termination letter. (7270, 7271).

181.   Because Radmilovich had not submitted Dr. Credidio's notes, UNUM absolved itself of any obligation to consider his behavioral health conditions. (7265).

182.   UNUM continued its refusal to acknowledge what Radmilovich's occupation consisted of. As it had done in the initial termination letter, UNUM listed the generic occupational requirements, ignoring all the evidence of how his occupation was actually performed. (7265, 698). Its one concession to the vocational evidence

---

[12] This "out sick" note is actually an email submitted with Radmilovich's appeal in which his employer told him not to return to work until he was "without restrictions." (1569).

Radmilovich had supplied was to expand the generic list to include a single additional generic occupation demand "influencing people in their opinions, attitudes and judgments." (7267). The letter did not address Galarraga's report in any substantive way and did not provide any rationale for rejecting its findings.

183.   Despite the diagnoses and explanations of Drs. Kaushal and Goyal, who had determined that microvascular ischemia was responsible for Radmilovich's symptoms and that he should not work, UNUM incorrectly averred that Radmilovich's cardiologist had found no organic reason for his symptoms and that neuropsychological testing did not confirm an organic basis for his cognitive symptoms. (7270). It discounted Dr. Credidio's opinion that Radmilovich's symptoms had an organic basis as "outside her area of practice." (7270).

184.   Radmilovich's LWOP claim was denied for the same reasons. (7262).

185.   Having exhausted his administrative remedies under ERISA, Radmilovich filed suit on 2/3/22.

## II.    [PROPOSED] CONCLUSIONS OF LAW

### The Standard of Review

186.   The Court has jurisdiction. 29 U.S.C. §§ 1132(a), (f), (g).

187.   The parties and the court agree that the applicable standard of review is *de novo,* requiring a thorough inspection of the administrator's decision without affording any deference at all to the plan administrator's findings. *Silver v. Executive Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 728 (9th Cir. 2006).

188.   When a district court reviews a plan administrator's denial of benefits *de novo*, it examines the administrative record without deference to the administrator's conclusions to determine whether the administrator erred in denying benefits. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc); *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1088–89 (9th Cir. 1999) (en banc).

189.   A plaintiff has the burden to prove by a preponderance of the evidence, or greater than 50%, that he remained disabled under the terms of the plan.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

190.   Regardless of the standard of review, "[w]hat the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." *Abatie v. Alta Health & Life Ins. Co*., 458 F.3d 955, 969 (9th Cir. 2006).

191.   The District Court's review is limited to the rationales for benefits denial that the plan administrator relied on in denying benefits and cannot adopt new rationales that the claimant had no opportunity to respond to during the administrative process. *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1182 (9th Cir. 2022). Rationales that are offered for the first time in litigation, whether in the briefs or at trial, cannot be considered. For this reason, as discussed below, several of UNUM's rationales cannot be considered.

192.   The Court finds that Radmilovich has proved by a preponderance of the evidence that he was disabled under the policy during the relevant time, which is as of UNUM's termination of benefits on 2/14/2020. UNUM has failed to rebut plaintiff's proof with credible evidence.

193.   While an ERISA claims administrator is not required to conduct in-person exams, the decision not to do so casts doubt on the "thoroughness and accuracy of the benefits determination. *Montour v. Hartford Life & Acc. Ins. Co.,* 588 F.3d 623, 634 (9th Cir. 2009); *Holmstrom v. Metropolitan Life Ins. Co*., 615 F.3d 758, 775 (7th Cir. 2010)("None of the doctors who concluded that Holmstrom failed to establish disability ever examined her."); *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011); *Hoover v. Provident Life & Acc. Ins. Co.,* 290 F.3d 801, 809 (6th Cir. 2002). Furthermore, not one physician who actually treated or examined Mr. Radmilovich thought he could perform his own occupation. (510, 575, 598, 611, 108). UNUM had a right under the policy to have Radmilovich examined, but it never did so, thereby rejecting the opportunity to have more complete evaluations of his claimed disabling condition. *Salomaa* at 676. The opinions of UNUM's paper-only reviewers

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

are therefore entitled to less weight regardless of whether they were reviewing his cardiac, cognitive or psychological conditions.

194.  A decision is not reasoned when neither the medical reviewers nor the insurer compare "claimant's symptoms or impairment to any description of the physical and cognitive demands of his own occupation as that term is defined in the plan." *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 279 (1st Cir. 2015). Claims must be administered according the plan's definitions and not standards that conflict with the plan. *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan,* 85 F.3d 455, 460 (9th Cir. 1996).

195.  UNUM's evidence that Radmilovich is not disabled is not convincing, and can be significantly discounted, because none of the physicians on whom UNUM relied made the comparison of Radmilovich's occupational duties to his impairments. The record shows that each was insulated from understanding Radmilovich's occupation as it was actually performed, meaning that the standard of disability articulated in the policy was never truly applied. As such, UNUM generated little, if any, credible evidence that Radmilovich was not disabled under the policy, which required it to consider whether he was unable to perform "with reasonable continuity the substantial and material acts necessary to pursue [his] usual occupation in the usual and customary way." His usual occupation was "the substantial and material acts you are routinely performing for your Employer when your disability begins." (136). The common law of ERISA requires UNUM to consider Radmilovich's actual job activities and not some other set of duties even where the policy language is not a clear as it is here. *Salz v. Std. Ins. Co.*, 380 F. App'x 723, 724 (9th Cir. 2010); *Kay v. Hartford Life & Accident Ins. Co.,* No. 21-55463, 2022 WL 4363444, at *2 (9th Cir. Sept. 21, 2022); *Lasser v. Reliance Standard Life Ins. Co*., 344 F.3d 381 (3d Cir. 2003); *Lacko v. United of Omaha Life Ins. Co.,* 926 F.3d 432, 445-46 (7th Cir. 2019); *Kinstler v. First Reliance Standard Life Ins. Co.* 181 F.3d 243 (2d Cir. 1999); *Doe v. Standard Ins. Co.,* 852 F.3d 118, 124 (1st Cir. 2017). UNUM was aware of its special obligation in this regard. (1462). But it

40

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

flouted its duty by creating a series of abstract demands instead of engaging with Radmilovich's real occupation. All of UNUM's medical reviewers' opinions are less convincing for this reason alone.

196.   Although the Court must decide whether Radmilovich was entitled to benefits as of the date they were terminated by UNUM, evidence acquired after that date is relevant. *Demer v. IBM Corporation LTD Plan*, 835 F.3d 893, 907-908 (9th Cir. 2016) (citing *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988)("reports containing observations made after the period for disability are relevant to assess the claimant's disability[;] [i]t is obvious that medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis"); *Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 860 F.3d 259, 266 (4th Cir. 2017); *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir. 1998)(granting benefits based on a medical opinion that Woo was disabled rendered years after she left employment); *See also, Silver v. Exec. Car Leasing Long-Term Disability Plan,* 466 F.3d 727, 735 (9th Cir. 2006)(acknowledging that if a claimant is disabled at point A and point C, it is highly likely he was disabled at point B). Indeed, the Ninth Circuit, itself, has remanded giving the claimant an opportunity to undergo and submit a functional capacity evaluation, years after the benefits termination. *Saffon v. Wells Fargo & Co. Long Term Disability Plan,* 522 F.3d 863, 872 (9th Cir. 2008); *See, Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 679 (9th Cir. 2011) (criticizing the insurer for complaining about an absence of testing and, when the testing was produced, claimed it didn't pertain to the time period in question); *Slupinski v. First Unum Life Ins. Co.,* No. 99 CIV. 0616 (TPG), 2005 WL 2385852, at *8 (S.D.N.Y. Sept. 27, 2005), *opinion clarified on denial of reconsideration,* No. 99 CV 0616(TPG), 2006 WL 2266569 (S.D.N.Y. Aug. 7, 2006), *rev'd in part,* 554 F.3d 38 (2d Cir. 2009), and *rev'd in part,* 554 F.3d 38 (2d Cir. 2009)(rejecting UNUM's argument that medical reports issued after the date of termination could not prove claimant's disability).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

197.   Not to allow evidence to relate back also flies in the face of ERISA procedures. UNUM's termination of benefits comes along with a statutory right to challenge that determination and obtain full and fair review that "*takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.*" 29 C.F.R. § 2560.503-1(h)(iv). ERISA claimants have 180 days to submit an appeal, meaning they frequently have no choice but to assemble new evidence after the date of termination or denial. 29 C.F.R. § 2560.503-1 (h)(3)(i); (h)(4). If all proof generated during that 180-day period could be deemed irrelevant based on the date of its creation, the right to an ERISA appeal would be meaningless. *Holmstrom,* 615 F.3d 758 at 776.

198.   Relatedly, disability may commence long before its etiology is fully understood. *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan,* 46 F.3d 938, 944 (9th Cir. 1995)(remanding to consider new physical etiology where a psychiatric explanation was originally suggested); *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir. 1998); *Hineman v. Long Term Disability Plan of ETrade Grp., Inc.,* 279 F. App'x 546, 548 (9th Cir. 2008)(finding it clearly erroneous to equate the date of disability with the date the disability was first medically diagnosed); *See also*, *Backman v. Unum Life Ins. Co. of Am.,* 191 F. Supp. 3d 1053, 1069 (N.D. Cal. 2016)(UNUM's failure to acknowledge the change in a doctor's opinion does not support its denial of benefits). Unless there is some other reason to mistrust a diagnosis, the fact that it arrives after the commencement of a claimant's disability is not a reason to discredit it. UNUM should know better. *Radford Tr. v. First Unum Life Ins. Co. of Am.,* 321 F. Supp. 2d 226, 236–37 (D. Mass. 2004), *rev'd in part, appeal dismissed in part,* 491 F.3d 21 (1st Cir. 2007)(rejecting Unum's argument that disability was unsupported because a diagnosis by a doctor was not made until after claimant was terminated). The Court also notes that, "[m]edicine is, at best, an inexact science, and we should not disregard the great weight of the evidence merely because objective laboratory diagnostic findings

either are not yet within the state of the art, or are inconclusive*." Gaylor v. John Hancock Mut. Life Ins. Co.,* 112 F.3d 460, 467 (10th Cir. 1997).

199. The evidence that Radmilovich's cognitive deficits alone render him disabled from his occupation is substantial and is corroborated by UNUM's own hired expert, Dr. Guay. Two neuropsychologists who examined Radmilovich drew the conclusion that his cognitive impairments would disable him from his occupation based on reliable tests. Dr. Guay, agreed that Radmilovich suffered from Mild Neurocognitive Disorder, thereby agreeing with at least one of Radmilovich's neuropsychologists. Had Dr. Guay been supplied with Dr. Keats' report, it appears likely she would have agreed with it. Dr. Brown's determination to the contrary is entitled to little if any weight. First, he appears to have rendered his opinion based on misleading information from Ms. Durrell. Second, he was willing to render an opinion without actually reviewing the evidence but instead taking the word of a non-physician as to what Dr. Guay's report actually said. Furthermore, the Court credits the explanation by Dr. Light as to why "mild neurocognitive disorder" does not mean that the impact on Radmilovich was not "mild" but would affect him occupationally. UNUM never rebutted this in any meaningful or credible way.

200. Additionally, a claimant's reports cannot be ignored where his condition would reasonably be expected to produce his symptoms. *Smolen v. Chater,* 80 F.3d 1273, 1282 (9th Cir.1996). Considering that it was statistically extremely unlikely that Radmilovich would survive his cardiac arrest without cognitive deficits, his complaints of his cognitive problems are entitled to greater weight. His complaints of cognitive impairment have extra support because Radmilovich has the additional risk factor of familial hyperlipidemia, requiring treatment that can cause cognitive decline. At least two of his physicians, Dr. Credidio and Dr. Kaushal, acknowledged that hyperlipidemia could have contributed.

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

201.   The Court finds that Radmilovich has met his burden to prove he was disabled from performing his occupation from a cognitive standpoint alone, even without considering his subjective reports of how he struggled to perform his job.

202.   Concerning Radmilovich's alleged disability due to his cardiac problem, there is abundant evidence that at the time he stopped working he was disabled due to a diagnosis of myocardial ischemia that did not come to light until after the symptoms appeared. But the fact that the diagnosis evolved over time and only became conclusive after he applied for benefits does not mean he was not disabled.

203.   As such, among other things, UNUM's reviewers never engaged with the level of stress that Radmilovich's occupation demanded. In fact, they were never told about its stress level and were kept from understanding *why* it might be stressful. Nonetheless, several of UNUM's paper reviewers relied on a highly questionable rationale regarding Radmilovich's ability to perform an occupation that they knew little about, *i.e.,* that Radmilovich's performance on treadmill stress tests proved that he could tolerate his stress level at work. The Court rejects this rationale. First, UNUM offered nothing to support that treadmill stress tests measure a claimant's ability to perform an occupation and it appears the opposite is true where ischemia is concerned. *State of New York v. Sullivan*, 906 F.2d 910, 914 (2d Cir. 1990). The Second Circuit found, based on the evidence presented, that "[a]n individual who does not show signs of heart disease during a treadmill test may still be severely disabled from ischemia. False assessments may occur because treadmill testing does not consider the full range of stresses and exertions that arise at the workplace or in daily living. For example, the test does not account for demands placed on the heart by heat, cold, humidity, pollution, altitude, psychological pressures and physical efforts that are sudden or prolonged." *Id*. at 914.

204.   As well, since none of UNUM's reviewers were apprised of what Radmilovich's occupation required of him, it made no sense for them to draw any equivalencies between his performance on stress tests and his ability to perform his job duties.

44

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

205.   The Court finds no reason to discredit Dr. Kaushal's ultimate opinion based on the way he arrived at the diagnosis or its timing. Radmilovich was an unusual patient, by definition, since most individuals who suffer cardiac arrest out of the hospital do not survive to be concerned about the cause of their remaining symptoms. Therefore, it is not surprising that such a patient might present some challenges in terms of diagnosis. As well, an IME by a highly credentialed, independent cardiologist, Dr. Goyal, supported Dr. Kaushal's conclusions as well as his recommendations that Radmilovich should not be working at a stressful job. The record is clear that Radmilovich's job was stressful and that stress was unavoidable. When UNUM argued against Dr. Kaushal and Goyal's opinions, they responded with more elaborate credible explanations for their opinions, and UNUM erred in deeming them nothing new as they were required by ERISA to consider them. 29 C.F.R. 2560.503-1(h)(iv). The credibility UNUM's decision is questionable, given its rejection of these explanations.

206.   It is understood that ERISA claimants can be disabled if working would put their health or life at risk. *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 391 (3d Cir. 2003)(arbitrary  and capricious to deny benefits to an orthopedic surgeon whose heart condition prevents him from performing surgery or on-call duties safely due to stress); *Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58, 66 (1st Cir. 2013)("risk of relapse is prohibitively impairing and thus becomes, for all practical purposes, a current disability"); *Silver,* 466 F.3d 727, 734 (9th Cir. 2006).

207.   UNUM rejected Radmilovich's complaints of pain and other sensations in his chest, dizziness and nausea. The same is true of his claimed cognitive symptoms. The reports of chest pain, fatigue and cognitive impairment were accepted by Radmilovich's treators. On the other hand, UNUM only had the reports of reviewing physicians, who did not examine or speak with plaintiff. *Demer v. IBM Corporation LTD Plan*, 835 F.3d 893, 906-907 (9th Cir., 2016.). This appears to be in violation of UNUM's agreement with the State of California, which in essence creates guidelines

45

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

for claims handling that UNUM is bound to observe. (982, 984, 994). This also reduces the credibility of its benefits termination.

208.    Even if Radmilovich's doctors had been unable to arrive at an explanation for his physical symptoms, it would not prevent him from collecting benefits. The policy does not require a diagnosis, only a sickness or injury. *Rochow v. Life Ins. Co. of N. Am.*, 482 F.3d 850, 865-866 (6th Cir. 2007). Therefore, UNUM's doctor's insistence that there was no diagnosis, or its untrue and unexplained statement on appeal that the diagnosis remained elusive, are not reasons that support the benefits termination.

209.    UNUM's argument that Radmilovich had "non-medical" reasons for stopping work cannot be considered. *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1182 (9th Cir. 2022). Meanwhile, even if it were proper to question Radmilovich's credibility on this record, which it is not, there is unrefuted expert and non-expert testimony that Radmilovich did not exaggerate, misrepresent or feign his symptoms. He resisted admitting to his disabilities or appearing to be disabled, according to both expert and lay witnesses. Both Drs. Keats and Light found that he put forth effort in his testing. Drs. Credidio and Light agreed that Radmilovich's had a pathological tendency to downplay his deficiencies. Radmilovich's brother, Todor, also reported that Radmilovich had a hard time accepting his post-cardiac arrest limitations and was obsessed with recovering.

210.    At trial, UNUM argued made several arguments that cannot be considered. *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1182 (9th Cir. 2022). It argued that the most pertinent records and documents supporting UNUM's benefits termination were Dr. Kaushal's records corresponding to the time Radmilovich was working. Transcript of Trial Day 1, p.94-111:19. UNUM's counsel also suggested that a gap in Radmilovich's visit to Dr. Kaushal showed how well Radmilovich was doing at work. Transcript of Trial Day 1, p.101:16-104:23. Counsel also argued that there was a lack of evidence from Radmilovich's employer that he was struggling on the job. *Id.* at p.110:19. Had UNUM sought more evidence of Radmilovich's struggles during the

46

time he was working, it was required to ask for it. *Saffon v. Wells Fargo & Co. Long Term Disability Plan,* 522 F.3d 863, 870 (9th Cir. 2008). If there was an absence of proof, UNUM was duty bound to ask for the information or advise plaintiff of the information it required. *Booton v Lockheed Medical Plan (Aetna)*, 100 F.3d 1461 (9th Cir., 1997).

211.   Furthermore, this argument contradicts UNUM's stated reasons in its appeal denial letter: "*These notes are dated prior to his work stoppage in September 2018, or early in the claim when we agreed he was disabled and we were issuing benefits. They do not provide information specific to his occupational function as of February 14, 2020, when his Long Term Disability benefits and coverage ended.*" (7268). The Ninth Circuit holds that ERISA plan administrators may not "hold in reserve" new rationales to present in litigation. *Collier* at 1188. Here, UNUM did not merely hold its rationale in reserve; it reversed its rationale in litigation when it served its interests to do so. The Court will not consider the argument that Dr. Kaushal's medical records corresponding to the time during which Radmilovich was still employed are proof that he was not disabled as of 2/14/2020.

212.   UNUM's insistence that Dr. Kaushal's records during the period when Radmilovich was working are inadequate is also beside the point. Radmilovich went to the emergency department on 9/7/18 with symptoms that prevented him from going on a business trip. He was never able to work again. His symptoms clearly were escalating at that point, regardless of how he was experiencing them earlier.

213.   Concerning lack of evidence from Radmilovich's employer, had UNUM needed more evidence that Radmilovich was struggling at work, it could have asked for it from the employer or Radmilovich himself. But it did not do so. Meanwhile, there is evidence that the employer did notice Radmilovich's struggles. It told him not to return until he was "without restrictions," suggesting that Prudential had reached the end of its rope in accommodating Radmilovich. There is evidence Radmilovich had already cut

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

47

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

back on work and was cancelling business trips due to pain. UNUM has never challenged this nor did it seek corroboration from his employer.

214.    A claims administrator must take all of a claimant's conditions into consideration, including those that might not be disabling alone but might worsen the impact of others. *Abram v. Cargill, Inc.*, 395 F.3d 882, 888 (8th Cir. 2005); *Green v. Sun Life Assurance Co. of Canada,* 259 F.App'x 42, 44 (9th Cir. 2007)(a claimant is not required to claim disability based on a single diagnosis); *Lacko v. United of Omaha Life Ins. Co.,* 926 F.3d 432, 446–47 (7th Cir. 2019)(holding that the failure to consider all of the claimant's conditions in combination is fatal to the ERISA benefits denial); *DuPerry v. Life Ins. Co. of N. Am.,* 632 F.3d 860, 873 (4th Cir. 2011); *James v. Liberty Life Assur. Co. of Bos.,*582 F. App'x 581, 588 (6th Cir. 2014)(rejecting piecemealed medical opinions that overlooked the co-morbidity of the diagnosis); *See also,* 919, 952, 977. So, in addition to considering whether a psychological condition may make a second condition worse, UNUM was under a duty to consider whether a man who was suffering from intermittent chest pain or other chest sensations, fatigue, dizziness and nausea, and who also had some level of diminished cognitive capacity, an Adjustment Disorder due to cardiac condition,  and perhaps a somatic symptom disorder, could perform his occupation with "reasonable continuity" and in the "usual and customary way." UNUM's siloed reviews did no such thing, even when the contribution of additional conditions was hinted at by its own reviewers, reducing the credibility of its decision. Although the Court finds that Radmilovich has met his burden to prove that he was disabled from either his cardiac condition or his cognitive impairments, even if these conditions were less severe, his combined conditions would certainly disable him.

**REMEDY**

215.    This Court determines that plaintiff is entitled to benefits throughout the "own occupation" period. A remand is ordered for UNUM to decide in the first instance whether Radmilovich is entitled to benefits under the any occupation standards of the LTD and LWOP policies and their respective definitions. Radmilovich is entitled to

48

submit any evidence that he sees fit before UNUM undertakes the determination if he so chooses and is entitled to any administrative remedy he would have if this were a new claim.

## CONCLUSION

216.   For the foregoing reasons, the Court overturns UNUM's claims decisions, denying plaintiff's long term disability and life waiver of premium benefits.  The parties are to meet and confer on a Proposed Judgment, consistent with the Findings of this Order and plaintiff is to submit the same to the Court within ten (10) days of the date of these findings. Thereafter, the parties are to meet and confer regarding plaintiff's Motion for Attorneys' Fees. If the parties are unable to reach an agreement regarding the amount of fees, plaintiff may submit his fee Motion to the Court within thirty (30) days of the date of Judgment.

_____
The Hon. David O. Carter
U.S. District Court Judge

Submitted by:
Kantor & Kantor, LLP
Glenn R. Kantor, Esq.
Sally M. Mermelstein, Esq. (*Pro Hac Vice)*
Rhonda Harris Buckner, Esq.


By:   */s/ Glenn R. Kantor*_____
      Glenn R. Kantor
      Attorneys for Plaintiff
      DAVID RADMILOVICH

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

49

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW