ROBERT E. HESS (SBN CA 178042)
rhess@maynardnexsen.com
MAYNARD NEXSEN LLP
10100 Santa Monica Blvd., Suite 550
Los Angeles, CA 90067
Telephone:  310-596-4500

Attorneys for Defendant
Unum Life Insurance Company of America

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SANTA ANA DIVISION

| | |
|---|---|
| DAVID RADMILOVICH,<br><br>              Plaintiff,<br><br>       vs.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA; AND DOES 1-10, inclusive,<br><br>              Defendants. | Case No. 8:22-cv-00181-DOC-KES<br><br>(Honorable David O. Carter, Ctrm: 10A – Santa Ana)<br><br>**DEFENDANT'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Trial Date:  September 22, 2023<br>Time:  8:30 a.m.<br>Ctrm:  10-A Santa Ana<br><br>Complaint Filed:  February 3, 2022 |

Unum Life Insurance Company of America ("Unum") hereby submits this proposed Findings of Fact and Conclusions of Law in the above-referenced case.

## FINDINGS OF FACT

1.      Any finding under this category that is a conclusion of law is also hereby adopted as a conclusion of law.

2.      Plaintiff David Radmilovich ("Plaintiff") was covered under a long-term disability ("LTD") policy (the "Policy") issued by Defendant Unum Life Insurance Company of America ("Defendant") to Plaintiff's employer, Prudential Overall Supply ("Prudential"). The Policy is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. Section 1001, *et seq*. ("ERISA").

**The Pertinent Provisions of the Policy**[1]

3.      "Total Disability" for the first 30 months (*i.e.*, throughout the Elimination Period and the next 24 months), requires a showing that the claimant, "as a result of sickness or injury," must be "unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way." [AR 12996]

4.      After benefits have been paid for 24 months, the claimant must prove he is "not able to engage with reasonable continuity in any occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity." [AR 12996]

5.      The Policy provides that benefits will stop "the date you are no longer disabled" [AR 13003], and LTD coverage will end "the last day you are in active employment." [AR 12994]  (Plaintiff's last day of active employment was September 6, 2018.) [AR 54]

6.      The Elimination Period under the Policy (a period after the disability onset date that must be satisfied before benefits are payable) is 180 days. [AR 12982]

---

[1] All page references are to documents contained in the Administrative Record (bates stamped AR 00001 – AR 13,028).

**<u>Unum's Initial Claim Evaluation</u>**

7.    In September 2019, Plaintiff submitted a claim for LTD benefits. [AR 54-57] He identified his medical condition as "chronic chest pain / cognitive issues / other diagnosis." [AR 54] He reported that "Heart Palpitations/Heart Flutters/Quivers in neck/Chest Pressure/Chest Pains/Spikes in Blood Pressure, PVC's, Other Heart issues, Cognitive degradation and limits" rendered him "unable to perform one or more" of the duties of his occupation as a director of production at Prudential. [AR 55]

8.    In support of his claim, Plaintiff submitted an Attending Physician Statement ("APS") from his cardiologist, Dr. Rishi Kaushal, who reported Plaintiff had a "history of cardiac arrest" for which he was hospitalized three years earlier, in August/September 2016.  [AR 114] Dr. Kaushal reported a diagnosis of coronary artery disease ("CAD") with "unstable angina," and chronic angina.[2] [AR 114-116] Dr. Kaushal identified restrictions and limitations ("R&Ls") consisting of lifting more than 10 pounds, walking more than 50 feet, and cognitive tasks including analytics, administration, communication and project management. [AR 115]  Dr. Kaushal told Unum these R&Ls were warranted because Plaintiff's "chest pain [was] exacerbated by physical & mental demands of his job requirements." [*Id.*]

9.    Unum also obtained information about Plaintiff's occupation from his employer, Prudential, an industrial cleaning company that supplies uniforms, laundry and work rentals. Prudential told Unum that Plaintiff's last day worked was September 24, 2018 [AR 86] and submitted a job description for Director of Production which included the following information: "[t]he normal work schedule is 8.00 hours per day 5 days per week," with the following physical requirements: standing occasionally (up to 1/3 of the time); walking occasionally (up to 1/3 of the time); sitting frequently (1/3 to 2/3 of the time); and "periodic (does not occur on

---

[2] Angina is a type of chest pain caused by reduced blood flow to the heart. *See* www.mayoclinic.org/angina.

DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

every shift)" lifting, pushing and pulling demands. [AR 99-103]   However, in November 2019, Prudential told Unum that Plaintiff could avoid lifting heavy items in his occupation if he chose to do so, and explained that lifting was required "[o]nly during training for this position or filling in at a plant could this [lifting requirement] apply but usually this could be passed down to a Corporate Production Manager if one is in position at the time." [AR 380]

10.     Unum arranged for a vocational rehabilitation consultant ("VRC") to review the file, and that VRC confirmed that Plaintiff's occupation fell within the "light work" category. [AR 459-461]

11.     During a call with Unum in September 2019, Plaintiff refused to disclose any information about his daily activities or his educational and work history ("would not provide"), but he did disclose that he was treating with psychologist Dr. Vivian Credido.   [AR 175] Shortly thereafter, attorney Rhonda Harris Buckner began representing Plaintiff in connection with his claim.  [AR 257-264]

**The Records from Plaintiff's Cardiologist Did Not Support Impairment**

12.     Unum obtained Dr. Kaushal's records which confirmed Plaintiff's diagnosis of and treatment for cardiac disease. However, the records reflected consistently normal cardiac and physical examination findings and a complete absence of any significant cardiac events (such as heart failure, cardiac arrhythmias or myocardial ischemia) after the 2016 heart surgery. As shown below, Dr. Kaushal's records also revealed that Plaintiff routinely engaged in strenuous exercise and admitted that he felt his best when exercising – and in fact Plaintiff reported that his cardiac related symptoms improved when he exercised.

13.     Relevant entries from Dr. Kaushal's records include the following:

9/18/18 treatment note: "[Patient] notes exercise and 'wearing himself out' make him feel better. He reports episodes of chest palpitations have been infrequent and have decreased." [AR 220] "Patient has chronic

chest pain syndrome which I feel is in part psychosomatic from patient's traumatic history of cardiac arrest and possibly exacerbated by depression/anxiety.  I have not discovered any organic etiology of this chest pain other than possible neuropathic origin following open heart surgery. . . . Recent ischemic evaluations including coronary angiogram have been negative; in fact, chest pain improves with exercise, thus very low likelihood of angina etiology of chest pain." [AR 223]

9/20/18 treatment note: "I continue to feel that the majority of symptoms may be psychosomatic from patient's traumatic history of cardiac arrest and possibly exacerbated by depression/anxiety.  I have not discovered any organic etiology of this chest pain other than possible neuropathic origin . . .." [AR 228]

10/10/18 treatment note: Although Plaintiff subjectively reported ongoing chest pain and fatigue, he told Dr. Kaushal he "remains active, exercises 4-5 times/week." [AR 216] Dr. Kaushal's physical examination was normal, including the exam of Plaintiff's heart ("regular rate and rhythm, S1 normal, S2 normal, no murmur, no click, no rub or gallop")[3] [AR 219] Under "Assessment and Plan," Dr. Kaushal wrote: "Left ventricular ejection fraction has essentially normalized . . . No evidence of ischemic lesion corresponding to stress echocardiogram . . . Chronic chest pain syndrome is likely nonanginal in etiology. Overall there has been some improvement in symptoms." [AR 219]

---

[3] S1 and S2 refer to heart sounds, which "are created from blood flowing through the heart chambers as the cardiac valves open and close during the cardiac cycle." See reference to "Physiology, Heart Sounds" at https://www.ncbi.nlm.nih.gov/books/NBK541010/.

<u>11/21/18 treatment note</u>: Plaintiff reported episodes of chest pain but "[n]otes pain intensity improvement with exertion." [AR 211] Plaintiff again reported "[h]e is active; exercise 3-4 days a week." [*Id*.] The heart exam was again normal, and Dr. Kaushal documented ongoing improvement. [AR 214]

<u>2/20/19 treatment note</u>: Plaintiff remained "active biking, walking, gym exercises 4-6 days a week." [AR 206] The heart exam was again normal, and Dr. Kaushal documented ongoing improvement.   [AR 209]

<u>8/6/19 treatment note</u>: Plaintiff was still reporting chest pain and cardiac symptoms, but reported "improvement in duration of palpitations." [AR 201] Plaintiff continued to exercise regularly, and continued to feel better when exercising: "He is active; elliptical exercises for 40 minutes 4-5 times a week. Notes degree of chest tightness during exertion but notes he feels better during exertion.  After exercising, chest tightness resolves around after 45 minutes." [AR 201] Dr. Kaushal's heart exam was again normal [AR 204], but since it had been more than 2 years since the last ischemic assessment, she ordered a nuclear stress test for further evaluation. [AR 205]

<u>8/29/19 Nuclear Stress Test (Exercise) report</u>: "Perfusion imaging is negative for ischemia.[4] LV [left ventricle] function and WM are normal." Overall Impression: **Patient has low (<1%) cardiovascular risk**. The ECG portion of this test is normal. This is a negative test." [AR 231]

---

[4] Myocardial ischemia occurs when blood flow to your heart is reduced, preventing the heart muscle from receiving enough oxygen. *See* https://www.mayoclinic.org/diseases-conditions/myocardial-ischemia/symptoms-causes/syc-20375417.

Perfusion Impression: Left ventricle perfusion is normal. [AR 231] Function Impression: The LV function is normal. Left ventricular ejection fracture was 57%."[5] [AR 230, 231, emphasis added]

Stress ECG Findings: An exercise test was performed . . . The patient reported no symptoms during the stress test . . . Overall, **the patient's exercise capacity was excellent**. The estimated VO2 max is 37.74 ml/min/kg . . . **normal heart rate response to stress**." [AR 231-232, emphasis added]

14.    Thus, Dr. Kaushal's records showed that Plaintiff's cardiac condition in and after he stopped working in September 2018 was well controlled, with no significant clinical or diagnostic findings, with numerous references to Plaintiff's strenuous physical exercise regimen.

15.    The entries in Dr. Kaushal's records about Plaintiff's robust exercise activities and his positive physical reaction to strenuous exercise directly contradict various representations (described below) by Plaintiff and Dr. Kaushal – not asserted until *after* Unum denied his claim – that Plaintiff was unable to exercise and that physical activities worsened his purported symptoms. For example, in his APS Dr. Kaushal told Unum that Plaintiff was unable to walk more than 50 feet ("Physical Restrictions:  . . . walking > 50 feet") [AR 115], Dr. Kaushal's records reflect admissions by Plaintiff that he was "active biking, walking, [doing] gym exercises 4-6 days a week" and that he "currently uses the bike machine for 40 minutes per day and brings his heart rate up to 160 BPM."  [AR 206, 587]

---

[5] A normal ejection fraction is about 50% to 75%, according to the American Heart Association.    *See*    https://www.mayoclinic.org/tests-procedures/ekg/expert-answers/ejection-fraction/faq.

16.     Although at times Plaintiff subjectively reported cognitive complaints, Dr. Kaushal did not document any observed cognitive deficits during any of his treatment sessions with Plaintiff, and the neurological examinations performed by Dr. Kaushal were consistently normal ("negative").   [*See, e.g.*, AR 204, 218] Dr. Kaushal's records also revealed that Plaintiff had undergone "neuropsychiatric and psychology evaluation" [AR 205], but the report from that evaluation was not included with Dr. Kaushal's records.

17.     In September 2019, Unum noted the absence of any clear support for a cardiac-based disability and documented that Dr. Kaushal's records "do not support a severity of conditions that would prevent EE [employee] from performing his job/occ demands." [AR 252] However, Unum recognized "[t]here also may be some BH [behavioral health] component," and noted that "records are missing from the therapist and from the neurocognitive psychological evaluation done earlier during 2019." [*Id.*] Unum therefore sought to obtain the records from Plaintiff's psychologist (Dr. Credido) and the report of the psychological evaluation done by Dr. Lauren Keats. [AR 252]

18.     In response to Unum's request for Dr. Credido's treatment notes, Plaintiff's attorney told Unum "we are not comfortable with this request and do not believe Unum is entitled to this private sensitive information which is not in its entirely pertinent to Mr. Radmilovich's disability." [AR 280-281]  Unum therefore wrote Dr. Credido and asked for information regarding Plaintiff's diagnosis and functional capacity. [AR 283-286]

19.     In a written response (and without providing her treatment notes), Dr. Credido reported a diagnosis of "adjustment disorder w/ mixed emotional features" with the following explanation: "Primary stress comes from being at work & realizing that symptoms secondary to cardiac arrest impede him from functioning at the necessary level for his professional role." [AR 294] Dr. Credido told Unum that Plaintiff had "ongoing cognitive impairments" but reported, *inter alia*, that Plaintiff

7

1  was "appropriately" managing his anxiety and depression, was exercising daily, was

2  living "independently and complet[ing] duties of daily living such as cleaning,

3  cooking and shopping," and was not taking any psychotropic medications.  [AR 295]

4      20.    In her narrative report to Unum, Dr. Credido did not describe any mental

5  status exam results or any direct observations of cognitive dysfunction, and instead

6  only conveyed Plaintiff's subjective reports of cognitive impairment. [AR 294-296]

7      21.    In response to Unum's request for Dr. Keats' neuropsychological report,

8  Plaintiff's attorney told Unum the report would not be provided because it "was not

9  intended either in whole or in part to be used for a disability claim or legal

10  proceeding." [AR 378] Unum told Plaintiff's attorney that if she was unwilling to

11  provide the report to Unum, the claim evaluation would be completed without it. [AR

12  469]

13      22.    In December 2019, Dr. Credido attributed Plaintiff's purported cognitive

14  impairment to "some degree of brain damage" caused by oxygen deprivation during

15  cardiac arrest. [AR 508] However, Dr. Credido did not provide any imaging, test

16  results or medical records to support her brain damage theory. Dr. Credido also

17  disclosed that Plaintiff "preferred to refrain" from trying any medications or

18  undergoing psychiatric evaluation despite his reportedly disabling complaints. [AR

19  510]

20      23.    Plaintiff's medical records from 2016 indicate that Plaintiff did *not*

21  sustain brain damage due to lack of oxygen. To wit, a 2016 brain MRI performed

22  shortly after the heart attack confirmed there was "no evidence of anoxic brain

23  injury." [AR 1630] (Anoxic brain injury happens when your brain loses oxygen

24  supply. *See* https://www.webmd.com/brain/anoxic-hypoxic-brain-injuries.)

25  **Unum's Further Claim Evaluation and Determination that Plaintiff was not**

26  **Entitled to Benefits beyond early October 2019**

27      24.    In December 2019, Unum arranged for several medical consultants to

28  review the file from both physical and behavioral health perspectives.

8

25.     The medical consultants who focused on Plaintiff's physical health and functionality were appropriate given that his claim was based on his August 2016 cardiac arrest and related complaints.

26.     Unum also appropriately arranged for other medical consultants to evaluate Plaintiff's psychiatric/psychological health and functionality because one of the medical professional certifying Plaintiff's disability was his treating psychologist, Dr. Credido, who told Unum that Plaintiff suffered from "adjustment disorder w/ mixed emotional features," as well as stress, anxiety and depression [AR 294-295]. Further, Dr. Kaushal's observed that "the majority of [Plaintiff's] symptoms may be psychosomatic from patient's traumatic history of cardiac arrest and possibly exacerbated by depression/anxiety." [AR 228]

27.     Onsite physician ("OSP") Robert Nosaka, M.D. (internal medicine) reviewed the file and found no medical support for R&LS beyond October 9, 2019. [AR 581-521] Although Dr. Nosaka noted that October 9, 2019 was the day Dr. Kaushal decreased the dosage of Plaintiff's Rosuvastatin (a cholesterol lowering drug), the "Analysis/Rationale" section of his medical report confirms that his conclusion was based on substantial medical information (beyond the medication decrease) which demonstrated that Plaintiff's cardiac-related conditions and symptoms were stable and well-managed and his exercise/cardiac tolerance was robust – as Unum had previously recognized in September 2019. [AR 252].  Dr. Nosaka summarized his rationale, in part, as follows:

> "He bikes, walks and exercises at the gym 4-6 days per week. . . .
> 10/9/19 appointment with Dr. Kaushal. Chest pain, palpitations and
> flutters are stable.  He remains active and exercises on an elliptical
> for 40 minutes 4-5 times per week. . . . Physical exam . . . Alert and
> oriented x3. Exam was normal. . . . Diagnostics are unremarkable.

9

Recent cardiac stress test reached a metabolic equivalent of 12 which indicates the ability to race a bicycle at 16-19 MPH and exceeds the physical demands of his occupation.

Physical exams are unremarkable and note no cognitive deficits. He is able to exercise extensively at a level that likely exceeds the metabolic equivalent of his occupation. Treatment plan is office visits and medication adjustment which can be typically provided while performing the duties of his occupation. Thus, given the unremarkable diagnostic and physical exam findings, the insured's level of activity and the conservative treatment plan, OSP opines that the insured is not precluded from performing the full-time duties of his occupation." [AR 520]

28.     Dr. Nosaka also spoke with Dr. Kaushal (on December 12, 2019) who confirmed that the cardiac workup for chest pain had been negative and that Plaintiff was able to exercise regularly, and Dr. Kaushal acknowledged and agreed there was no clear etiology for Plaintiff's reported pain. [AR 530-531]

29.     Dr. Kaushal's treatment note dated October 9, 2019 corroborated Dr. Nosaka's finding that Plaintiff was not disabled as of that date. For example, Dr. Kaushal reported on that date that Plaintiff's subjective complaints of chest pain, palpitations and flutters were "stable," that his flutters only occurred for "short periods," that his chest pain was only "intermittent," and that his activity level remained robust and therapeutic: "He remains active; cardiac rehabilitation, elliptical exercises 40 minutes 4-5 times a week. . . . He reports chest pain and tightness improve with exercise." [AR 445]  Also, Dr. Kaushal physical exam on that date was entirely normal:

"Musculoskeletal: Negative

Neurologic: Negative

DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

- - -

General appearance: alert and oriented x 3, appears stated age and cooperative

- - -

Heart: regular rate and rhythm, S1 normal, S2 normal, no murmur, no click, no rub or gallop

Assessment and Plan:

. . . Left ventricular ejection fraction has essentially normalized. Patient underwent coronary angiogram on February 2, 2017 due to abnormal stress echo demonstrating severe native multivessel coronary artery disease with patent grafts. No evidence of ischemic lesion corresponding to stress echocardiogram. Septal wall motion abnormality likely related to post sternotomy appearance of septum rather than due to true ischemia. Chronic chest pain syndrome is likely nonanginal in etiology.

30.     Another medical consultant, Designated Medical Officer ("DMO") George DiDonna, M.D. (cardiovascular disease physician) also reviewed the file for Unum. [AR 533-536] As reflected in his report dated December 13, 2019, Dr. DiDonna found that occupational R&Ls were not medically supported and summarized his conclusions, in part, as follows:

"While the insured has continued to complain of various types of chest pain there has not been direct evidence of ongoing myocardial ischemia as an etiology. There is no evidence of heart failure (LVEF 57%) or impairing cardiac arrhythmias. The insured has demonstrated above average exercise capacity for age and is reasonably capable of performing the occupational demands detailed in the medical referral. The insured's self-described activities align with his ETT [exercise tolerance test] results." [AR 535-536]

11

31.    To address Plaintiff's complaints of cognitive impairment and Dr. Credido's disability opinion, Unum asked another medical consultant, psychiatrist Jonathan Morris, M.D., to review the file.  [AR 537-539] Dr. Morris found no clinical evidence of impairing symptoms due to a behavioral health condition or medication side effects. *Id.*

32.    Unum then asked a second psychiatrist (independent medical consultant Mark Schroeder, M.D.) to review the file.  [AR 542-544]  Dr. Schroeder focused on the absence of any clinical evidence of cognitive impairment in the medical records, and stated as follows:

> "The records did not document significant mental status abnormalities.  The records of Dr. Kaushal and Dr. Credido do not include any mental status exams.  Dr. Credido opined that the claimant could not perform his full occupational duties because of cognitive impairment including problems with memory, attention, concentration, and multitasking.  However, the record did not present evidence of such impairment by means of detailed behavioral observations or cognitive testing. . . .  It would be expected that a mental impairment severe enough to prevent the performance of work duties would also cause significant disruption of other life activities.  However, the claimant reported performing a full range of daily activities independently including cleaning, cooking, shopping, and exercising.  That the claimant could perform these activities raises questions about the severity of impairment. . . .
>
> In summary, I concluded that the available evidence did not support the AP's [attending physician's] opinion about behavioral health restrictions/limitations during the timeframe in question by means of significant mental status abnormalities, cognitive deficits, psychiatric

impairment of daily activities, or by participation in intensive mental health treatment.  Instead, I concurred with the OSP opinion that file documentation of symptoms severity, functional impairment, and treatment intensity is not consistent with the opined restrictions and limitations during the timeframe in question." [AR 543]

33.     Based on the opinions of Dr. Nosaka, Dr. DiDonna, Dr. Morris and Dr. Schroeder, and the medical information that confirmed an absence of impairing cardiac or cognitive symptoms, Unum determined that the medical information did not establish that Plaintiff was unable to perform the demands of his occupation beyond October 8, 2019. [AR 554] Unum therefore approved benefits through that date and conveyed that determination to Plaintiff's attorney in a letter dated December 23, 2019. [AR 560-568]

34.     In that claim determination letter, Unum explained the reasons (which went far beyond just a change in medication) why it found that Plaintiff was not disabled, in part, as follows:

"· Recent diagnostics are unremarkable.

    - A recent cardiac stress test reached a metabolic equivalent of 12 which indicates the ability to race a bicycle at 16-19 miles per hour and exceeds the physical demand of this occupation.

· Physical exams are unremarkable and noted no cognitive deficits.

    · Documented ability to exercise extensively at a level that likely exceeded the metabolic equivalent of this occupation.

    · Treatment plan is office visits and medication adjustment which can by typically provided concurrently while performing the duties of this occupation.

    · Thus, given the unremarkable diagnostic and physical exam findings, the insured's level of activity and the conservative

13

treatment plan, [Unum's consulting] physician opined that the patient would not be precluded from performing the full-time duties of this occupation as of October 9, 2019." the review of the medical records do not support a behavioral health or cognitive impairment at any time during the claim.  The review of the cardiology records support a functional impairment precluding the occupational demands through October 8, 2019.  At this time we are able to issue benefits through October 8, 2019, but need additional information in order to continue our review for further benefits."  [AR 565]

**The information submitted in support of Plaintiff's claim (including his results on neuropsychological testing) did not establish disability**

35.     One week after Unum issued its claim determination letter, and after treating Plaintiff for more than *three years* following his August 2016 cardiac event, Dr. Kaushal offered to Unum a never-before mentioned opinion, as follows: "Upon further review of patient's medical records & care, etiology of chest pain may be coronary spasm or microvascular disease. . . . Work stress has been found to be a trigger of pain." [AR 575] Dr. Kaushal offered no explanation for this new opinion or why he was withdrawing his prior findings and opinions regarding Plaintiff's reported chest pain (including in September and November 2018, when Dr. Kaushal wrote "I continue to feel that the majority of symptoms may be psychosomatic," "I have not discovered any organic etiology of this chest pain other than possible neuropathic origin," and "[c]hronic chest pain syndrome is likely nonanginal in etiology."[6] [AR 228, 219]).

---

[6] "Nonanginal chest pain, which doctors may also call noncardiac chest pain, refers to pain a person without heart disease may feel behind the breast bone." https://www.medicalnewstoday.com/articles/nonanginal-chest-pain

36.     Unum arranged for both Dr. Nosaka and Dr. DiDonna to review Dr. Kaushal's new opinion in January 2020, and they each found that that it did not alter their prior determinations. [AR 614-615, 672-675]

37.     Dr. DiDonna summarized his position at that time as follows:

"There are no additional cardiac studies submitted and no cardiac clinical information except for Dr. Kaushal's revised opinion. . . . It should be noted there are no prior manifestations of coronary artery spasm in the records . . . there is no documentation of myocardial ischemia by objective techniques. There are no Fractional Flow Reserve tests. There are no Coronary Flow Reserve tests and no evidence of either spontaneous or inducible coronary spasm have been observed by coronary angiography.

Dr. Kaushal did not submit direct evidence supportive of [her] diagnosis except patient self-report. In addition, there is no direct support for the diagnosis of microvascular angina despite the availability of both invasive and non-invasive tests for the diagnosis of this condition." [AR 674-675]

38.     Dr. DiDonna also concluded that even if a diagnosis of coronary spasm or microvascular disease was supported, either condition could be managed with pharmacological and non-pharmacological treatments and would not be disabling. [AR 675]

39.     In January 2020, Plaintiff finally provided Unum with Dr. Keats' neuropsychological report. [AR 585-606] As reflected in that report, Plaintiff told Dr. Keats that he was riding an exercise bike for 40 minutes a day and is "prone to pushing through exhaustion." [AR 587] Plaintiff also told Dr. Keats there were non-medical factors impacting his decision not to return to work, including that he felt he was at a "cross roads" with his career. [AR 587]

40. Overall, the results of the tests administered by Dr. Keats demonstrated an absence of disabling cognitive impairment. Significant findings reflected in Dr. Keats' report include the following:

"He was oriented in all spheres and there was no evidence of formal thought or perceptual disturbance. Speech was linear and goal-directed. . . . Overall, sustained attention and effort appeared to be good. . . . Judgment and insight appeared intact."

"Mr. Radmilovich demonstrated high average abilities to learn and retain details of a complex figure, suggesting visual memory is a strength . . . Consistent with reported academic and occupational history, remote memory was intact (high average range). This is suggestive of intact abilities to retrieve well-learned information from memory.""

"Executive abilities ranged from average to high average. As noted, auditory attention and working memory performance ranged between the average to high average range."

"[Plaintiff] perceives himself to be experiencing poor health and feeling weak and tired . . . he may be prone to developing physical symptoms in response to stress or be preoccupied with physical health concerns. . . . With the exception of neurologic symptoms, his responses indicated a lower degree of dysfunction that the reference group."

"Mr. Radmilovich was able to sustain attention, pace, and effort over the examination, without interference from pain."

16

"Results from testing demonstrated focal areas of potential mild cognitive decline, but overall, he performed in the average to high average range. His report of difficulty counting, abstracting, losing train of thought, divided his attention, focusing and remembering details, was not necessarily found on this examination."

[AR 589-598]

41.     Thus, the results of Dr. Keats' independent neuropsychological evaluation did not support the assertions of Plaintiff, Dr. Kaushal and Dr. Credido that Plaintiff was experiencing cognitive impairment to a degree that precluded his return to work.  Dr. Keats' diagnostic impression was somatic symptom disorder and mild neurocognitive disorder. [AR 598]

42.     Plaintiff's attorney also obtained a letter from Dr. Keats to support Plaintiff's claim. [AR 607-613] Notably, even though Dr. Keats wrote the letter to Plaintiff's attorney and was aware the letter was "needed to determine functional capacity" and to "embellish" her IME report [AR 607], Dr. Keats' corresponding "support" for Plaintiff's claimed R&Ls was not compelling.  Dr. Keats speculated that Plaintiff's test results suggested that there was "*some* decline in cognitive ability since his injury." [AR 609, emphasis added]

43.     Even if true, "some decline" in cognitive ability does not equate to total disability, and there is no merit to the notion that Plaintiff must be "100%" in order to rejoin the workforce.

44.     Further, when asked whether a Plaintiff's return to his occupation would cause harm or a deterioration of his functional capacity, Dr. Keats responded with the following speculative opinion: "it is *possible* a work environment *may* exacerbate cognitive or functional difficulties." [AR 612, emphasis added] Dr. Keats did not opine that Plaintiff was cognitively disabled or precluded from working in his occupation.

DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

45. Dr. Keats also reported that based on her clinical interviews of Plaintiff, "Mr. Radmilovich was managing his stress and symptoms well." [AR 610] This observation (made during interviews in late 2018) is notable because at that time, Plaintiff was facing several significant life stressors: "current stressors involve his health and being at a cross roads with his career . . . he is also experiencing a divorce," and "his oldest son is not speaking with him and blames him for the divorce." [AR 587, 588]

46. The fact that Plaintiff was "managing his stress and symptoms well" while dealing with such stressors supports a conclusion that he could likewise manage the stress that might result from the performance of his occupational duties, and refutes the assertions by Plaintiff and the doctors who support his claim that he would not be able to handle occupational stress if he returns to work.

47. Likewise, the fact that Plaintiff could tolerate intense psychical exercise also supports for the conclusion that he can handle work-related stress. As later explained by Dr. Kaushal, "there is a clear relationship between stress (**whether physical or emotional/mental**) and ischemia." [AR 1446, emphasis added] Likewise, a cardiologist later retained by Plaintiff's attorneys (Dr. Parag Goyal) explained that "Stress, **whether physical or emotional** . . . increases heart rate and blood pressure. This increases the workload of the heart" [AR 891, emphasis added]

48. Thus, according to Plaintiff's own medical advocates, his heart's ability to function well and without debilitating symptoms in response to physical stress (i.e., exercise) establishes that his heart will function well and without debilitating symptoms if he experiences work-related stress.

49. Unum sent the new materials, including Dr. Keats' report, to independent neuropsychologist David Nowell, Ph.D. [AR 656] Dr. Nowell confirmed that Dr. Keats' testing showed only "mild impairment, [with] overall performance in the average to high average range." [*Id*.] Dr. Nowell's impression was somatic symptom disorder and neurocognitive disorder. [*Id*.] He later reviewed the raw test data from

18

Dr. Keats' evaluation and confirmed it did not support disability, explaining that the data "yields performances within normal limits with some variability as would be expected in a battery of tests yielding multiple scores and indices of performance. . . . the 1/31/19 exam yielded no clear evidence of cognitive impairment." [AR 664]

50.     Dr. Morris and Dr. Schroeder also reviewed the additional materials and affirmed there was no support for R&Ls due to a behavioral health condition, including those R&Ls reported by Dr. Credido. [AR 679-681, 689-690]

51.     Because the additional information did not provide a basis to overturn the prior claim determination, in February 2020 Unum reiterated its determination that Plaintiff was able to perform the duties of his occupation and thus not entitled to benefits beyond October 8, 2019.  [AR 697-705] Unum conveyed that determination to Plaintiff's counsel in a letter dated February 14, 2020. [AR 698]

52.     Unum explained that benefits for the period of October 9, 2019 through February 14, 2020 had been paid under a reservation of rights [AR 698], and in fact those benefits "were released in error." [AR 678] However, Unum told Plaintiff it would not seek to recover the erroneously paid benefits. [AR 698]

**Plaintiff's Appeal of Unum's Claim Determination**

53.     In August 2021, Plaintiff's attorneys appealed Unum's claim determination and submitted various additional materials. [AR 784-768] These materials included a July 2020 neuropsychological evaluation report by Roger Light, Ph.D. which reflected a diagnosis of major neurocognitive disorder, a notable difference as compared to Dr. Keats' diagnosis of mild neurocognitive disorder. [AR 844-885]

54.     Plaintiff also submitted a report from cardiologist Dr. Parag Goyal, who did a record review and telephone interview but did not examine Plaintiff. There are numerous reasons why Dr. Goyal's disability opinion is unreliable.

55.     Preliminarily, Dr. Goyal's opinion was premised on his belief that Plaintiff has "typical angina." [AR 890] That belief is squarely refuted by the records

of Dr. Kaushal, who expressed on multiple occasions that Plaintiff's symptoms were *not* caused by angina. *See* treatment notes of Dr. Kaushal dated 9/18/18 ("very low likelihood of angina etiology of chest pain" [AR 223]), 9/20/18 ("I continue to feel that the majority of symptoms may be psychosomatic" [AR 228]), and 10/10/18 ("chest pain syndrome is likely nonanginal in etiology" [AR 219]). As explained by cardiologist Dr. DiDonna, "there is no direct support for the diagnosis of microvascular angina."  [AR 675]

56.     Dr. Goyal also confirmed that "[s]erial echocardiograms have demonstrated that his left ventricular ejection fraction have improved/recovered." [AR 887]

57.     The improvement of Plaintiff's left ventricular ejection fraction ("LVEF") is significant.  "Your ejection fraction is an indicator of how well your heart is working. A low ejection fraction typically means you have or are at risk for heart failure." (*See* https://my.clevelandclinic.org/health/articles/16950-ejection-fraction) LVEF

58.     Plaintiff's LVEF readings contemporaneous with Unum's October 2019 claim denial were 57% [AR 231], and in his Oct. 9, 2019 note Dr. Kaushal confirmed that Plaintiff's "[l]eft ventricular ejection fraction has essentially normalized." [AR 420].  As shown by the chart below, the evidence establishes that at least by October 2019, Plaintiff's LVEF – a critical indicator of heart health – was  entirely normal:

**Ejection Fraction Percentage - Male**

| Normal | Mildly Abnormal | Moderately Abnormal | Severely Abnormal |
|---|---|---|---|
| 52% to 72% | 41% to 51% | 30% to 40% | Below 30% |

*See* https://my.clevelandclinic.org/health/articles/16950-ejection-fraction

59.     Further, Dr. Goyal acknowledged that the nuclear stress test performed in August 2019 was "negative for ischemia," [AR 888] and he did not deny that the same test confirmed that Plaintiff "has low (<1%) cardiovascular risk," "excellent" exercise capacity and a "normal heart rate response to stress." [AR 231-232]

20

60.    Dr. Goyal speculated that it is "reasonable to draw the inference that the etiology of his condition is coronary microvascular disease." [AR 889] However, Dr. Goyal never administered any tests to confirm or support his "inference that the etiology of his condition is coronary microvascular disease." [AR 886-892] Further, while Dr. Goyal referenced various diagnostic studies, he did not review the films/imaging pertaining to those studies, and instead relied on the written reports and comments by others about the results of the studies.  [AR 886, 888]  Further, none of the imaging and diagnostic studies cited by Dr. Goyal demonstrated findings of microvascular disease. [AR 888] As explained by Dr. DiDonna, there are "both invasive and non-invasive tests for the diagnosis of [microvascular angina]." [AR 675] Dr. DiDonna explained that in the absence of positive findings from such objective testing and techniques, "there is no direct support for the diagnosis of microvascular angina" in Plaintiff's case. [*Id.*]

61.    Notably, the updated records from Dr. Kaushal submitted on appeal showed normal physical exams contemporaneous to Unum's determination that Plaintiff was not disabled by October 2019 and the termination of benefits in February 2020, including the following:

10/9/19 treatment note: "Musculoskeletal: Negative. Neurologic: Negative . . . General appearance: alert and oriented x 3, appears stated age and cooperative. . . . Heart: regular rate and rhythm, S1 normal, S2 normal, no murmur, no click, no rub or gallop. . . . Left ventricular ejection fraction has essentially normalized. . . Patient remains active without exertional ischemic symptoms." [AR 420]

12/3/20 treatment note: "Patient reports stable symptoms which include occasional chest pain at rest and with exertion.  Remains as active as possible." "Heart: Regular rate and rhythm, S1 normal, S2 normal, no murmur, no click, no rub or gallop." [AR 1081, 1084]

DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

2   1/4/21 treatment note: "The several times that he has exercised, feels less strain

3   on his heart when working out which he was pleased with."  "Heart: Regular

4   rate and rhythm, S1 normal, S2 normal, no murmur, no click, no rub or gallop."

5   [AR 1100, 1104]

6   62.    Plaintiff's attorney later submitted a September 2, 2021 letter from Dr.

7   Kaushal in support of the appeal in which Dr. Kaushal offered several new opinions

8   and representations in an effort to support Plaintiff's claim.

9   63.    First, Dr. Kaushal wrote that Plaintiff's "ability to maintain an exercise

10  program is profoundly limited due to the onset of exercise-induced and post-

11  exertional chest pain and fatigue," and he added that post exertional symptoms left

12  Plaintiff "bedridden" for days. [AR 1421-1422] This purported exercise intolerance

13  and post-exercise discomfort reported by Dr. Kaushal was completely contradicted

14  by the entries in Dr. Kaushal's own medical records, including the following:

15  -    "He remains active; cardiac rehabilitation, elliptical exercises 40 minutes 4-

16       5 times a week." "No exertional angina [chest pain] or dyspnea [shortness

17       of breath]." [AR 417 – 10/9/19 treatment note]

18  -    "He is active: eliptical exercises for 40 minutes 4-5 times a week . . . chest

19       tightness during exertion but notes he feels better during exertion.  After

20       exercising, chest tightness resolves after 45 minutes." [AR 201 – 8/6/19

21       treatment note]

22  -    "He is active; biking, walking, gym exercises 4-6 days a week." [AR 206 –

23       2/20/19 treatment note]

24  -    "He remains active; exercises 4-5 times/week." [AR 216 – 10/10/18

25       treatment note]

26  -    "[Patient] notes exercise and 'wearing himself out' make him feel better"

27       [AR 220]

28  -    "[n]otes pain intensity improvement with exertion" [AR 211]

22

- "Notes degree of chest tightness during exertion but notes he feels better during exertion. After exercising, chest tightness resolves around after 45 minutes" [AR 201]

- In or around June 2018, Plaintiff rode from Torrance to San Diego on his bike and told Dr. Kaushal that he "felt well, no angina or SOB" during his ride [AR 389] Plaintiff lives in Torrance, CA [AR 81] – located approximately 118 miles from San Diego.

64.    Moreover, there is not a single reference to Plaintiff being "bedridden for days" in the record during the 12 months prior to and including February 2020.

65.    In his September 2021 letter, Dr. Kaushal also stated as follows: "The objective findings which support this [diagnosis of coronary microvascular disease as the etiology of his symptoms] include the demonstration of severe ischemia on multiple stress echocardiograms." [AR 1421] The ischemia found on the stress echocardiograms was found in the septal walls of the heart, as described by Dr. Kaushal as follows: "stress echocardiogram markedly abnormal, demonstrating stress-induced ischemia of the anterior, anteroseptal, and inferior walls. Possibly accounting for patient's exertional dyspnea and chest pain." [AR 1099] The septum of the heart is a wall of tissue that separates the left and right sides of the heart and enables blood to flow as it should. It consists of the atrial septum and the ventricular septum. (*See* https://www.medicalnewstoday.com/articles/septum-heart)

66.    This new assertion by Dr. Kaushal – that the ischemia found on stress echocardiograms was evidence of an etiology of coronary microvascular disease – was directly contrary to his prior opinion (which was offered *before* Plaintiff's claim was denied) of the abnormalities found on stress echocardiograms.  Specifically, in his October 9, 2019 treatment note, Dr. Kaushal wrote as follows:

. . . Left ventricular ejection fraction has essentially normalized. Patient underwent coronary angiogram on February 2, 2017 due to abnormal

23

stress echo demonstrating severe native multivessel coronary artery disease with patent grafts. **No evidence of ischemic lesion corresponding to stress echocardiogram. Septal wall motion abnormality likely related to post sternotomy appearance of septum rather than due to true ischemia.** Chronic chest pain syndrome is likely nonanginal in etiology. [AR 420, emphasis added]

67.    Similarly, in July 2018 Dr. Kaushal told Plaintiff that his reported chest pain was "[u]nlikely [of] ischemic etiology." [AR 387]

68.    Thus, before Plaintiff's claim was denied, and based on his care and treatment of Plaintiff during the 3+ years following his 2016 cardiac event, Dr. Kaushal was of the opinion that Plaintiff's stress echocardiogram abnormalities were attributable to the anatomical change caused by Plaintiff's sternotomy (an incision made to gain access for heart surgery), not ischemia or heart disease. As Dr. Goyal explained, "discomfort at [a] sternotomy scar site – this is not uncommon, and does not end to cause disabling symptoms." [AR 889] Only after Plaintiff's claim was denied did Dr. Kaushal change his opinion and say that the abnormalities on the echocardiograms suggested true ischemia and/or an etiology of coronary microvascular disease.

69.    Other unsupported representations by Dr. Kaushal to Unum include his assertions that Plaintiff's work activities triggered and exacerbated his purported cardiac symptoms.  In this regard, Dr. Kaushal made the following representations:

-    "chest pain [was] exacerbated by physical & mental demands of his job requirements." [AR 115]

-    "[w]ork stress has been found to be a trigger of [Plaintiff's] pain." [AR 575]

-    "Mr. Radmilovich has experienced severe and disabling symptoms of chest pain, shortness of breath, and fatigue which have been

DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

exacerbated by physical and emotional stress, including that provided by his occupation." [AR 1421]

- "Fairly average levels of work stress can cause his cardiac symptoms to occur." [AR 1421]

- "Because of the frequency and severity of Mr. Radmilovich's cardiac symptoms that I believe have occurred as a result of work stress, I have emphatically advised Mr. Radmilovich that he should not resume work as a life-preserving measure." [AR 1422]

70.    These representations by Dr. Kaushal that Plaintiff's purported cardiac symptoms (including pain) were caused or made worse by his work-related activities and/or work related stress are belied by Dr. Kaushal's own treatment records covering the 20-month period during which Plaintiff retuned to work in his own occupation after his cardiac event. That period spanned from January 16, 2017 [AR 1077] through September 24, 2018 [AR 86], and Plaintiff presented to Dr. Kaushal on six occasions during that 20-month span: on 1/31/17; 2/4/17; 4/17/17; 6/27/17; 6/6/18; and 7/24/18.

71.    Plaintiff did not treat with (and there are no treatment records from) any medical provider other than Dr. Kaushal for the 20-month period while Plaintiff was working in his occupation from January 2017 to September 2018.  (Dr. Vivian Credido began treating him in September 2018, after he stopped working [AR 507]; Dr. Lauren Keats evaluated Plaintiff in and after November 2018 [AR 585]; Plaintiff's attorneys arranged for him to be evaluated by Dr. Roger Light and Dr. Parag Goyal in June 2020 and April 2021, respectively. [AR 844, 886])

72.    Not only do Dr. Kaushal's records over that 20-mponth period show that Plaintiff was doing so well from a cardiac perspective that he went a full year without treatment by his cardiologist (from June 2017 to June 2018), but these treatment notes fully refute the notion that work or work-related stress cause or trigger Plaintiff's symptoms for the following reasons:

DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

- There is no entry in these records of abnormal arrhythmia episodes, and a Holter Monitor study performed in February 2017 confirmed "Predominantly Normal Sinus [Rhythm]" [AR 404-405; see also AR 408 ("no arrhythmias on today's ECG")

- Plaintiff denied chest pain ("No angina") in January 2017 [AR 406]

- The physical exams of his heart were normal on every single visit [AR 408, 402, 398, 394, 390, and 386]

- Plaintiff told Dr. Kaushal he "[f]eels well, without complaints" and had "[n]o angina, no shortness of breath" in February 2017. [AR 401]

- Plaintiff reported "[n]o angina or exertional shortness of breath" in April 2017 [AR 397] and similarly reported "[n]o exertional dyspnea or angina" in June 2017. [AR 392]

- In June 2018, his first visit with Dr. Kaushal in 12 months, Plaintiff told Dr. Kaushal he was "doing very well overall" with "[n]o CHF (congestive heart failure) symptoms." Plaintiff validated how well his heart was doing by telling Dr. Kaushal that he "[r]ecently rode down to San Diego on his bike; felt well, no angina or SOB." [AR 389] (Plaintiff lives in Torrance, CA [AR 81] – located approximately 118 miles from San Diego.)

- Plaintiff reported only a single episode of shortness of breath during the 20-month span while he was working. In July 2018, he told Dr. Kaushal he experienced "one episode of shortness of breath" which "lasted about 15-20 minutes, and resolved without recurrence." [AR 385] At that same visit, Plaintiff reported "no pleuritic chest pain no lightheadedness" and Dr. Kaushal documented that Plaintiff was "[o]verall doing very well." [AR 385, 387]

- There is not a single reference in the records contemporaneous to Plaintiff's 20-month return to work to complaints or reports (by Plaintiff) or observations (by Dr. Kaushal) of fatigue, cognitive impairment, poor motor skills or other neurological deficits.

DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    - There is not a single reference in those records to complaints by Plaintiff of

2    work-stress, or a report by him that work activities exacerbated his cardiac

3    symptoms, or that he was "bedridden" for any period of time due to stress or

4    exertion.

5    [See Dr. Kaushal's treatment notes from January 31, 2017 through July 24,

6    2018 at AR 404-408, 400-403, 396-399, 392-395, 388-391, 384-387]

7    73.    These above-referenced inconsistencies and contradictions between Dr.

8    Kaushal's treatment records and his representations that Plaintiff's purported cardiac

9    symptoms (including pain) were caused or made worse by his work-related activities

10   and/or work related stress, as well as the disconnect between Dr. Kaushal's

11   representations of Plaintiff's exercise intolerance and the entries in his records

12   showing that Plaintiff routinely engaged in vigorous exercise, establish that Dr.

13   Kaushal's opinions are not reliable.

14   74.    Dr. Credido's disability opinions are also unreliable, because they are

15   based on unsubstantiated, after-the-fact subjective reports from Plaintiff about his

16   purported work-related problems. In this regard, Dr. Credido submitted information

17   to Unum on two occasions, in October and December 2019. [AR 294-296, 507-510]

18   Each time, Dr. Credido premised her opinions on the problems Plaintiff allegedly

19   experienced while working from January 2017 to September 2018, and cited his

20   alleged work-related struggles as the basis for her opinion that Plaintiff is disabled.

21   [*Id.*] For example, in October 2019 Dr. Credido told Unum that Plaintiff "attempted

22   to return to his professional occupation," but "cognitive impairment (fog & memory

23   lapses) impaired his ability to perform at the level required for his position," and

24   "symptoms impaired necessary functions in his occupation." [AR 295] Dr. Credido

25   also told Unum that Plaintiff's "[p]rimary stress comes from being at work & realizing

26   that symptoms secondary to cardiac arrest impede him from functioning at the

27   necessary level for his professional role." [AR 294] Since Dr. Credido began treating

28   Plaintiff only *after* he stopped working, her understanding of the alleged problems he

27

experienced at work necessarily came from Plaintiff's after-the-fact description. Thus, Dr. Credido simply accepted at face value Plaintiff's report that he struggled at work – despite the absence of corroborating entries in the contemporaneous medical records.  Also, in neither of her submissions to Unum did Dr. Credido identify if, when or how she evaluated or observed for herself any of the cognitive problems Plaintiff reported to her. [AR 294-296, 507-510] For these reasons, Dr. Credido's opinions are not reliable.

75.    In a declaration he submitted to Unum in support of his appeal, Plaintiff identified a laundry list of symptoms that he purportedly "experienced upon returning to work," including, among others, the following:  "recurring/chronic fatigue, muscle weakness, loss of balance, reduced motor skills, slurring of speech, drooling, involuntary aspiration of saliva, dizziness/lightheadedness, blurry vision, recurring trembling in upper left chest/neck area, persistent irritations at the chest surgical scar site, tinnitus [and] cognitive impairments." [AR 1078] In fact, there is not a single complaint or report (by Plaintiff) or observation (by Dr. Kaushal) of any of these symptoms in Dr. Kaushal's medical records spanning the 20-month period he returned to work. [AR 404-408, 400-403, 396-399, 392-395, 388-391, 384-387]

76.    The incongruity between Plaintiff's representations to Unum and the documented medical evidence supports the conclusion that Plaintiff's report to Unum and his physicians about work-related difficulties and an inability to handle work-related stress is not credible.

**Unum Affirmed its Claim Determination on Appeal**

77.    In response to Plaintiff's appeal, Unum arranged for several additional medical consultants to review the file.

78.    Independent neuropsychologist Julie Guay, Psy.D. reviewed Dr. Light's report and the raw data from his testing. [AR 1414-1415]

DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

79.    Dr. Guay found that the data supported a diagnosis of *mild* – not major – neurocognitive disorder, and noted several reasons why Dr. Light's opinion was not reliable, including the following:

> "The data supports the previous diagnosis of Mild Neurological Disorder, most likely due to multiple etiologies, and does not support a diagnosis of Major Neurocognitive Disorder. Dr. Light used a narrow range for premorbid ability (>90%) . . . and argued that every score below that range was considered a decline.  This fails to account for normal variability that occurs even in individuals who are very high functioning.  The claimant's test indices and vocational history support a hypothesis that premorbid functioning was above average and a range of >75th percentile is more reasonable to account for normal variability."

> "The data does not support [Dr. Light's] statement that the 'breadth and severity of the decrement from expected level of functioning was dramatic.' With respect to 'breadth,' [Dr. Light] did not assess learning and memory, even though this domain is one of the area's most often affected by hypoxia."

> "The claimant demonstrated no significant decline on measures of abstract verbal and nonverbal reasoning and two of the three measures of auditory working memory. On most of the remaining tasks, including perceptual reasoning abilities, processing speed, basic attention, and most measures of executive functioning, his scores were average, which suggests mild decline."

"The data does not support the conclusion that somatization was not a possible factor in the claimant's performance. Dr. Light did not assess for this in the current evaluation, nor did he utilize any comprehensive neuropsychological measures to assess response tendencies or symptom validity.  In addition, in contrast to Dr. Light's statement that there was nothing in the claimant's history to suggest that he was prone to somatization, . . . results from Dr. Keats' evaluation from 12/2019 did reflect greater endorsement of somatic concerns that was typical, including fatigue and neurological complaints." [AR 1414-1415]

80.    Dr. Light did not evaluate Plaintiff until June 2020. Even if Plaintiff demonstrated cognitive impairment of a degree that would impact his ability to perform his occupational duties in June 2020, such evidence does not establish the existence of such impairment in October 2019, when Unum determined Plaintiff was no longer disabled.

81.    Also, Dr. Light's disability opinion was based, in part, upon his interview of Ira Jacobs, described as someone who had "worked together [with Plaintiff] for 17 years in various positions and companies."  [AR 858] Mr. Jacobs told Dr. Light that "after he returned to work from post illness, [Mr. Radmilovich] was different in the way he functioned and acted," that "while Mr. Radmilovich was still sharp and alert, it would take him longer to gather his thoughts or to focus on the present conversation," that "his thought processes were not as quick as they were prior to the cardiac arrest" but added that "Mr. Radmilovich's level of performance even after his illness, compared to most people, was still 'pretty good.' [AR 858-859]

82.    Mr. Jacobs' personal opinion that Plaintiff was "different" and took longer to "gather his thoughts" does not establish that Plaintiff was unable to perform the cognitive requirements of his job and/or unable to handle the stress of his occupation, especially in light of Mr. Jacob's admission that Plaintiff was "still sharp

and alert" and "pretty good" following his cardiac arrest. Mr. Jacobs did not describe any situation where Plaintiff failed to complete a project or assigned task, made an error in judgment, made any mistakes or otherwise did anything "wrong" in performing his job.

83.   Further, even if Plaintiff had to monitor his blood pressure and heartbeat, taking such steps does not prove he is disabled under the Policy.  The workforce is full of productive employees who perform their jobs despite having to keep an eye on one or more medical conditions (*e.g.*, diabetes), and no physician has declared Plaintiff disabled due to hypertension or an occasional rapid heartbeat.

84.   Mr. Jacobs did not corroborate the purported "chest pain episodes, nausea and fatigue" symptoms that Plaintiff later told Unum and his physicians that he experienced due to work-stress and which rendered him disabled during the 20-month span he worked after the cardiac arrest.

85.   The clinical medical evidence does not establish that Plaintiff has disabling cognitive impairment.   Although there are multiple references to encephalopathy in Plaintiff's medical records [AR 803, 804, 1583, 6754, 6867, 7244], those entries refer to diagnostic impressions offered during Plaintiff's initial admission following his cardiac arrest in August 2016. [*Id*.] The Administrative Record does not reflect that the possible encephalopathy was ever evaluated or verified by any medical provider following Plaintiff's discharge in September 2016. Thus, the "multiple references" to encephalopathy are references to the same impression made in the discharge summary of encephalopathy at Little Company of Mary, not multiple independent diagnoses of that condition.

86.   Moreover, the record does not contain an opinion by a neurologist or other brain specialist that Plaintiff sustained brain damage, much less permanent brain damage of a nature that resulted in cognitive impairment, and a September 2016 brain MRI performed confirmed there was "no evidence of anoxic brain injury." [AR 1630].

A repeat brain MRI done in March 2018 was likewise normal ("Negative MRI of the brain"). [AR 7219]

87.     A finding that Plaintiff sustained brain damage in August 2016 is further refuted by the fact that Plaintiff went back to work in his occupation for nearly two years during which time he did not report any cognitive impairment to any medical providers, and during which time not a single medical provider documented any signs or symptoms of cognitive impairment. [AR 404-408, 400-403, 396-399, 392-395, 388-391, 384-387]

88.     The additional medical consultants who reviewed the file on appeal were psychiatrist Peter Brown, M.D., Scott Norris, M.D. (family and occupational medicine physician) and Timothy McDermott, M.D. (internal medicine, cardiovascular disease, interventional cardiology and nuclear cardiology physician).

89.     Dr. Brown's involvement was appropriate in light of Dr. Credido's report that Plaintiff suffered from "adjustment disorder w/ mixed emotional features," as well as stress, anxiety and depression [AR 294-295] and Dr. Kaushal's report that Plaintiff "has chronic chest pain syndrome which I feel is in part psychosomatic." [AR 223]

90.     As reflected in Section 2 of his report (the section that was "completed by OSP"), Dr. Brown reviewed the prior reports from Dr. Keats, Dr. Light and Dr. Guay. [AR 1438] Dr. Brown did not rely on a summary of those reports by Katherine Durrell, as Plaintiff has suggested.

91.     Based on his review of the file, Dr. Brown found no restrictions or limitations from a behavioral health perspective and opined that Plaintiff's cognitive disorder diagnosis had not been established according to accepted standards, and explained as follows: "Repeat neuropsychological testing [] has found evidence of, at most, a mild decline in cognitive function with findings that are not consistent with those typically seen in cognitive disorder."  [AR 1439] Dr. Brown also added that

DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  Plaintiff's "refusal to provide relevant treatment records seriously compromised any

2  evaluation of [Dr. Credido's] assertions.] [*Id.*]

3      92.    Dr. Norris noted the discrepancies between Dr. Kaushal's letters

4  prepared after Plaintiff's claim was denied versus the documented evidence of

5  Plaintiff's ability to tolerate work activities and work-stress as well as regular (and

6  strenuous) exercise, and the cardiac functional testing that showed no evidence of

7  ischemia, with excellent exercise tolerance. [AR 1444-1446] Dr. Norris noted there

8  was no explanation for "how [Plaintiff] would be able to tolerate the physical stress

9  of a rigorous exercise program yet be unable to tolerate the occupational stress

10 associated with his work." [AR 1446] Dr. Norris recommended sending the file to a

11 cardiologist to further evaluate the new information. [*Id.*]

12     93.    Cardiologist Dr. McDermott wrote a detailed report regarding the

13 medical information which he summarized, in part, as follows:

14         "Postoperative exercise stress testing 8/29/19 documents excellent function . .

15         . Normal left ventricular systolic function EF 57% and normal perfusion scan

16         no evidence ischemia. Stress echo 10/26/2020 documents excellent functional

17         capacity 12.8 METS. Cardiac catheterization 11/24/2020 documents all

18         surgical bypasses to be widely patent. . . . Cardiac examinations and vital signs

19         have been unremarkable during multiple encounters . . . The insured has not

20         required hospitalization since CABG for unstable angina or required any type

21         of coronary intervention. Additional cardiac testing sometimes performed for

22         evaluation in these types of conditions such as cardiac MRI, cardiac PET

23         imaging, or invasive assessment with determination of FFR, CFR parameters

24         has not been performed." [AR 1456-1457]

25     94.    Dr. McDermott also noted a disconnect between Dr. Kaushal's statement

26 that "[Plaintiff's] ability to maintain an exercise program is profoundly limited" with

27 the multiple entries in the medical records showing that Plaintiff consistently engaged

28 in regular exercise and reported that his symptoms improved with exercise. [AR 1457]

95.     Dr. McDermott also challenged Dr. Kaushal's report that Plaintiff experienced disabling chest pain and fatigue after the stress echocardiograms: "this is not mentioned in the [echocardiogram] report. Symptoms of this nature would typically occur within minutes (or seconds) after completion of exercise in most individuals. Reported/observed activities were c/w [consistent with] excellent physical activity tolerance and the capacity to perform substantial cognitive activity." [AR 1457]

96.     Dr. McDermott concluded his analysis as follows:

"The available evidence including multiple stress tests in conjunction with available coronary angiograms documents persistent patency of bypass grafts and excellent functional capacity.  The insured's self-statements along with those of his AP cardiologist affirm a lifestyle that remains active and robust with vigorous physical activities performed on a regular and repetitive basis.

There is conflicting evidence as to whether this individual has myocardial ischemia.  His nuclear perfusion study suggests the absence of ischemia. Prior stress test reflects the absence of cardiac symptoms during stress as well as lack of electrocardiographic changes. Stress echocardiography imaging suggests ischemia may be present but certainly there may be challenges in interpretation in the presence of preexisting wall motion abnormalities.  **Regardless of whether this individual has any myocardial ischemia present, the available medical records clearly establish that the insured retains the functional capacity to perform (and exceed) the occupational demands of his profession** . . . The etiology of his reported chest pains remains elusive and has not been definitively established (based on current diagnostic means) to be based on microvascular angina; moreover, the available medical records do not establish a clear relation

34

between physical or work stress and his related symptoms.  Based on a reasonable degree of medical certainty the medical records provided do not support R&Ls as previously outlined by AP cardiology, and that the insured should have been able to participate in full time occupational work activities from 2/14/2020 and thereafter." [AR 1457, emphasis added]

97.    Also, after Unum's vocational consultant confirmed that Plaintiff's occupation fell within the "light work" category and identified the physical and cognitive demands of the occupation [AR 1462-1464], psychiatrist Dr. Brown confirmed that the medical information did not establish R&Ls that would preclude Plaintiff from performing the cognitive demands of his job. [AR 1465-1466]

98.    In January 2022, Plaintiff's counsel submitted additional materials, including letters from Drs. Light and Kaushal, but those materials consisted of only historical medical information that Unum had already evaluated, information about Plaintiff's status after his coverage under the Policy ended (in February 2020) that was thus irrelevant, and opinions from Drs. Light and Kaushal that were either duplicative to their prior opinions or new opinions without any new clinical evidence or support.

99.    Notably, Dr. Light conceded that his evaluation of Plaintiff did not include important test measures (as noted by Dr. Guay), but Dr. Light tried to justify his selective test battery by claiming that his was merely "a supplement to a prior neuropsychological assessment performed by Dr. Keats, and as such a full assessment was not indicated." [AR 1564]

100.    In a letter dated December 28, 2021, Dr. Kaushal said that Plaintiff's exercise tolerance had "significantly diminished" during the nine months from approximately March – December 2021. [AR 1567] Even if true, Plaintiff's purported diminished exercise tolerance in or after March 2021 was not pertinent to Plaintiff's attempt to show that he was disabled *in February 2020* when Unum closed his claim.

1    That conclusory statement by Dr. Kaushal did not refute in any way the evidence of

2    Plaintiff's excellent exercise tolerance in 2019 and 2020.

3        101.   Plaintiff also submitted a report from Charles Galarraga, a vocational

4    consultant retained by Plaintiff's attorneys.  Mr. Galarraga conducted a "labor market

5    survey" and concluded that Plaintiff was unable to perform the duties of "his Usual

6    Occupation and Any Occupation." [AR 842]   But Mr. Galarraga's labor market

7    survey was obviously designed to elicit "would not hire" responses from potential

8    employers.  To wit, Mr. Galarraga asked potential employers whether one could

9    "avoid stress while performing the duties of this occupation." [AR 829] He asked

10   other questions similarly designed to support his "Plaintiff is disabled" opinion, such

11   as whether an individual could perform the job despite "issues with aspects of working

12   memory including issues with even basic mental calculations / arithmetic," "inability

13   to multitask," "emotional lability (exaggerated moods) and rapid frustrations," and

14   "difficulty composing emails and letters."  [AR 829]  Neither the results from this

15   labor market survey nor Mr. Galarraga's opinions were reliable.

16       102.   Moreover, there is zero evidence in the record that the alleged work-

17   related difficulties that Mr. Galarraga built into his survey questions were ever

18   reported by Plaintiff to his employer or any of his physicians, or that any such

19   difficulties were observed by his employer or any of his physicians on even a single

20   occasion during the 20 months while Plaintiff was working from January 2017 to

21   September 2018. And Mr. Galarraga's assumption that Plaintiff must avoid and

22   cannot handle even the slightest degree of "stress" is inconsistent with (i) the fact that

23   Plaintiff worked for 20 months without once complaining to Dr. Kaushal about work

24   stress or its impact on his ability to function, without once requiring hospitalization

25   or emergency treatment for any symptom, and without experiencing any heart failure

26   events, and (ii) the findings of Dr. Keats, who found that Plaintiff was able to

27   "manag[e] his stress and symptoms well" despite dealing with substantial emotional

28

stressors (including a divorce and resulting family discord, health concerns and uncertainty about his career). [AR 610]

103.   For these reasons, Mr. Galarraga's self-serving report does not establish that Plaintiff is disabled under the Policy, and Unum did not fail to adequately address the demands of Plaintiff's occupation.

104.   Plaintiff also sent Unum an email exchange dated September 15, 2018 with a subject line titled "David out sick." [AR 1569] As shown in those emails, after Plaintiff said that he had "contacted the airlines and canceled" and "will be out through Tues.," a person at Prudential named Stefan Schurter responded as follows: "for your return, we will need a doctor's note that clears you back to work without restrictions.  We need to make sure you are 100% ready and healthy for work." [AR 1569] This email does not establish that anyone at Prudential observed Plaintiff experiencing any physical or cognitive problems at work, or was aware of any of the alleged symptoms that Plaintiff later told Unum and his physicians he experienced while working.  There is no information in the Administrative Record about Mr. Schurter or his relationship to Plaintiff.  The email from Plaintiff that prompted Mr. Shurter's reply does not reference any physical or cognitive complaints, and thus provides no context as to what information was provided to Mr. Schurter about Plaintiff's health status. In fact, before submitting tis email exchange to Unum Plaintiff or someone else redacted the contents of the "original message" from Mr. Schurter that apparently prompted Plaintiff's response. [*See* bottom entry on AR 1569] It might be that Plaintiff had the flu and MR. Shurter was worried that he might infect other employees.  The bottom line is that there is no context provided for Mr. Schurter's comments, and this email exchange does not validate Plaintiff's claims that he experienced debilitating physical and cognitive problems while working in 2017 and 2018, and it does not establish that Plaintiff is disabled from performing the duties of his usual occupation.

105.   Because the information submitted with Plaintiff's appeal did not establish entitlement to further LTD benefits, Unum affirmed its prior claim determination and thoroughly explained the reasons for doing so in a letter to Plaintiff's attorneys dated January 21, 2022.  [AR 7261-7276] Unum summarized the outcome on appeal as follows:

> "The records do not support he is disabled from performing his usual occupation as of February 14, 2020, when his Long Term Disability benefits ended.  His Long Term Disability coverage also ended at that time, as he was not in active employment with the policyholder to be in an eligible group for coverage.   Any subsequent worsening of his condition or new periods of disability are not covered." [AR 7266]

## CONCLUSIONS OF LAW

(1)   Any conclusion under this category that is a finding of fact is also hereby adopted as a finding of fact.

(2)   The Policy at issue in this case is governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, et seq., which provides the exclusive remedy for Plaintiff's claims.   *See* 29 U.S.C. § 1132(a)(1)(B).

(3)   The parties agree that the *de novo* standard of judicial review applies to this case.

(4)   Under the *de novo* standard of judicial review, the Court evaluates whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest.  *Abatie v. Alta Health & Life Ins. Co*., 458 F.3d 955, 963 (9th Cir. 2006).

(5)   When reviewing an ERISA benefits decision *de novo*, the Court "determines in the first instance if the claimant has adequately established that he or

1  she is disabled under the terms of the plan." *Muniz v. Amec Constr. Mgmt.*, 623 F.3d

2  1290, 1294 (9th Cir. 2010).

3        (6)    It is Plaintiff's burden to prove he is disabled by a preponderance of the

4  evidence during the relevant timeframe (which in this case is February 2020, when

5  Unum closed his claim). *Muniz, supra,* 623 F.3d at 1294 ("the burden of proof is

6  placed on the claimant"); *see also*, *Eisner v. The Prudential Ins. Co. of Am.*, 10

7  F.Supp.3d 1104, 1113–14 (N.D. Cal. 2014).

8        (7)    The existence of a medical condition alone does not establish the

9  existence of a disability under the terms of the subject insurance policy. *See Leipzig*

10  *v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004) ("Many persons with serious

11  heart conditions work at stressful jobs for years without ill effects. Think of President

12  Eisenhower, Vice President Cheney, and Associate Justice Stevens."). Rather, "[i]t

13  is an individual's ability to function, not simply their diagnosis, that entitles him or

14  her to disability benefits." *Biggar v. Prudential Ins. Co. of Am.*, 274 F. Supp. 3d 954,

15  966 n.9 (N.D. Cal. 2017) (citation omitted); *see also*, *Matthews v. Shalala*, 10 F.3d

16  678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof

17  of a disability. A claimant bears the burden of proving that an impairment is

18  disabling"); *see also Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370

19  F.3d 869, 880 (9th Cir. 2004)*; Seleine v. Fluor Corp. Long-Term Disability Plan*, 598

20  F.Supp.2d. 1090, 1100 (C.D. Cal. 2009) (same).

21        (8)    Unum is not required to accept Plaintiff's statements that he is disabled

22  when such statements are not corroborated by the medical evidence, because a

23  claimant's subjective reports will not establish disability where other evidence in the

24  record does not support the existence of a medical condition that renders the claimant

25  unable to work.

26        (9)    Plaintiff's assertion that his self-reported symptoms rise to the level of

27  disability should not be taken at face value.  Rather, the Court should also properly

28  look to the objective medical evidence in the record to determine whether there is

DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

evidence of actual disability.  *See Fair v. Bowen,* 885 F.2d 597, 602 (9th Cir.1989) ("the prospect of receiving disability benefits based on an ailment whose extent is objectively unverifiable provides a strong incentive to falsify or exaggerate"); *Foladpour v. Hartford Life & Acc. Ins. Co*., 2015 WL 3658774, at \*12 (C.D. Cal. June 12, 2015) ("It is not unreasonable for a plan administrator to require some objective evidence as proof of total disability"); *Langlois v. Metropolitan Life Ins. Co*., 2012 WL 1910020, \*14 (N.D. Cal. 2012) ("subjective evidence of a disabling condition is inherently less reliable than objective evidence"); *Savafi v. SBC Disability Income Plan*, 493 F. Supp. 2d 1107, 1118 (C.D. Cal. 2007); *Kushner v. Lehigh Cement Co*., 572 F. Supp. 2d 1183 (C.D Cal. 2008); *Munn v. Hertz Long-Term Disability Plan*, 2010 U.S. Dist. LEXIS 99752 (N.D. Cal. Sept. 7, 2010); *Bratton v. Metropolitan Life Ins. Co*., 439 F. Supp. 2d 1039, 1052 (C.D. Cal. 2006) ("A finding of disability based on mere subjective complaints would open the Plan up to malingering and would greatly hamper [the insurance company] from exercising its fiduciary role of scrutinizing requests for benefits").

(10)   The Court is not required to accept the opinion of any treating physician as determinative.  In fact, courts have recognized that treating physicians are often required to accept the self-reported complaints of their patients and that, as a result, their opinions may be less reliable.  *See Black & Decker v. Nord*, 538 U.S. 822, 832 (2003) ("a treating physician, in a close case, may favor a finding of 'disabled'"); *Shaw v. Life Ins. Co. of N. Am.*, 114 F. Supp. 3d 1114, 1130 (C.D. Cal. 2015) ("a paper review by a physician retained by the plan administrator may be more reliable than the opinion of a treating physician."); *Seleine, supra*, 598 F. Supp. 2d at 1102 ("[t]reating physicians are more or less required to accept their patients' representations"); *Leipzig v. AIG Life Ins. Co*., 362 F.3d 406, 409 (7th Cir. 2004) ("Physicians accept at face value what patients tell them about their symptoms; but insurers ... must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk.)"

(11)   Additionally, ERISA does not require plan administrators to accord special deference to opinions of treating physicians such as Dr. Kaushal.  *See Nord, supra*, 538 U.S. at 828-829 (The "treating physician rule" does not apply to administrators in ERISA cases); *see also, Rorabaugh v. Continental Cas. Co.*, 321 Fed.Appx. 708, 709 (9th Cir. 2009) (plan administrators not obliged to accord special deference to the opinions of treating physicians even when court reviews benefit determination de novo); *Savafi*, *supra*, 493 F. Supp 2d at 1120-1121 (same).

(12)   "A physician's opinion is more credible when supported by medical and vocational evidence of contemporaneous functional limitations." *Biggar*, *supra*, 274 F. Supp. 3d at 968. In *Biggar*, the court concluded that the plaintiff, who claimed disabling tremors, loss of balance, and sleepiness from Parkinson's Disease, had "failed to demonstrate that he suffered from physical impairments so substantial that they prevented him from" working where his treating physician's "conclusions about the severity of [his] symptoms are not supported by her own contemporaneous general examinations of [his] physical condition"). *Id*. at 966–69; *see also, Muniz*, supra, 623 F.3d at 1297 (upholding district court's finding that treating physician's records were "inconsistent, incomplete, and did not ultimately support [plaintiff's] claim that he met the definition of total disability under the [ ] plan.").

(13)   As shown in the Findings of Fact, there were significant inconsistencies between Dr. Kaushal's reports of Plaintiff's alleged inability to handle exercise, work activities and work stress, and his own treatment records.  These inconsistencies render Dr. Kaushal's disability opinion unreliable.

(14)   Likewise, there were significant inconsistencies between Dr. Credido's reports of Plaintiff's purported problems while working and the contemporaneous medical evidence that also render Dr. Credido's disability opinions unreliable. A primary consideration in determining the weight given to a treatment provider's opinion is "how much detail the doctor provides supporting his or her conclusions." *Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1129-30 (C.D.

41

Cal. 2015) (citations omitted); *see also, Alto v. Hartford Life Ins. Co*., 485 Fed.Appx. 482, 484 (2nd Cir. 2012) (court upheld denial where treating physician's disability determination lacked sufficient detail).  Here, the lack of detail provided by Dr. Credido, along with the other issues described above, render Dr. Credido's disability opinion unreliable and certainly inadequate to establish that Plaintiff is disabled under the Policy.

(15)  Also, Dr. Goyal based his opinions on assumptions about the medical information that were refuted by Dr. Kaushal's findings and opinions and inconsistent with the evidence in the Administrative Record, rendering Dr. Goyal's opinions unreliable as well.

(16)  Moreover, because the reports from Unum's medical consultants are comprehensive and well supported, they should be given significant weight.  *See Ibrahim v. Bayer Corp. Disability Plan*, 584 Fed. Appx. 743, 745 (9th Cir. 2014) ("The administrator was entitled to credit Dr. Hennessey's opinion rather than the conclusory and belated opinion of Dr. Yip, Ibrahim's treating physician."); *Sanchez-Levine, supra*, 2017 U.S. Dist. LEXIS 159162, *26 ("MetLife properly relied on Dr. Sugarman's and Dr. Gordan's reviews to support the conclusion that Sanchez-Levine was not disabled within the meaning of the Plan because those reports are thorough and well supported."); *Shaw, supra,* 144 F. Supp. 3d at 1130 ("a paper review by a physician retained by the plan administrator may be more reliable than the opinion of a treating physician."); *Broyles v. A.U.L. Corp. Long Term Disability Ins. Plan*, 2009 U.S. Dist. LEXIS 110744, *18 (N.D. Cal. Nov. 12, 2009) ("consulting physicians' opinions based on reviews of medical records are an acceptable basis of an administrator's determination.").

(17)  Unum's claim determination is not rendered incorrect simply because it chose to make a determination without obtaining its own examination of Plaintiff. "There is no requirement in ERISA that the claims administrator order an in-person independent medical examination of a claimant," and "reviews of medical records are

DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

an acceptable basis of an administrator's determination." *Constantino v. Aetna Life Ins. Co.*, 2014 WL 5023222, at *7 (C.D. Cal. 2014)(citation omitted); *see also Nord*, *supra*, 538 U.S. at 834 ("courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician"); *Inciong v. Fort Dearborn Life Ins. Co.*, 570 F. App'x 724, 726 (9th Cir. 2014) (ERISA does not require an independent medical examination); *Kushner v. Lehigh Cement Co.*, 572 F.Supp.2d 1182, 1192 (C.D.Cal.2008) (same).

(18)   Based on the totality of the evidence in the Administrative Record, Plaintiff failed to prove by a preponderance of the evidence that he was disabled as of February 2020 and thus failed to prove he is entitled to further benefits under the subject Policy.   Accordingly, Unum's claim decision is affirmed, and no further disability benefits are owed to Plaintiff.

Judgment shall be entered in Defendant's favor consistent herewith.


DATED:  August 7, 2023                    MAYNARD NEXSEN LLP


By:   */s/ Robert Hess*
ROBERT E. HESS
Attorneys for Defendant
Unum Life Insurance Company of
America

DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

# CERTIFICATE OF SERVICE

### *David Radmilovich v. Unum Life Insurance Co. of America*

### Case No. 8:22-cv-00181-DOC-KES

**COUNTY OF ORANGE, STATE OF CALIFORNIA**

I am a citizen of the United States and employed in San Francisco, California, at the office of a member of the bar of this Court at whose direction this service was made. I am over the age of 18 and not a party to the within actions. My business address is 10100 Santa Monica Blvd., Suite 550, Los Angeles, CA 90067.

On **August 7, 2023**, I served the document(s) entitled, **DEFENDANT'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**, on the interested parties in this action as stated below:

> Glenn R. Kantor
> KANTOR & KANTOR, LLP
> 19839 Nordhoff Street
> Northridge, California 91324
> Telephone:  818-886-2525
> Facsimile:  818-350-6272
> Email: gkantor@kantorlaw.net
>
> *Attorneys for Plaintiff, David Radmilovich*

☒ **(BY CM/ECF SERVICE)**: I caused such document(s) to be delivered electronically via CM/ECF as noted herein.

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed on **August 7, 2023** at Los Angeles, California.


*/s/ Bernadette Morgan*
Bernadette Morgan

DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW